UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| [UNDER SEAL], | Case No. **ORIGINAL** |
| Plaintiff, | **COMPLAINT** |
| v. | |
| [UNDER SEAL], | **(FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3729 et seq)** |
| Defendants. | |

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel LISA PENCE, LISA ADKINS, ROBIN DILLON TEAGUE, and AMY CARNELL,<br><br>        Plaintiffs,<br><br>    v.<br><br>CURO HEALTH SERVICES HOLDINGS, INC., CURO HEALTH SERVICES LLC, TNMO HEALTHCARE, LLC d/b/a AVALON HOSPICE, AVALON HOSPICE, LLC; and REGENCY HEALTH CARE CENTERS, INC.,<br><br>        Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT**<br>**[31 U.S.C. §§ 3729 et seq.]**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Robin Teague, Lisa Pence, Lisa Adkins, and Amy Carnell (collectively, "Relators") hereby file this Complaint against Curo Health Services Holdings, Inc., Curo Health Services, LLC, TNMO Healthcare, Inc. d/b/a Avalon Hospice ("Avalon"), Avalon Hospice, LLC, and Regency Healthcare Centers, Inc. (collectively, "Defendants").

## INTRODUCTION

1.      This action is based on Defendants' scheme to defraud the United States of millions of dollars annually through fraudulent billing practices and representations.

2.      The Medicare laws and regulations governing hospice provide that to qualify for hospice, a patient must have a terminal illness and have less than six months to live. Hospices provide patient care and assume all financial responsibility for medical treatment related to the terminal illness; in exchange, hospices are paid a per diem amount for qualified enrolled patients.

3.      If a hospice patient must be admitted to a hospital for problems related to the terminal illness (referred to as the "qualifying condition"), it is the financial obligation of the hospice to pay the hospital for such services.

4.      The fraudulent practices by Defendants here are two-fold. First, Defendants purposefully evade their obligation to pay for hospital treatment provided to hospice patients by either improperly "revocating" or disenrolling a patient from hospice when the patient is admitted to a hospital for treatment, or fraudulently inducing the patient to revocate himself or herself before entering the hospital. Revocating patients reverts the financial responsibility for hospital costs back to Medicare. In other words, Defendants falsely represent to the government that the patient was not receiving Medicare-funded hospice care

at the time of the hospitalization, thereby relieving the hospice company of the obligation to pay for the medical care. In most or all cases, the financial responsibility for the hospitalization of improperly "revocated" hospice patients would fall back to Medicare.

5.     Second, Defendants improperly enroll or "qualify" patients for hospice who are not actually eligible to receive hospice care, such as patients who do not meet the Medicare guidelines for receiving hospice care because they are not in the end stages of a sufficiently grave illness. Improperly qualifying patients for hospice care results in Medicare paying false bills for hospice services.

## JURISDICTION AND VENUE

6.     This is a civil action arising under the laws of the United States to redress violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq*. Relators are authorized to bring this private action on behalf of themselves and the United States under 31 U.S.C § 1330(b)(1) and (h).

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. § 3732(a), the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

8.     Venue is proper in this District because: (a) Defendants, or at least one of them, can be found, reside, or transact or have transacted business in the Middle District of Tennessee; and (b) many of the acts proscribed by 31 U.S.C. §3729 occurred in the Middle District of Tennessee. Defendants operate at least three hospice offices in the Middle District of Tennessee (Nashville, Cookeville, and Dickson) wherein the prohibited conduct occurred.

## THE PARTIES

9.    Relator Robin Teague served as a Team Assistant and Office Manager in the Jackson, Tennessee office of Avalon Hospice from October 2010 until January 16, 2012.

10.    Relator Lisa Pence served as a Team Assistant/Licensed Practical Nurse and Supervisor of Clinical Staff in the Jackson, Tennessee office of Avalon Hospice from June 27, 2011 until March 12, 2012.

11.    Relator Lisa Adkins served as a Hospice Care Consultant, colloquially referred to as a "patient recruiter," in the Jackson, Tennessee office of Avalon Hospice from March 2011 until July 11, 2012. In that position, Ms. Adkins was responsible for recruiting patients to receive hospice care.

12.    Relator Amy Carnell served as a Registered Nurse in the Jackson, Tennessee office of Avalon Hospice from May 2011 through February 2012.

13.    Defendant Curo Health Services Holdings, Inc. is a Delaware Corporation, headquartered at 491 Williamson Rd Suite 204, Mooresville, NC 28117-9255.

14.    Defendant Curo Health Services, LLC ("Curo"), is a Delaware Corporation, headquartered at 491 Williamson Road, Mooresville, North Carolina, 28117. Curo is a portfolio company of a Chicago private equity group, GTCR. Curo operates six hospice groups in various states, including hospices located in the Middle District of Tennessee.

15.    Defendant TNMO Healthcare, LLC ("TNMO") is a Delaware Corporation, headquartered at 491 Williamson Road, Suite 204, Mooresville, North Carolina, 28117-9255, doing business as Avalon Hospice. TNMO Healthcare is, upon information and belief, wholly-owned by Curo.

16.     Defendant Avalon Hospice, LLC ("Avalon") is a Delaware Corporation, headquartered at 491 Williamson Road, Suite 204, Mooresville, North Carolina, 28117-9255, with its principal place of business in Tennessee. Avalon Hospice, LLC was acquired by TNMO Health Services, LLC in 2011.

17.     Relators allege that the above Defendants are alter egos of one another and are under common control. Curo Health Services Holdings, LLC, TNMO, and Avalon are headquartered at the same address in North Carolina. Internal reports used by Defendants for its hospices, such as the Jackson office of Avalon, use "Curo," "Regency Health Care," and "Avalon" interchangeably. Curo's website calls "Avalon" one of its hospice brands. Defendants' termination documents sent to Relator Lisa Adkins were on "Avalon" letterhead, had a return address for "Curo," and stated that her employment with "TNMO" was being terminated. Executive Director Lora Harnack's published resume reads that she is employed by "Curo."

18.     Defendant Regency Health Care Centers, Inc. ("Regency") is a Tennessee Corporation, headquartered at 530 Gay Street, Knoxville, Tennessee, 37902. On information and belief, prior to a merger in approximately 2011 that resulted in Avalon's current ownership structure, Avalon was owned by Regency.

## FACTUAL ALLEGATIONS

### A.     Hospice Care

19.     Hospice care is defined as palliative care for patients with less than six months to live. Hospice care is a relatively new element of health care in the United States. Medicare first paid for hospice care in 1983. Medicare Payment Advisory Commission,

*Report to Congress: Medicare Payment Policy* March 2013, ch. 12 p. 263 (hereinafter "MEDPAC 2013") (excerpts attached hereto as Ex. A). Hospice care has become a very fast-growing segment of the health care market.

20.     In 2011, an estimated 1.2 million patients received services from hospice. *Id.* In 2011, Medicare paid approximately $13.8 billion for hospice care, more than four-times what Medicare paid in 2000. *Id.* In 2011, 45.2 percent of Medicare beneficiaries who died that year used hospice, up from 23 percent in 2000. *Id.* at 269.

21.     Hospice is the only Medicare benefit that includes pharmaceuticals, medical equipment, 24 hour/seven day a week access to palliative care, and support for loved ones following a death.

22.     Patients must "elect" to receive the Medicare hospice benefit. Centers for Medicare and Medicaid Services, *Medicare Benefit Policy Manual*, CMS Pub. 100-02, (hereinafter "MPBM") Chap. 9, Sec. 10 (Rev. 141, Mar. 2, 2011); available at http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/bp102c09.pdf accessed July 5, 2013 (excerpts attached hereto as Ex. B). By doing so, they agree to forgo Medicare coverage for intensive conventional treatment for the terminal illness. *Id.* Medicare continues to cover items and services unrelated to the terminal illness. *Id.*

23.     Beneficiaries elect hospice for defined benefit periods. *Id.* Under current Medicare rules, the first hospice benefit period is 90 days. *Id.* If the patient's life expectancy remains six months or less, the patient can be recertified for another 90 days. After the second 90-day period, the patient can be recertified for an unlimited number of 60-day

periods, as long as he or she remains eligible to receive government-funded hospice care under applicable guidelines. *Id.*

24. For recertification, only the hospice physician (medical director) has to certify that the patient's life expectancy is six months or less.

25. Medicare pays a daily rate to hospice providers for each day a beneficiary is enrolled in hospice, about $153 per day in 2013. MEDPAC, ch. 12 p. 263.

26. The hospice assumes all financial risk for costs and services associated with care related to the patient's terminal illness, including the cost of hospitalizations. *Id.*

27. The hospice provider receives payment for every day a patient is enrolled, regardless of whether the hospice staff visited the patient each day. *Id.* This payment design is intended to encompass not only the cost of visits but also other costs a hospice incurs related to on-call services, care planning, drugs, medical equipment, and supplies related to the patient's terminal condition, patient transportation between sites of care, and other less frequently used services. *Id.*

28. A patient may voluntarily disenroll from hospice care at any time. MPBM Sec. 20.2 (Rev. 141 Mar. 2, 2011). When the patient disenrolls or, in the colloquial, is "revocated," Medicare again pays for their medical care according to its customary rules. *Id.*

29. Another significant trend is the growth of for-profit hospices. In 2000, for-profit hospices made up about 30% of all hospice providers; by 2011, for-profit hospice providers made up almost 57% of hospice providers. MEDPAC at 270.

30. The financial incentives for hospice providers are straightforward: get as many patients on the hospice rolls as possible and avoid paying for expensive medical care,

1082298.6

such as hospitalizations. Thus, for-profit hospices seek to enroll as people who are less sick, because less sick patients will tend to live longer and thereby allow the hospice to earn more Medicare per-diem payments, while also tending to require less medical care or hospitalization.

### B.     Revocating Hospitalized Patients

31.     As noted, when a hospice provides care for a patient, the hospice assumes all financial responsibility for medical care related to the illness for which hospice care is sought. MPBM Sec. 10 (Rev. 141, Mar. 2, 2011). If the patient requires hospitalization while on hospice related to the hospice illness, the hospice provider is financially responsible for the hospital expenses. *Id.*

32.     Medicare regulations specifically prohibit a hospice from dumping a patient simply because the patient's care has become expensive for the hospice. *Id.* Sec. 20.2.1 (Rev. 141, Mar. 2, 2011).

33.     On information and belief, Avalon would almost always (i.e., up to 90 percent of the time) disenroll or "revocate" a patient from hospice care when a patient required hospitalization. Typically, a nurse from hospice was instructed to tell the patient or the patient's family that the rules required the person to voluntarily disenroll from hospice care prior to hospitalization and that the patient would not receive medical care unless the patient or the family signed the form. The form was typically dated before the hospitalization, even if that required back-dating the signature. If the patient did not voluntarily revoke herself or himself, Avalon would nevertheless execute the revocation forms either by forging the necessary signatures or by stating that the consent to revoke was given verbally. Once the

patient was released from the hospital, if the patient had hospice eligibility time remaining, Avalon would re-enroll the patient in hospice. In the Jackson office, these instructions came from Barbara Gordon, the Director of Operations. Curo's Executive Director, Lora Harnack, who had operational oversight responsibility over the Nashville, Jackson, Cookeville, Tullahoma, and Knoxville Curo/Avalon offices, had knowledge of the wrongful conduct and played a role in directing the conduct. Relators and other employees reported this activity to corporate executives, including, but not limited to, Curo Regional Director Travis Glade and Curo Vice-President James Cocke, yet the only action that was taken was that Relators were terminated.

34. Relators estimate that the vast majority (between 75%-80%) of all revocated Avalon patients are re-enrolled in hospice after discharge from the hospital; for those who do not re-enroll, most either died in the hospital or had used up their hospice eligibility.

35. In this way, the hospice fraudulently avoided paying for the patient's medical care as required by Medicare rules. Defendants improperly shifted the patient's hospitalization expenses back to Medicare. In so doing, Defendants made false claims for payment per the False Claims Act.

36. Examples of patients who where wrongfully revocated include, but are not limited to, the following:

a. Patient A: MR#88709 - - attending physician was Dr. William Jennings. Admitted to hospice November 22, 2011 for cerebral vascular disease. Patient was wrongfully revocated.

b.      Patient B: MR#89377 - - attending physician was Dr. William

Jennings.  Admitted to hospice December 14, 2011 for prostate cancer.  Patient was

wrongfully revocated.

c.      Patient C:  MR#88705 - - attending physician was Dr. William

Jennings.  Admitted to hospice November 22, 2011 for COPD.  Patient was wrongly

revocated.

d.      Patient D: MR#81824 - - attending physician was Dr. Thomas

McDonald.  Admitted to hospice March 31, 2011 for Alzheimers Disease.  Patient

was wrongfully revocated.

e.      Patient E: MR#89160 - - attending physician not listed.  Admitted to

hospice December 7, 2011 for Dementia.  Patient was wrongfully revocated.

**C.      Qualifying Unqualified Patients for Hospice Care**

37.     Defendants employ hospice care consultants—or recruiters—whose sole job is

to identify potential hospice patients and induce the patients to seek hospice care from

Avalon.  The recruiters are paid about $100 per patient admitted to hospice.

38.     Defendants' recruiters visit nursing homes, hospitals, doctor's offices, and

assisted living facilities in an effort to identify potential patients.  Once the patient is

identified by the recruiter, the recruiter works with the patient and/or the patient's family to

get the treating physician to sign a form that states that the person *may* be eligible for hospice

care.

39.     From the perspective of the treating physician, if a patient or their family

requests hospice care, the physician has no incentive to refuse to sign the form that says the

patient "may" be eligible and has every incentive to accommodate the patient in seeking the kind of care hospice theoretically provides.

40.     Once the patient is "referred" for an evaluation for hospice care, the hospice sends a nurse to evaluate the patient.    Defendants' nurses were handed a "cheat sheet" that listed the symptoms that would qualify a patient for hospice care.   The nurse would have no reason to have such a cheat sheet if the nurse were objectively assessing a patient.

41.     After Defendants' nurses completed an evaluation, the evaluation would be sent to the hospice medical director to determine whether the patient qualified for hospice– that is, whether the patient had a terminal disease and had less than six months to live.

42.     Defendants' management would review the evaluation completed by the nurse and, if it didn't include sufficient symptoms to establish that the patient qualified for hospice, management would alter it to include additional symptoms.

43.     After the records were altered, they were sometimes sent to the medical director to sign and approve.  Blank forms pre-signed by the medical directors would often be used (the medical directors would "robo-sign" batches of these), or the medical director's signature would even be forged.

44.     One indicator that Defendants have qualified many unqualified patients is the average length of stay of the patients.  The national average length of stay in 2010 was 86 days; the median length of stay during 2011 was approximately 17 days.  MEDPAC ch. 12, p. 271.  On information and belief, the average length of stay at Avalon was significantly longer.

45.     Further, a significant number of the patients were ultimately discharged from hospice without dying.  Far from being on their deathbeds, Defendants' hospice patients have been seen driving around in Tennessee and attending a concert.

46.     In the Jackson office, these instructions for this fraudulent activity came from Barbara Gordon, the Director of Operations.  Curo's Executive Director, Lora Harnack, who had operational oversight responsibility over the Nashville, Jackson, Cookeville, Tullahoma, and Knoxville Curo/Avalon offices, had knowledge of the wrongful conduct and played a role in directing the conduct.  Relators and other employees reported this activity to corporate executives, including, but not limited to, Curo Regional Director Travis Glade and Curo Vice-President James Cocke, yet the only action that was taken was that Relators were terminated.

47.     Examples of patients who did not qualify for hospice and were wrongfully admitted include, but are not limited to, the following:

        a.      Patient V:  MR#87857 - - attending physician was Dr. William Jennings.  Although admitted to hospice October 27, 2011 for lung cancer, patient did not qualify for hospice.

        b.      Patient W:  MR#89304 - - attending physician was Dr. William Jennings.  Although admitted hospice December 14, 2011 for cerebral vascular disease, patient did not qualify for hospice.

        c.      Patient X:  MR#88653 - - attending physician was Dr. William Jennings. Although admitted to hospice November 18, 2911 for cardiomyopathy, patient did not qualify for hospice.

d.     Patient Y:  MR#88390 - - attending physician was Dr. Conrad Sioson. Although admitted to hospice November 17, 2011 for bladder cancer, patient did not qualify for hospice.

e.     Patient Z:  MR#88144 - - attending physician was Dr. Kevin Stroup. Although admitted to hospice November 7, 2011 for CVA, patient did not qualify for hospice.

**D.     State Claims -- Robin Teague**

48.     Plaintiff Robin Teague is a former employee of Defendants, having been employed from on or about September, 2010 until Defendants terminated Teague's employment on or about January 16, 2012.

47.     Plaintiff was terminated by Defendants for refusing to perform the illegal tasks Defendants required her to do.    Soon after Teague  made numerous complaints to her superiors making clear references to activities occurring in the Jackson office that she was ethically and legally prohibited from doing, Defendants terminated her employment, stating the reason was "lack of work."

48.     In addition to the Medicare fraud alleged above, additional illegal activity in which Teague refused to participate and about which she reported to superiors includes, but is not limited to, the following:

a.   requiring unlicensed medical personnel to perform medical services that only licensed medical personnel are allowed to perform;

b.   falsification of time sheets; and

c.   falsification of doctor's orders.

49.     After Teague began notifying upper management about the illegal activities in the Jackson office, she was terminated from her employment.   Previous to her refusals to participate in the illegal activities and her complaints, she had a stellar employment record.

50.     Based upon the foregoing, Teague has experienced humiliation, degradation, embarrassment, loss of income, mental anguish, and other damages.

**E.     State Claims – Lisa Pence**

51.     Plaintiff Lisa Pence is a former employee of Defendants, having been employed from on or about June 27, 2011 until Defendants terminated Pence's employment on or about March 10, 2012.

52.     Pence was terminated by Defendants for refusing to perform the illegal tasks Defendants required her to do.  Soon after Pence made numerous complaints to her superiors making clear references to activities occurring in the Jackson office that were fraudulent and illegal and in which she was ethically and legally prohibited from participating, Defendants terminated her employment.   In her termination statement, Pence was cited for "disruptive behavior" and "negativity."

53.     In addition to the Medicare fraud alleged above, additional illegal activities in which Pence refused to participate and about which she reported to superiors include, but are not limited to, the following:

a.     Sending unlicensed personnel to perform patient services that only licensed personnel may perform;

b.     Falsification of time sheets; and

c.     Falsely representing that physicians had given oral orders when no such orders were given.

54.     After Pence began notifying upper management about the illegal activities in the Jackson office, she began receiving write-ups which were undeserved. The second write-up resulted in her termination. Previous to her refusals to participate in the illegal activities and her complaints, she had a stellar employment record. Shockingly, it was corporate officials who labeled her as "negative," "insubordinate," and "disruptive" after her reports to them. Corporate officials wrote Pence up for "making false malicious statements" about her supervisor's leadership.

55.     Based upon the foregoing, Pence has experienced humiliation, degradation, embarrassment, loss of income, mental anguish, and other damages.

**F.     State Claims – Lisa Adkins**

56.     Plaintiff Lisa Adkins is a former employee of Defendants, having been employed from on or about March 8, 2011 until Defendants terminated Adkins' employment on or about July 10, 2012.

57.     Adkins was placed on administrative leave after she voiced internal complaints to her superiors, refused to participate in the illegal activity, and then reported to the Tennessee Bureau of Investigation about Defendants' illegal activity. Adkins' complaints to her superiors made clear references to activities that were fraudulent and illegal. One of these was sent via letter to Rob Hewlett, her district manager, who forwarded her letter to corporate officials. For her own peace of mind and to protect herself from

criminal charges, Adkins also informed her superiors of the tasks that she was ethically and legally prohibited from doing.

58.     When two patients died after Defendants' failure to provide them services, Adkins obtained legal counsel and requested an appointment with the TBI so that she could report what Defendants were doing.  And, after informing her supervisor that she had made this report to the TBI, Adkins was placed on administrative leave.

59.     In addition to the Medicare fraud alleged above, a summary of some of the illegal activities in which Adkins refused to participate and about which she reported to superiors and/or the TBI is as follows:

> a.  Defendants accepted and billed for patient services that were not provided. After accepting hospice patients, some of whom were in critical need of immediate services, Defendants would often fail to order the necessary medical supplies in a timely manner, leaving these patients without care.
>
> b.  Defendants would also refuse to service many patients due to the Jackson office being short-staffed.  Defendants nonetheless certified to Medicare/Medicaid that the services would be provided and insurance companies were being billed as though these services occurred.  Adkins' letter to District Manager Rob Hewlett dated March 7, 2012 specifically addressed this and referred him to the previous week when twelve patients failed to receive services and two of those patients died.
>
> c.  Adkins complained about and reported to her superiors that patients were offered free supplies and/or money by the Jackson office if they would remain

as Defendants' patients. Adkins was instructed to offer free supplies at the Jackson office's expense if a patient would remain as its patient. Adkins was handed cash by the local manager to purchase these supplies, but Adkins refused to do so. Adkins knew the seriousness of these violations and wrote to Hewlett about them in her letter dated March 7, 2012.

d. Defendants falsified documents showing patient services that never occurred. So that Medicare/Medicaid/insurance companies could be billed for services, documents were falsified showing patient services that never were provided.

e. Defendants re-created documents with fraudulent signatures. To attempt to cover-up previous illegalities, many documents were "re-created." During the "re-creation" process, doctors' signatures would be fraudulently entered in the file.

f. Adkins complained about the falsification of new diagnoses for patients whose health had improved and would no longer qualify for hospice without a new diagnosis. These patients were told what types of new health complaints to make although no treatment for these new complaints was provided. This system kept recovered patients as patients under hospice care. Adkins discovered that a medication was being provided to the Director's husband that was not medically necessary.

60. After Adkins began complaining to her superiors, she was told that she was not qualified for a promotion, although she had more than adequate credentials. She was also told by her supervisor that "we don't want any whistleblowers." Adkins' district

manager told her that her complaints had been relayed to corporate and Adkins knows of approximately seven additional times that corporate received such reports.

61.     Based upon the foregoing, Adkins has experienced humiliation, degradation, embarrassment, loss of income, mental anguish, and other damages.

**F.     State Claims – Amy Carnell**

62.     Plaintiff Amy Carnell is a former employee of Defendants, having been employed as an RN from on or about May, 2011 until Defendants constructively terminated Carnell's employment on or about February 24, 2012.

63.     Carnell's constructive termination by Defendants was a result of Carnell's refusal to perform the illegal tasks Defendants required her to do.   Carnell made numerous complaints to her superiors making clear references to activities occurring in the Jackson office that were fraudulent and illegal and in which she was ethically and legally prohibited from participating.   Carnell feared criminal charges as well as the loss of her nursing license had she participated in these activities.

64.     In addition to the Medicare fraud alleged above, other illegal activities in which Carnell refused to participate and about which she reported to superiors include, but are not limited to, the following:

      a.   Requiring unlicensed medical personnel to perform medical services that only licensed medical personnel are authorized to perform;

      b.   Falsification of timesheets;

      c.   Falsification of doctor's orders; and

      d.   Falsification of nurses' signatures.

65.     Although Carnell began notifying upper management about the illegal activities in the Jackson office, upper management failed to take action to rectify the illegal activities.  Carnell was forced to resign for fear of losing her nursing license and therefore was constructively terminated.

66.     Based upon the foregoing, Carnell has experienced humiliation, degradation, embarrassment, loss of income, mental anguish, and other damages.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### False Claims Act, 31 U.S.C. § 3729(a)(1)

67.     Relators repeat and reallege each and every allegation contained in all preceding paragraphs as though fully set forth herein.

68.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

69.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for payment or approval within the meaning of 31 U.S.C. § 3729(a)(1)(A).

70.     By virtue of the acts described above, Defendants knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim within the meaning of 31 U.S.C. § 3729(a)(1)(B).

71.     The United States, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid claims that it would not have paid but for Defendants' fraudulent conduct.

72.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial

73.     Additionally, the United States is entitled to the maximum penalty of $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus three times the amount of damages which the Government sustains because of Defendants' conduct described herein.  31 U.S.C. § 3729(a)(1)(G).

## SECOND CAUSE OF ACTION

### Retaliation, 31 U.S.C. § 3730(h)

74.     Relators repeat and reallege each and every allegation contained in all preceding paragraphs as though fully set forth herein.

75.     This is a claim for damages and relief available under a provision of the federal False Claims Act, 31 U.S.C. § 3730(h).

76.     Relators are entitled to relief, as Defendants discharged them and discriminated against them in the terms and conditions of their employment because of their lawful acts in furtherance of an action under 31 U.S.C. § 3730 or their efforts to stop violations of the False Claims Act.

## THIRD CAUSE OF ACTION

### Tennessee State Whistleblower Statute, Tenn. Code Ann. § 50-1-304(a), (d)(1), and Tennessee Common Law

77.     Relators repeat and reallege each and every allegation contained in all preceding paragraphs as though fully set forth herein.

78.     This is a claim for damages and relief available under the Tennessee State Whistleblower Statute, Tenn. Code Ann. § 50-1-304.

79.     By virtue of the acts described above, Defendants discharged or terminated Relators solely for refusing to participate in, or refusing to remain silent about, illegal activities, within the meaning of Tenn. Code Ann. § 50-1-304.

80.     By virtue of the acts described above, Relators refused to participate in or remain silent about activities in violation of the laws of the United States, or the State of Tennessee, or other regulations intended to protect the public health, safety and welfare, within the meaning of Tenn. Code Ann. § 50-1-304(c).

81.     This is also a claim for damages and relief available under Tennessee common law for retaliatory discharge based on whistleblowing and refusal to participate in illegal activities.

82.     Defendants' conduct has violated both Tenn. Code Ann. § 50-1-304(c) and the common law duties imposed on employers precluding discharging employees for refusing to participate in, or refusing to remain silent about, illegal activities.

83.     By reason of Defendants' acts, the Relators have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

## PRAYER

84.     WHEREFORE, Relators pray for judgment against Defendants as follows:

a.      Judgment in an amount equal to three times the amount of each false claim for compensation by Defendants, plus a civil penalty of $10,000 for each violation of 31 U.S.C. § 3729(a)(1);

b.      An award to each Relator of the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

c.   All relief to which Relators are entitled under 31 U.S.C. § 3730(h);

d.   Damages to each Relator pursuant to Tenn. Code Ann. § 50-1-304(d)(1);

e.   Damages to each Relator pursuant to Tennessee common law;

f.   Attorneys' fees, expenses and costs of suit herein incurred, pursuant to 31 U.S.C. § 3730(d) and Tenn. Code Ann. § 50-1-304(d)(2);

g.   An injunction against each of the Defendants for any continuing conduct violating 31 U.S.C. § 3729(a)(1);

h.   An order directing Defendants to cease and desist from violating 31 U.S.C. § 3729(a)(1);

i.   Punitive damages, where applicable; and

j.   Such other and further relief as the Court deems just and proper.

Dated: July 9, 2013                    Respectfully submitted,

                                       LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

                                       By: *Kenneth S. Byrd*
                                           Kenneth S. Byrd

                                           Mark P. Chalos (TN19328)
                                           mchalos@lchb.com
                                           Kenneth S. Byrd (TN23541)
                                           kbyrd@lchb.com
                                       LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                       150 Fourth Avenue, North, Suite 1650
                                       Nashville, TN 37219-2423
                                       Telephone: (615) 313-9000
                                       Facsimile: (615) 313-9965


                                           Robert J. Nelson (CA State Bar No. 132797)
                                           rnelson@lchb.com
                                           Lexi J. Hazam (CA State Bar No. 224457)
                                           lhazam@lchb.com
                                           Lisa J. Cisneros (CA State Bar No. 251473)
                                           lcisneros@lchb.com
                                       LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                       275 Battery Street, 29th Floor
                                       San Francisco, CA 94111-3339
                                       Telephone: 415.956.1000
                                       Facsimile: 415.956.1008
                                       *To be admitted pro hac vice*


                                           Teresa A. Luna (TN State Bar No. 26447)
                                           tluna@spraginslaw.com
                                       SPRAGINS, BARNETT & COBB, PLC
                                       P.O. Box 2004, 312 E. Lafayette Street
                                       Jackson, TN 38302
                                       Telephone: (731) 424-0461
                                       Facsimile: (731) 424-0562


                                       **Attorneys for Relators**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Complaint was served by hand the 9th day of July, 2013, upon the following:

United States Attorney for the Middle District of Tennessee.

By: _Kenneth S. Byrd_ (signature)

Kenneth S. Byrd

Mark P. Chalos (TN State Bar No. 19328)
mchalos@lchb.com
Kenneth S. Byrd (TN State Bar No. 23541)
kbyrd@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
150 Fourth Avenue, North, Suite 1650
Nashville, TN 37219-2423
Telephone: (615) 313-9000
Facsimile: (615) 313-9965

# REPORT TO THE CONGRESS

# Medicare Payment Policy



EXHIBIT

tables'

A

MEDPAC Medicare
Payment Advisory
Commission



# MEDPAC

Medicare
Payment Advisory
Commission

The Medicare Payment Advisory Commission (MedPAC) is an independent congressional agency established by the Balanced Budget Act of 1997 (P.L. 105–33) to advise the U.S. Congress on issues affecting the Medicare program. In addition to advising the Congress on payments to health plans participating in the Medicare Advantage program and providers in Medicare's traditional fee-for-service program, MedPAC is also tasked with analyzing access to care, quality of care, and other issues affecting Medicare.

The Commission's 17 members bring diverse expertise in the financing and delivery of health care services. Commissioners are appointed to three-year terms (subject to renewal) by the Comptroller General and serve part time. Appointments are staggered; the terms of five or six Commissioners expire each year. The Commission is supported by an executive director and a staff of analysts, who typically have backgrounds in economics, health policy, and public health.

MedPAC meets publicly to discuss policy issues and formulate its recommendations to the Congress. In the course of these meetings, Commissioners consider the results of staff research, presentations by policy experts, and comments from interested parties. (Meeting transcripts are available at www.medpac.gov.) Commission members and staff also seek input on Medicare issues through frequent meetings with individuals interested in the program, including staff from congressional committees and the Centers for Medicare & Medicaid Services (CMS), health care researchers, health care providers, and beneficiary advocates.

Two reports—issued in March and June each year—are the primary outlets for Commission recommendations. In addition to annual reports and occasional reports on subjects requested by the Congress, MedPAC advises the Congress through other avenues, including comments on reports and proposed regulations issued by the Secretary of the Department of Health and Human Services, testimony, and briefings for congressional staff.

# REPORT TO THE CONGRESS

# Medicare Payment Policy



MEDPAC    Medicare
          Payment Advisory
          Commission

425 Eye Street, NW • Suite 701 • Washington, DC 20001
(202) 220-3700 • Fax: (202) 220-3759 • www.medpac.gov

## Background

Medicare began offering a hospice benefit in 1983, pursuant to the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA). The benefit covers palliative and support services for terminally ill beneficiaries who have a life expectancy of six months or less if the terminal illness follows its normal course. A broad set of services is included, such as nursing care; physician services; counseling and social worker services; hospice aide (also referred to as home health aide) and homemaker services; short-term hospice inpatient care (including respite care); drugs and biologicals for symptom control; supplies; home medical equipment; physical, occupational, and speech therapy; bereavement services for the patient's family; and other services for palliation of the terminal condition. In 2011, more than 1.2 million Medicare beneficiaries received hospice services, and Medicare expenditures totaled about $13.8 billion.

Beneficiaries must "elect" the Medicare hospice benefit; in so doing, they agree to forgo Medicare coverage for conventional treatment of the terminal illness. Medicare continues to cover items and services unrelated to the terminal illness. For each person admitted to a hospice program, a written plan of care must be established and maintained by an interdisciplinary group (which must include a hospice physician, registered nurse, social worker, and pastoral or other counselor) in consultation with the patient's attending physician, if any. The plan of care must identify the services to be provided (including management of discomfort and symptom relief) and describe the scope and frequency of services needed to meet the patient's and family's needs.

Beneficiaries elect hospice for defined benefit periods. Under current policy, the first hospice benefit period is 90 days. For a beneficiary to initially elect hospice, two physicians—a hospice physician and the beneficiary's attending physician—are generally required to certify that the beneficiary has a life expectancy of six months or less if the illness runs its normal course.[1] If the patient's terminal illness continues to engender the likelihood of death within six months, the patient can be recertified for another 90 days. After the second 90-day period, the patient can be recertified for an unlimited number of 60-day periods, as long as he or she remains eligible.[2] For recertification, only the hospice physician has to certify that the beneficiary's life expectancy is six months or less. Beneficiaries can transfer from one hospice to another once during a hospice benefit period and can disenroll from hospice at any time.

In recent years, Medicare spending for hospice care increased dramatically. Spending reached about $13.8 billion in 2011, more than quadrupling since 2000. This spending increase was driven by greater numbers of beneficiaries electing hospice and by longer stays among hospice patients with the longest stays.

### Medicare payment for hospice services

The Medicare program pays a daily rate to hospice providers for each day a beneficiary is enrolled in hospice. The hospice assumes all financial risk for costs and services associated with care for the patient's terminal illness and related conditions. The hospice provider receives payment for every day a patient is enrolled, regardless of whether the hospice staff visited the patient each day. This payment design is intended to encompass not only the cost of visits but also other costs a hospice incurs for palliation and management of the beneficiary's terminal condition and related conditions, such as on-call services, care planning, drugs, medical equipment, supplies, patient transportation between sites of care specified in the plan of care, short-term hospice inpatient care, and other less frequently used services.

Payments are made according to a per diem rate for four categories of care: routine home care, continuous home care, inpatient respite care, and general inpatient care (Table 12-1, p. 264). A hospice is paid the routine home care rate (about $153 per day in 2013) for each day the patient is enrolled in hospice, unless the hospice provides care under one of the other categories (continuous home care, inpatient respite care, or general inpatient care). Overall, routine home care accounts for about 97 percent of hospice care days. The payment rates for hospice are updated annually by the inpatient hospital market basket index. Beginning in fiscal year 2013, the annual update is reduced by a productivity adjustment, as required by the Patient Protection and Affordable Care Act of 2010 (PPACA). An additional reduction to the market basket update of 0.3 percentage point is required in fiscal year 2013 and possibly in fiscal years 2014 through 2019 if certain targets for health insurance coverage among the working-age population are met. The payment methodology and the base rates for hospice care have not been recalibrated since initiation of the benefit in 1983.

The hospice daily payment rates are adjusted geographically to account for differences in wage rates

Case 3:13-cv-00672    Document 1    Filed 07/09/13    Page 29 of 96 PageID #: 29

**TABLE
12–1**

**Medicare hospice payment categories and rates**

| Category | Description | Base payment rate, 2013 | Percent of hospice days, 2010 |
|---|---|---|---|
| Routine home care | Home care provided on a typical day | $153.45 per day | 97.3% |
| Continuous home care | Home care provided during periods of patient crisis | $37.32 per hour | 0.5 |
| Inpatient respite care | Inpatient care for a short period to provide respite for primary caregiver | $158.72 per day | 0.2 |
| General inpatient care | Inpatient care to treat symptoms that cannot be managed in another setting | $682.59 per day | 2.0 |

Note: Payment for continuous home care (CHC) is an hourly rate for care delivered during periods of crisis if care is provided in the home for 8 or more hours within a 24-hour period beginning at midnight. A nurse must deliver more than half of the hours of this care to qualify for CHC-level payment. The minimum daily payment rate at the CHC level is about $299 per day (8 hours at $37.32 per hour); maximum daily payment at the CHC level is about $896 per day (24 hours at $37.32 per hour).

Source: CMS Manual System Pub 100–04 Medicare Claims Processing, Transmittal 2497, "Update to Hospice Payment Rates, Hospice Cap, Hospice Wage Index and the Hospice Pricer for FY 2013," July 20, 2012.

among local markets. Each category of care's base rate has a labor share, which is adjusted by the hospice wage index for the location where care is furnished, and the result is added to the nonlabor portion. From 1983 to 1997, Medicare adjusted hospice payments with a 1983 wage index based on 1981 Bureau of Labor Statistics data. In fiscal year 1998, CMS began using the most current hospital wage index to adjust hospice payments and applied a budget-neutrality adjustment each year to make aggregate payments equivalent to what they would have been under the 1983 wage index. This budget-neutrality adjustment increased Medicare payments to hospices by about 4 percent. In fiscal year 2010, CMS began phasing out the budget-neutrality adjustment over seven years. It was reduced by 0.4 percentage point in 2010 and by an additional 0.6 percentage point in each year from 2011 through 2013. The budget-neutrality adjustment will be reduced by an additional 0.6 percentage point each subsequent year until it is eliminated entirely in 2016.

Beneficiary cost sharing for hospice services is minimal. There is no cost sharing for hospice care other than for prescription drugs and inpatient respite care. For prescriptions, hospices may charge 5 percent coinsurance (not to exceed $5) for each prescription furnished outside the inpatient setting. For inpatient respite care, beneficiaries may be charged 5 percent of Medicare's respite care payment per day. In practice, hospices do not generally charge or collect these copays from Medicare beneficiaries. Because hospice is one of the few areas in the Medicare program with minimal or no cost sharing

and hospice length of stay has increased substantially for patients with the longest stays, in the future the Commission may explore the potential for modest cost sharing for the hospice benefit. (For a more complete description of the hospice payment system, see http://www.medpac.gov/documents/MedPAC_Payment_Basics_12_hospice.pdf.)

## Commission's prior recommendations

The Commission's analyses of the hospice benefit in the June 2008 and March 2009 reports found that the structure of Medicare's hospice payment system makes longer stays in hospice more profitable for providers than shorter stays. This payment structure may be spurring some providers to pursue business models that maximize profit by enrolling patients more likely to have long stays (Medicare Payment Advisory Commission 2009, Medicare Payment Advisory Commission 2008). The mismatch between Medicare payments and hospice service intensity throughout an episode distorts the distribution of payments across providers, making hospices with longer stays more profitable than those with shorter stays. We also found that the benefit lacks adequate administrative and other controls to check the incentives for long stays in hospice and that CMS lacks data vital for effective management of the benefit. In March 2009, the Commission made recommendations to reform the hospice payment system, ensure greater accountability in use of the hospice benefit, and improve data collection and accuracy (see text box). Since that time, additional data have become available allowing us to analyze hospice visit patterns across

Case 3:13-cv-00672   Document 1   Filed 07/09/13   Page 30 of 96 PageID #: 30

## March 2009 Commission recommendations on hospice

The Commission's June 2008 and March 2009 reports raised concerns that the structure of the hospice payment system creates financial incentives for very long stays and that CMS does not have adequate administrative controls to check these incentives or ensure providers' compliance with the benefit's eligibility criteria. These reports found:

- a substantial increase in the number of hospices, driven almost entirely by growth in for-profit providers;

- a substantial increase in average length of stay due to increased lengths of stay among patients with the longest stays;

- higher profit margins among hospice providers with longer stays;

- longer stays among for-profit hospices than nonprofit hospices across all diagnoses;

- anecdotal reports, obtained from a Commission-convened panel of hospice industry experts, that some hospices admit patients who do not meet the Medicare hospice eligibility criteria (a life expectancy of six months or less if the disease runs its normal course) and that some hospice physicians are not engaged in the hospice certification process; and

- focused efforts by some hospices to enroll nursing home residents, a population that tends to have conditions associated with long hospice stays,

as well as anecdotal reports of questionable relationships between some nursing facilities and hospices.

The Commission's several analyses of the hospice payment system show that long stays in hospice are more profitable for providers than short stays. They find that hospice visits tend to be more frequent at the beginning and end of a hospice episode and less frequent in the intervening period. The Medicare payment rate, which is constant over the course of the episode, does not take into account the different levels of effort that occur during different periods in an episode. As a result, long hospice stays, which generally have a lower average visit intensity over the course of an episode, are more profitable than short stays. The incentives in the current hospice payment system for long stays may have spurred some providers to pursue business models that maximize profit by enrolling patients more likely to have long stays. The mismatch between Medicare payments and hospice service intensity throughout an episode distorts the distribution of payments across providers, making those hospices with longer stays more profitable than those with shorter stays. To address these problems, the Commission made recommendations in March 2009 to reform the hospice payment system, to ensure greater accountability in use of the hospice benefit (which included two parts: increased accountability standards for providers and a request for the Office of Inspector General (OIG) to investigate selected hospice arrangements), and to improve data collection and accuracy. The Congress and CMS have adopted policies consistent with several of these recommendations.

*(continued next page)*

episodes of care. In the online appendixes to the March 2010 and March 2011 reports, available at http://www.medpac.gov, we analyzed patient-level data on hospice visits from a group of 17 nonprofit hospices and initial Medicare claims data on hospice visits through 2009 for the full Medicare provider population. Analyses of these data confirmed our earlier findings—that the number of hospice visits per week is higher early in a hospice episode and at the end of an episode near the time of a patient's death—and supported the need for a payment system

that is better aligned with the U-shaped pattern of service intensity during a hospice care episode.

PPACA includes a number of provisions related to Medicare hospice services, including several policies consistent with some of the Commission's recommendations, particularly in the areas of greater accountability and data collection. PPACA also gives CMS the authority to revise in a budget-neutral manner the methodology for determining hospice payment rates

Case 3:13-cv-00672   Document 1   Filed 07/09/13   Page 31 of 96 PageID #: 31

Several policies to increase provider accountability have been adopted. Effective October 2009, CMS adopted a requirement that all certifications and recertifications include a brief physician narrative explaining the clinical basis for the patient's prognosis. Effective January 2011, the Patient Protection and Affordable Care Act of 2010 (PPACA) requires a hospice physician or nurse practitioner to have a face-to-face visit with a patient before the 180th-day recertification and prior to each subsequent recertification.[3]

The Commission also recommended that the OIG study several issues related to hospice care in nursing facilities. The OIG has completed or has work under way in several of these areas. The OIG completed a study on hospices that rely heavily on nursing home patients (Office of Inspector General 2011). It found that these hospices are more likely to be for profit and to treat patients with conditions that typically have longer stays and require less complex care. The OIG recommended that CMS (1) monitor hospices that rely heavily on nursing home patients and (2) reduce payment rates for hospice services provided in nursing homes. The OIG's 2013 work plan includes additional studies examining hospices' marketing practices and financial relationships with nursing facilities.[4]

In the area of data collection, CMS expanded its data-reporting requirements for hospice claims in January 2010 consistent with the Commission's

recommendation to include the length of visits in 15-minute increments, as well as additional types of visits such as physical, speech, and occupational therapist visits. PPACA mandated that CMS begin collecting additional data to inform hospice payment system reform as the Secretary of Health and Human Services determines appropriate not later than January 1, 2011.

Additional steps have been taken by the Congress and CMS on payment reform, but the pace and shape of those efforts are unclear at present. Therefore, we are reprinting the Commission's recommendation on payment reform below. That recommendation, which was made in March 2009, urged payment reform by 2013. While that time frame is no longer feasible since 2013 is already under way, the indicators that led us to make this recommendation have not changed, and thus the need for payment reform still exists and the recommendation still stands. In addition, PPACA includes a provision requiring that, beginning January 2011, Medicare perform medical reviews of hospice claims exceeding 180 days for hospices with many long-stay patients, consistent with a Commission recommendation. CMS has not yet implemented this PPACA provision, so we are also reprinting our standing recommendation on that issue below.

### Recommendation 6-1, March 2009 report

**The Congress should direct the Secretary to change the Medicare payment system for hospice to:**

*(continued next page)*

for routine home care and other services as the Secretary of Health and Human Services determines appropriate, beginning no earlier than fiscal year 2014. PPACA includes additional hospice provisions, such as a hospice quality data pay-for-reporting program beginning in fiscal year 2014, a pilot project to test a hospice pay-for-performance program to start by January 2016, and a demonstration project to test concurrent hospice and conventional care.

### Medicare hospice payment limits ("caps")

The Medicare hospice benefit was designed to give beneficiaries a choice in their end-of-life care, allowing them to forgo conventional treatment (often in inpatient settings) and die at home, with family, and according to their personal preferences. The inclusion of the Medicare hospice benefit in TEFRA was based in large part on the premise that the new benefit would be a less costly alternative to conventional end-of-life care (Government Accountability Office 2004, Hoyer 2007). Studies show

Case 3:13-cv-00672   Document 1   Filed 07/09/13   Page 32 of 96 PageID #: 32

## March 2009 Commission recommendations on hospice (cont.)

- have relatively higher payments per day at the beginning of the episode and relatively lower payments per day as the length of the episode increases,

- include a relatively higher payment for the costs associated with patient death at the end of the episode, and

- implement the payment system changes in 2013, with a brief transitional period.

**These payment system changes should be implemented in a budget-neutral manner in the first year.**

Compared with the current hospice payment system, the Commission-recommended payment model would result in a much stronger relationship between Medicare payments and hospices' service intensity throughout an episode, and it has the potential to promote stays of a length consistent with hospice as an end-of-life benefit. It would also change the distribution of payments across providers. Providers with shorter stay patients, which tend to have lower margins, would see an increase in their Medicare payments, whereas providers with longer stay patients, which tend to have higher margins, would see a decrease.

Under PPACA, the Congress gave CMS the authority to revise in a budget-neutral manner the hospice payment system for routine home care and other services as the Secretary determines appropriate, not earlier than fiscal year 2014. The statute indicates that such revisions may

include adjustments to the per diem payments to reflect changes in the resource intensity of services throughout a hospice episode, but it does not mandate such an approach. CMS is required to consult with hospices and the Commission on revisions to the payment system.

Measures consistent with the Commission's recommendation for increased hospice accountability have been implemented, with the exception of focused medical review (third point below). Focused medical review of hospices with unusually high rates of long-stay patients would provide greater oversight of the benefit and target scrutiny toward those providers for whom it is most warranted.

### Recommendation 6-2A, March 2009 report

**The Congress should direct the Secretary to:**

- require that a hospice physician or advanced practice nurse visit the patient to determine continued eligibility prior to the 180th-day recertification and each subsequent recertification and attest that such visits took place,

- require that certifications and recertifications include a brief narrative describing the clinical basis for the patient's prognosis, and

- require that all stays in excess of 180 days be medically reviewed for hospices for which stays exceeding 180 days make up 40 percent or more of their total cases. ∎

---

that beneficiaries who elect hospice incur less Medicare spending in the last two months of life than comparable beneficiaries who do not but also that Medicare spending for beneficiaries is higher for hospice enrollees in the earlier months before death than it is for nonenrollees. In essence, hospice's net reduction in Medicare spending decreases the longer the patient is enrolled, and beneficiaries with very long hospice stays may incur higher Medicare spending than those who do not elect hospice. (For a fuller discussion of the cost of hospice

care relative to conventional care at the end of life, see the Commission's June 2008 report.)

To make cost savings more likely, the Congress included in the hospice benefit two limitations, or "caps," on payments to hospices. The first cap limits the number of days of inpatient care a hospice may provide to 20 percent of its total Medicare patient care days. This cap is rarely exceeded; any inpatient days provided in excess of the cap are reimbursed at the routine home care payment rate.

Case 3:13-cv-00672   Document 1   Filed 07/09/13   Page 33 of 96 PageID #: 33

**TABLE**
**12–2**

**Use of hospice continues to increase**

**Percent of Medicare decedents who used hospice**

| | 2000 | 2008 | 2009 | 2010 | 2011 | Average annual percentage point change 2000–2010 | Percentage point change 2010–2011 |
|---|---|---|---|---|---|---|---|
| All beneficiaries | 22.9% | 40.1% | 42.0% | 44.0% | 45.2% | 2.1 | 1.2 |
| FFS beneficiaries | 21.5 | 39.2 | 41.0 | 43.0 | 44.2 | 2.2 | 1.2 |
| MA beneficiaries | 30.9 | 44.0 | 46.1 | 47.8 | 48.9 | 1.7 | 1.1 |
| Dual eligibles | 17.5 | 35.9 | 37.5 | 39.2 | 40.3 | 2.2 | 1.1 |
| Nondual eligibles | 24.5 | 41.5 | 43.4 | 45.5 | 46.8 | 2.1 | 1.3 |
| Age (in years) | | | | | | | |
| <65 | 17.0 | 25.1 | 26.1 | 27.2 | 27.8 | 1.0 | 0.6 |
| 65–74 | 25.4 | 36.2 | 37.3 | 38.6 | 39.3 | 1.3 | 0.7 |
| 75–84 | 24.2 | 41.2 | 43.1 | 45.1 | 46.3 | 2.1 | 1.2 |
| 85+ | 21.4 | 45.4 | 48.0 | 50.4 | 52.0 | 2.9 | 1.6 |
| Race/ethnicity | | | | | | | |
| White | 23.8 | 41.8 | 43.7 | 45.8 | 47.0 | 2.2 | 1.2 |
| African American | 17.0 | 30.8 | 32.6 | 34.1 | 35.4 | 1.7 | 1.3 |
| Hispanic | 21.1 | 32.9 | 34.8 | 37.0 | 38.3 | 1.6 | 1.3 |
| Asian American | 15.2 | 24.5 | 26.0 | 28.1 | 30.0 | 1.3 | 1.9 |
| Native North American | 13.0 | 29.8 | 29.7 | 30.6 | 32.4 | 1.8 | 1.8 |
| Sex | | | | | | | |
| Male | 22.4 | 36.8 | 38.6 | 40.4 | 41.3 | 1.8 | 0.9 |
| Female | 23.3 | 43.0 | 45.1 | 47.2 | 48.6 | 2.4 | 1.4 |
| Beneficiary location | | | | | | | |
| Urban | 24.3 | 41.7 | 43.5 | 45.5 | 46.6 | 2.1 | 1.1 |
| Micropolitan | 18.5 | 35.8 | 37.5 | 39.8 | 41.4 | 2.1 | 1.6 |
| Rural, adjacent to urban | 17.6 | 34.7 | 36.9 | 38.7 | 40.2 | 2.1 | 1.5 |
| Rural, nonadjacent to urban | 15.8 | 30.5 | 32.8 | 34.5 | 35.9 | 1.9 | 1.4 |
| Frontier | 13.2 | 25.7 | 27.1 | 30.1 | 30.7 | 1.7 | 0.6 |

Note: FFS (fee-for-service), MA (Medicare Advantage). Beneficiary location reflects the beneficiary's county of residence grouped into four categories (urban, micropolitan, rural adjacent to urban, and rural nonadjacent to urban) based on an aggregation of the urban influence codes. "Urban" areas contain a core area with a population of 50,000 or more; "micropolitan" areas contain at least one cluster of between 10,000 and 50,000 people; "rural, adjacent to urban" are counties that are adjacent to urban areas and do not have a city of 10,000 people in the county; and "rural, not adjacent to urban" are rural counties that are not adjacent to urban areas and do not have a city of 10,000 people. "Frontier" counties have six or fewer people per square mile.

Source: MedPAC analysis of data from the denominator file and the Medicare Beneficiary Database from CMS.

The second, more visible cap limits the aggregate Medicare payments that an individual hospice can receive. It was implemented at the outset of the hospice benefit to ensure that Medicare payments did not exceed the cost of conventional care for patients at the end of life. Under the cap, if a hospice's total Medicare payments exceed its total number of Medicare beneficiaries served multiplied by the cap amount ($25,377.01 in 2012), it must repay the excess

to the program.[5,6] This cap is not applied individually to the payments received for each beneficiary but rather to the total payments across all Medicare patients treated by the hospice in the cap year. The number of hospices exceeding the average annual payment cap historically has been low, but we have found that increases in the number of hospices and increases in very long stays have resulted in more hospices exceeding the cap (with the

Case 3:13-cv-00672   Document 1   Filed 07/09/13   Page 34 of 96 PageID #: 34

number peaking in 2009). With rapid growth in Medicare hospice spending in recent years, the hospice cap is the only significant fiscal constraint on the growth of program expenditures for hospice care (Hoyer 2007).

## Are Medicare payments adequate in 2013?

To address whether payments for 2013 are adequate to cover the costs efficient providers incur, we examine several indicators of payment adequacy. Specifically, we assess beneficiaries' access to care by examining the capacity and supply of hospice providers, changes over time in the volume of services provided, quality of care, providers' access to capital, and the relationship between Medicare's payments and providers' costs. Overall, the Medicare payment adequacy indicators for hospice providers are positive. Unlike our assessments of most other providers, we could not use quality of care as a payment adequacy indicator since information on hospice quality is generally not available.

### Beneficiaries' access to care: Use of hospice continues to increase

Hospice use among Medicare beneficiaries increased in 2011, continuing the trend of a growing proportion of beneficiaries using hospice services at the end of life. In 2011, 45.2 percent of Medicare beneficiaries who died that year used hospice, up from 44.0 percent in 2010 and 22.9 percent in 2000 (Table 12-2). While hospice use continued to grow in 2011, the rate of increase was not as large as prior years. Hospice use varies by beneficiary characteristics (i.e., enrollment in traditional fee-for-service (FFS) Medicare or Medicare Advantage (MA); beneficiaries dually eligible for Medicare and Medicaid and Medicare-only beneficiaries; urban and rural residence; and age, gender, and race), but it increased across all beneficiary groups in 2011.

Use of hospice is slightly more prevalent among beneficiaries enrolled in MA than in FFS, although differences in hospice use rates have narrowed over time (Table 12-2). (MA plans do not provide hospice services. Once a beneficiary in an MA plan elects hospice care, the beneficiary receives hospice services through a hospice provider paid by the Medicare FFS program but may remain enrolled in the MA plan to receive any plan supplemental benefits as well as Medicare Part D coverage

for drugs not related to the terminal condition.[7]) In 2000, in rounded figures, 22 percent of Medicare FFS decedents used hospice compared with 31 percent of decedents enrolled in MA. By 2011, these use rates rose to 44 percent of Medicare FFS decedents and 49 percent of MA decedents.

Hospice use varies by other beneficiary characteristics. In 2011, a smaller proportion of Medicare decedents who were dually eligible for Medicare and Medicaid used hospice compared with the rest of Medicare decedents (about 40 percent and 47 percent, respectively) (Table 12-2). Hospice use has increased in all age groups but is more prevalent and has grown more rapidly among older beneficiaries. In 2011, more than half (52 percent) of Medicare decedents age 85 or older used hospice. Female beneficiaries were also more likely than male beneficiaries to use hospice, which partly reflects the longer average life span among women than men and greater hospice use among older beneficiaries.

Hospice use also varies by racial and ethnic groups (Table 12-2). As of 2011, hospice use was highest among White Medicare decedents followed by Hispanic, African American, Native North American, and Asian American decedents. Hospice use grew substantially among all these groups between 2000 and 2011. Nevertheless, differences in hospice use across racial and ethnic groups persist but are not fully understood. Researchers examining this issue have cited a number of possible factors, such as cultural or religious beliefs, preferences for end-of-life care, socioeconomic factors, disparities in access to care or information about hospice, and mistrust of the medical system (Barnato et al. 2009, Cohen 2008, Crawley et al. 2000).

Hospice use is more prevalent among urban beneficiaries than rural, although use has grown in all types of areas (Table 12-2). In 2011, the share of decedents residing in urban counties who used hospice was 47 percent; in micropolitan counties, 41 percent; in rural counties adjacent to urban counties, 40 percent; in rural nonadjacent counties, 36 percent; and in frontier counties, 31 percent. Use rates for beneficiaries residing in these areas increased between 0.6 percentage point and 1.6 percentage points compared with the prior year.

One driver of increased hospice use over the past decade has been growing use by patients with noncancer diagnoses, as there has been increased recognition that hospice can appropriately care for such patients.

Case 3:13-cv-00672   Document 1   Filed 07/09/13   Page 35 of 96 PageID #: 35

| TABLE 12-3 | Increase in total number of hospices driven by growth in for-profit providers |

| Category | 2000 | 2007 | 2008 | 2009 | 2010 | 2011 | Average annual percent change 2000–2007 | 2007–2010 | 2010–2011 |
|---|---|---|---|---|---|---|---|---|---|
| All hospices | 2,255 | 3,250 | 3,329 | 3,385 | 3,498 | 3,585 | 5.4% | 2.5% | 2.5% |
| For profit | 672 | 1,676 | 1,755 | 1,834 | 1,954 | 2,052 | 13.9 | 5.2 | 5.0 |
| Nonprofit | 1,323 | 1,334 | 1,334 | 1,324 | 1,319 | 1,308 | 0.1 | −0.4 | −0.8 |
| Government/other | 258 | 240 | 240 | 227 | 225 | 225 | −1.0 | −2.1 | 0.0 |
| Freestanding | 1,069 | 2,103 | 2,203 | 2,282 | 2,397 | 2,485 | 10.2 | 4.5 | 3.7 |
| Hospital based | 785 | 685 | 663 | 634 | 612 | 597 | −1.9 | −3.7 | −2.5 |
| Home health based | 379 | 441 | 440 | 447 | 466 | 480 | 2.2 | 1.9 | 3.0 |
| SNF based | 21 | 21 | 23 | 22 | 23 | 23 | 0.0 | 3.1 | 0.0 |
| Urban | 1,424 | 2,190 | 2,268 | 2,323 | 2,430 | 2,534 | 6.3 | 3.5 | 4.3 |
| Rural | 788 | 1,012 | 1,008 | 1,005 | 1,002 | 985 | 3.6 | −0.3 | −1.7 |

Note:   SNF (skilled nursing facility). Numbers may not sum to total because of missing data for a small number of providers.

Source:   MedPAC analysis of Medicare cost reports, Provider of Services File, and the standard analytic file of hospice claims from CMS.

We estimate that the share of hospice decedents with noncancer diagnoses has grown from 48 percent in 2000 to 68 percent in 2011.[8] The biggest increase in hospice enrollment among patients with noncancer diagnoses occurred among those with neurological conditions, debility, and nonspecific signs and symptoms. For example, between 2000 and 2011, the share of hospice decedents with neurological conditions (e.g., Alzheimer's or non-Alzheimer's dementia) grew from 10 percent to 16 percent. During this same period, the share of hospice decedents with debility grew from 4 percent to 10 percent, and those with nonspecific signs and symptoms increased from 2 percent to 6 percent.

## Capacity and supply of providers: Supply of hospices continues to grow, driven by growth in for-profit providers

The number of hospice providers has grown substantially since 2000. From 2000 to 2011, the total number of hospices increased 59 percent, from about 2,255 to 3,585 (Table 12-3). The number of providers grew most rapidly in the years prior to 2007, with an average annual growth rate of 5.4 percent between 2000 and 2007. The number of hospices grew at an average rate of about 2.5 percent per year from 2007 to 2010 and grew another 2.5

percent in 2011. The somewhat slower growth in the past few years may in part be influenced by guidance CMS issued in 2007 to state survey and certification agencies. This guidance placed surveys of hospices applying to be new Medicare providers (and surveys of certain other providers) in the lowest tier of their workload priorities.[9]

For-profit hospices have accounted for most of the growth in the number of hospices. Between 2000 and 2011, the number of for-profit hospices more than tripled, increasing from 672 to 2,052 (Table 12-3). During this time period, the number of nonprofits declined 1 percent and the number of government hospices declined 13 percent. As of 2011, about 57 percent of hospices were for profit, 36 percent were nonprofit, and 6 percent were government. The number of providers by ownership type in this report is based on different data sources, which we believe more accurately capture ownership type and changes in ownership, than those used for prior reports.[10] The use of the different data sources does not alter our longstanding finding of rapid growth in the number of for-profit providers.

Growth in the number of hospices occurred mostly among freestanding providers, increasing from 1,069 in 2000 to 2,485 in 2011 (Table 12-3). Over this period, the number

MedPAC

Case 3:13-cv-00672   Document 1   Filed 07/09/13   Page 36 of 96 PageID #: 36

**TABLE
12–4**

**Hospice use has increased substantially**

| Category | 2000 | 2010 | 2011 | Average annual change, 2000–2010 | Change, 2010–2011 |
|---|---|---|---|---|---|
| Number of hospice users (in millions) | 0.534 | 1.159 | 1.219 | 8.1% | 5.2% |
| Total spending (in billions) | $2.9 | $13.0 | $13.8 | 16.2% | 6.8% |
| Average length of stay among decedents (in days) | 54 | 86 | 86 | 4.8% | 0.0% |
| Median length of stay among decedents (in days) | 17 | 18 | 17 | +1 day | −1 day |

Note: Average length of stay is calculated for decedents who used hospice at the time of death or prior to death and reflects the total number of days the decedent was enrolled in the Medicare hospice benefit during his/her lifetime. The percent change in number of hospice users and total spending displayed in the chart may not equal the percent change calculated using the yearly data displayed in the chart due to rounding.

Source: MedPAC analysis of the denominator file, the Medicare Beneficiary Database, and the 100 percent hospice claims standard analytic file from CMS.

of hospital-based hospices declined nearly 25 percent, and the number of home-health-based hospices increased by just over 25 percent. The number of SNF-based hospices is small and changed little. As of 2011, about 69 percent of hospices were freestanding, 17 percent were hospital based, 13 percent were home health based, and less than 1 percent were SNF based. This report uses a data source to identify type of hospice (freestanding, hospital based, home health based, or SNF based) that is different from prior reports. In this report, we identify the type of hospice based on the type of cost report filed for the hospice (i.e., the hospice filed a freestanding hospice cost report or was included in the cost report of a hospital, home health agency, or SNF).[11,12]

Overall, the supply of hospices has increased substantially since 2000 in both urban and rural areas, although the number of hospices located in rural areas has declined modestly since 2007 (Table 12-3). Roughly consistent with the share of Medicare beneficiaries residing in each area, 72 percent of hospices were located in urban areas and 28 percent were located in rural areas as of 2011. Hospice location does not provide a full picture of access to services because a hospice's service area may extend beyond the boundaries of the county where it is located. In addition, as shown in our March 2010 report, there is no relationship between supply of hospices (as measured by number of hospices per 10,000 beneficiaries) and the rate of hospice use (as measured by share of decedents who use hospice before death) across states (Medicare Payment Advisory Commission 2010).

**Volume of services: Number of hospice users continues to grow, while average length of stay was steady overall in 2011**

The number of Medicare beneficiaries receiving hospice services increased rapidly in the last decade, more than doubling since 2000. In 2011, more than 1.2 million beneficiaries used hospice services, up from just over 0.5 million in 2000 (Table 12-4). Between 2000 and 2010, the number of hospice users increased at an average rate of 8.1 percent per year. The number of hospice users continued to grow in 2011 by 5.2 percent.

Average length of stay, which has increased substantially since 2000, grew more slowly in the last few years and changed little in 2011. Between 2000 and 2011, average length of stay among Medicare decedents increased from 54 days to 86 days. In the past few years, growth in average length of stay has slowed, increasing in 2008, 2009, and 2010 from 83 days to 84 days to 86 days, respectively, and holding steady at 86 days in 2011.

The increase in average length of stay observed since 2000 in large part reflects an increase in very long hospice stays, while short stays remained virtually unchanged (Figure 12-1, p. 272). Between 2000 and 2011, hospice length of stay at the 90th percentile grew substantially, increasing from 141 days to 241 days. Growth in very long stays has slowed in recent years. The 90th percentile of length of stay grew 5 days between 2008 and 2010 and grew 1 additional day in 2011. Median length of stay, which held steady at 17 days for most of the decade, edged upward to 18 days in 2010 and returned to 17 days in 2011. In 2011,

Case 3:13-cv-00672   Document 1   Filed 07/09/13   Page 37 of 96 PageID #: 37

FIGURE
12–1

**Growth in length of stay among hospice patients with the longest stays has slowed**



Note: Length of stay is calculated for decedents who used hospice at the time of death or before death and reflects the total number of days the decedent was enrolled in the Medicare hospice benefit during his/her lifetime.

Source: MedPAC analysis of the denominator file and the Medicare Beneficiary Database from CMS.

25 percent of stays were 5 days or less, unchanged from the prior year.

The Commission has previously expressed concern about very short and very long hospice stays. With very short hospice stays, the concern is that patients enter hospice too late to fully benefit from all that hospice has to offer. As discussed in our March 2009 report, a Commission-convened panel of hospice industry representatives indicated that very short stays in hospice stem largely from factors unrelated to the Medicare hospice payment system, such as some physicians' reluctance to have conversations about hospice or a tendency to delay such discussions until death is imminent; difficulty some patients and families may have in accepting a terminal prognosis; and financial incentives in the FFS system for increased volume of services (Medicare Payment Advisory Commission 2009). The issue of the FFS system rewarding volume over quality is a broader issue that affects not only Medicare's hospice services but Medicare's other services paid under

FFS. Payment system reforms such as accountable care organizations—which restructure incentives and focus on the patient's overall needs rather than fragmented services—may help reduce financial incentives that can deter hospice referral. With respect to the challenges of physician–patient communication about advanced illnesses, there may be potential for shared decision-making tools to improve the timeliness and clarity of information patients receive about their condition and treatment options and empower patients to make choices based on their preferences.

Some point to the requirement that beneficiaries forgo intensive conventional care to enroll in hospice as a factor that contributes to deferring hospice care and thus short hospice stays. PPACA mandates a three-year demonstration at 15 sites to test the effect on quality and cost of allowing concurrent hospice and conventional care. However, no funding was appropriated for this demonstration, so its future is unclear. A few private

Case 3:13-cv-00672   Document 1   Filed 07/09/13   Page 38 of 96 PageID #: 38

MedPAC

**TABLE**
**12-5**

**Hospice average length of stay among decedents by beneficiary and hospice characteristics, selected years**

| Characteristic | Average length of stay among decedents (in days) | | | |
|---|---|---|---|---|
| | 2000 | 2009 | 2010 | 2011 |
| **Beneficiary** | | | | |
| Diagnosis | | | | |
| Cancer | 50 | 53 | 53 | 52 |
| Neurological conditions | 63 | 132 | 134 | 137 |
| Heart/circulatory | 46 | 76 | 76 | 74 |
| Debility | 49 | 98 | 97 | 97 |
| COPD | 69 | 107 | 110 | 107 |
| Other | 48 | 85 | 88 | 86 |
| Main location of care | | | | |
| Home | N/A | 87 | 87 | 88 |
| Nursing facility | N/A | 107 | 111 | 111 |
| Assisted living facility | N/A | 143 | 148 | 149 |
| Hospice facility or hospital | N/A | 14 | 14 | 15 |
| **Hospice** | | | | |
| Hospice ownership | | | | |
| For profit | 59 | 100 | 101 | 102 |
| Nonprofit | 49 | 69 | 70 | 69 |
| Type of hospice | | | | |
| Freestanding | 55 | 87 | 89 | 89 |
| Home health based | 46 | 70 | 69 | 68 |
| Hospital based | 49 | 62 | 62 | 61 |

Note: COPD (chronic obstructive pulmonary disease), N/A (not available). Average length of stay is calculated for Medicare beneficiaries who died in a given year and used hospice that year and reflects the total number of days the decedent was enrolled in the Medicare hospice benefit during his/her lifetime. Main location is defined as the location where the beneficiary spent the largest share of his/her hospice days in a given year.

Source: MedPAC analysis of 100 percent hospice claims standard analytical file data, Medicare Beneficiary Database, Medicare hospice cost reports, Provider of Services file data from CMS.

insurers are experimenting with this approach among the commercially insured, working-age, managed care population. One insurer reported that its concurrent care program resulted in greater hospice enrollment, less use of intensive services, and lower costs (Krakauer et al. 2009). It is uncertain whether this type of approach would yield savings in a Medicare FFS environment, with the absence of health plan utilization management and an elderly population with a greater prevalence of noncancer diagnoses, which tend to result in longer hospice stays.

Length of stay varies by observable patient characteristics, such as patient diagnosis and location, which makes it possible for providers to focus on more profitable patients

(Table 12-5). For example, Medicare decedents in 2011 with neurological conditions and chronic obstructive pulmonary disease had substantially higher average lengths of stay (137 days and 107 days, respectively) than those with cancer (52 days) and heart or circulatory conditions (74 days). While length of stay changed little for most diagnosis groups in the last three years, length of stay for decedents with neurological conditions increased five days between 2009 and 2011—from 132 days to 137 days.

Differences in length of stay by diagnosis are reflected in the percentile distribution of length of stay (Table 12-6, p. 274). Length of stay is similar for patients with the

Case 3:13-cv-00672   Document 1   Filed 07/09/13   Page 39 of 96 PageID #: 39

TABLE
12-6

**Distribution of hospice length of stay among decedents
by beneficiary and hospice characteristics, 2011**

| | Percentile of length of stay | | | | |
|---|---|---|---|---|---|
| Characteristic | 10th | 25th | 50th | 75th | 90th |
| **Beneficiary** | | | | | |
| Diagnosis | | | | | |
|   Cancer | 3 | 6 | 17 | 51 | 126 |
|   Neurological | 3 | 7 | 25 | 140 | 423 |
|   Heart/circulatory | 2 | 4 | 11 | 54 | 210 |
|   Debility | 3 | 7 | 23 | 100 | 280 |
|   COPD | 2 | 5 | 20 | 105 | 316 |
|   Other | 2 | 4 | 13 | 79 | 251 |
| Main location of care | | | | | |
|   Home | 4 | 9 | 26 | 86 | 231 |
|   Nursing facility | 3 | 6 | 21 | 105 | 332 |
|   Assisted living facility | 5 | 12 | 50 | 180 | 423 |
|   Hospice facility or hospital | 2 | 2 | 4 | 9 | 19 |
| **Hospice** | | | | | |
| Hospice ownership | | | | | |
|   For profit | 3 | 6 | 21 | 92 | 295 |
|   Nonprofit | 2 | 5 | 14 | 58 | 184 |
| Type of hospice | | | | | |
|   Freestanding | 2 | 5 | 17 | 78 | 251 |
|   Home health based | 2 | 5 | 15 | 61 | 183 |
|   Hospital based | 2 | 5 | 14 | 53 | 160 |

Note:   COPD (chronic obstructive pulmonary disease). Length of stay is calculated for Medicare beneficiaries who died in 2011 and used hospice that year and reflects
the total number of days the decedent was enrolled in the Medicare hospice benefit during his/her lifetime. Main location is defined as the location where the
beneficiary spent the largest share of his/her hospice days in 2011.

Source:   MedPAC analysis of 100 percent hospice claims standard analytical file data, Medicare Beneficiary Database, Medicare hospice cost reports, Provider of Services
file data from CMS.

shortest stays, irrespective of diagnosis. For example,
when stratified by diagnosis, 10 percent of patients have
a length of stay of stay of two to three days regardless of
their condition, and 25 percent of patients have stays of
a week or less. Length-of-stay differences become more
pronounced among patients with the longer stays (e.g.,
75th percentile and 90th percentile). For example, patients
with neurological conditions and cancer have similar
lengths of stay at the 10th percentile and 25th percentile.
However, compared with cancer patients, those with
neurological conditions have stays that are about 1 week
longer at the 50th percentile, about 3 months longer at the
75th percentile, and roughly 300 days longer at the 90th
percentile.

Length of stay also varies by site of service. In 2011,
average length of stay was higher among Medicare
decedents whose main location of care was an assisted
living facility (149 days) or a nursing facility (111 days)
rather than home (88 days). Further, length of stay has
increased since 2009 by four to six days in these facility
settings, but by one day in the home (Table 12-5, p.
273). Length-of-stay differences across settings are
most pronounced among patients with longer stays. For
example, the 75th percentile of length of stay varied by
about 100 days across the three settings (86 days at home,
105 days at a nursing facility, and 180 days at an assisted
living facility) and the 90th percentile varied by just under
200 days (231 days, 332 days, and 423 days across the

Case 3:13-cv-00672   Document 1   Filed 07/09/13   Page 40 of 96 PageID #: 40

MEDPAC

three settings, respectively) (Table 12-6). Differences in the diagnosis profile of patients residing in assisted living facilities and nursing facilities compared with patients residing in home settings account for some of the differences in length of stay, but the markedly longer stays among assisted living facility residents are not understood and bear further monitoring and examination.

The differences in length of stay by patient characteristics are reflected in differences in length of stay by provider type. In 2011, average length of stay was substantially higher at for-profit hospices than at nonprofit hospices (102 days compared with 69 days); between 2009 and 2011, stays increased 2 days among for profits and stayed essentially the same for nonprofits. The higher length of stay among for profits has two components: (1) for profits have more patients with diagnoses that tend to have longer stays, and (2) for profits have longer stays for all diagnoses than nonprofits. These patterns reinforce the assertion that the payment system favors longer stays and that changes are needed to make it more neutral toward length of stay.

The markedly longer stays of some providers raise program integrity questions. An expert panel of hospice medical directors and executives that the Commission sponsored in fall 2008 indicated that some hospices were enrolling patients who did not meet the eligibility criteria. In March 2009, the Commission recommended several steps to improve accountability, including requiring a physician narrative on certifications and recertifications, physician or nurse practitioner face-to-face visits prior to recertification at 180 days and beyond, and focused medical review of hospice providers where stays beyond 180 days made up an unusually high share of their caseload compared with other providers. CMS implemented a physician narrative requirement in October 2009, and PPACA required face-to-face recertification visits as of January 2011 (implementation was delayed to April 2011).

The 2011 hospice claims data offer a first look at utilization patterns after implementing the face-to-face visit requirement. In 2011, average length of stay was steady, and length of stay at the 90th percentile increased by one day. With the available data it is difficult to discern what influence the face-to-face visit requirement may have had on length of stay versus other factors such as a general increase in regulatory scrutiny. Another aspect of hospice care that the face-to-face visit might affect is live discharge rates if physicians or nurse practitioners find

| TABLE 12–7 | Percent of hospice benefit periods that ended with a live discharge, by benefit period number and year | |
|---|---|---|
| Hospice benefit period number | Percent of hospice benefit periods ending with a live discharge | |
| | 2010 | 2011 |
| 1 | 9.2% | 8.8% |
| 2 | 13.9 | 13.6 |
| 3 | 10.6 | 10.7 |
| 4 | 10.3 | 10.0 |
| 5 or higher | 9.0 | 8.3 |

Note: Data include benefit periods that ended between April and December of 2010 and 2011.

Source: MedPAC analysis of the denominator file, the Medicare Beneficiary Database, and 100 percent hospice claims standard analytic file from CMS.

patients ineligible for hospice after conducting the visit. Face-to-face visits are required prior to recertifying any hospice patient for a third or subsequent benefit period. If the face-to-face visit requirement led to more live discharges, we would expect to see more live discharges at the end of the second benefit period (i.e., before the patient is recertified for the third benefit period) and subsequent benefit periods. The share of benefit periods ending with a live discharge changed little in 2011 compared with the prior year; if anything, they declined slightly (Table 12-7). For example, 13.6 percent of second benefit periods ended with a live discharge in 2011, down slightly from 13.9 percent in 2010.[13] It is difficult to know what is driving the slight decline in live discharges, but it could suggest more appropriate patients being admitted to hospice.

One example of hospices with unusual utilization patterns are the roughly 10 percent of hospices that exceed the aggregate payment cap. As shown in our March 2011 and 2012 reports and online Appendix 12-A to this report, which is available at http://www.medpac.gov, above-cap hospices have substantially higher lengths of stay and rates of discharging patients alive than other hospices (Medicare Payment Advisory Commission 2012, Medicare Payment Advisory Commission 2011).[14] As noted in our March 2012 report, these data may suggest that above-cap hospices are admitting patients who do not meet the hospice eligibility criteria, which merits further investigation by the OIG and CMS.

Case 3:13-cv-00672   Document 1   Filed 07/09/13   Page 41 of 96 PageID #: 41

TABLE
12-8

**Hospices that exceeded Medicare's annual payment cap, selected years**

|  | 2002 | 2006 | 2008* | 2009* | 2010* |
|---|---|---|---|---|---|
| Percent of hospices exceeding the cap | 2.6% | 9.4% | 10.2% | 12.5% | 10.1% |
| Average payments over the cap per hospice exceeding the cap (in thousands) | $470 | $731 | $571 | $485 | $426 |
| Payments over the cap as percent of overall Medicare hospice spending | 0.6% | 2.4% | 1.7% | 1.7% | 1.2% |
| Total Medicare hospice spending (in billions) | $4.4 | $8.8 | $11.4 | $12.0 | $12.9 |

Note:   The cap year is defined as the period beginning November 1 and ending October 31 of the following year.
        *Due to a change in data availability and refinements in the estimation methodology, the estimates in 2008, 2009, and 2010 are not entirely comparable to the
        estimates for 2002 and 2006.

Source: MedPAC analysis of 100 percent hospice claims standard analytical file data, Medicare hospice cost reports, Provider of Services file data from CMS. Data on total
        spending for each fiscal year from the CMS Office of the Actuary.

In 2010, 10.1 percent of hospices exceeded the cap, down from an estimated 12.5 percent in 2009 (Table 12-8).[15] This decline is a reversal of the trend we observed in the last decade of a growing share of hospices exceeding the cap.[16] Among hospices that exceeded the cap, the average amount over the cap was smaller in 2010 than in 2009, continuing the trend since 2006 of above-cap hospices exceeding the cap by smaller amounts over time. Taken together, these data may suggest that some hospices are adjusting their admissions patterns to avoid exceeding the cap or to exceed it by less. While above-cap hospices are required to return payments that exceed Medicare's cap, the government's ability to obtain repayment is less certain for hospices that close. At the extreme, one hospice provider in 2012 reportedly closed and opened as a new hospice to avoid repaying cap overpayments (Waldman 2012).

Given the concerns about very short and very long hospice stays, it may be worthwhile to consider providing physicians who refer patients to hospice with summary feedback on the length of stay of patients they refer. If referring physicians have information about the outcome of their referrals, it might help them gauge the timing of their conversations with patients about hospice and might lower the prevalence of very short stays and very long stays. Of course, there will always be some very short and very long stays in hospice because of uncertainty in predicting life expectancy and unforeseen events. But to the extent that some of these stays occur because physicians lack information about what occurs after a hospice referral, this type of feedback has the potential to influence referrals to hospice and help promote lengths of stay that are sufficient to benefit patients and are consistent with an end-of-life benefit.

## Quality of care: Information on hospice quality is limited

We do not have sufficient data to assess the quality of hospice care provided to Medicare beneficiaries because publicly reported information on quality is generally unavailable. PPACA mandated that CMS publish quality measures by 2012. Beginning in fiscal year 2014, hospices that do not report quality data will receive a 2 percentage point reduction in their annual payment update.

CMS has adopted two quality measures for the first year of the pay-for-reporting program. Hospices must report these measures in 2013 (based on data from the last three months of calendar year 2012) or face a 2 percentage point reduction in their payment update for fiscal year 2014. The first measure, endorsed by the National Quality Forum, focuses on pain management (i.e., the share of patients who reported being uncomfortable because of pain at admission whose pain was brought to a comfortable level within 48 hours—commonly referred to as the National Hospice and Palliative Care Organization's comfortable dying measure). The second measure is process related and is designed to help develop future quality measures. Hospices will report whether they are tracking at least three measures focused on patient care and what those measures are, which CMS indicated will help identify feasible quality measures in the future. Given the penalty for nonreporting and the limited scope of the initial

MedPAC

measures, it is likely that the vast majority of providers will report in 2013.

For future reporting years, CMS has expressed interest in developing a more comprehensive set of hospice quality measures for payment years after 2015. CMS has indicated that a standardized patient assessment instrument might be needed to support the collection of a broader set of quality measures. CMS has indicated that it is in the early stages of developing and testing a patient-level data set and may consider implementation as early as calendar year 2014. The patient assessment instrument that CMS is testing includes items that would support several new quality measures recently endorsed by the National Quality Forum, including process measures related to pain screening and assessment, dyspnea assessment and treatment, and provision of a bowel regimen for patients receiving opioids. CMS has also expressed interest in developing a bereaved family member survey.

As discussed in our March 2012 report, in November 2011 we convened a technical panel of hospice clinicians, researchers, quality experts, and other stakeholders to provide input on hospice quality measurement (Medicare Payment Advisory Commission 2012). Several panelists indicated that Medicare claims data might be a source of quality care indicators. For example, claims data showing hospices that provided few visits in the last days of life, provided no higher acuity hospice care (general inpatient care or continuous home care) to any patients, or had unusually high live-discharge rates could signal potentially poor quality and indicate the need for further CMS scrutiny.

## Providers' access to capital: Access to capital appears to be adequate

Hospices in general are not as capital intensive as other provider types because they do not require extensive physical infrastructure (although some hospices have built their own inpatient units, which require significant capital). Overall access to capital for hospices appears adequate.

Some freestanding hospices are part of large publicly traded chain providers. Recent financial reports for these hospices have been favorable, with strong margins and cash flow. In 2011 and 2012, publicly traded hospice companies made investments to expand operations, either through acquisition of other hospice providers or through investments in new inpatient units, suggesting adequate access to capital among these providers. Also, a few

publicly traded nursing home companies have reported expanding into the hospice sector through acquisitions, citing favorable margin opportunities.

Less information is available on access to capital for privately held providers. Among private equity groups, the number of merger and acquisition transactions for hospice providers, which increased in 2009, 2010, and 2011, declined in the first half of 2012. Some analysts have characterized this decline as a natural lull after a period of high acquisition activities rather than a reflection of reduced interest in the sector (Braff Group 2012a, Braff Group 2012b). The continued growth in the number of for-profit providers suggests adequate access to capital for these providers. Less is known about access to capital for nonprofit freestanding providers, which may be more limited. Hospital-based and home-health-based hospices have access to capital through their parent providers, which also appear to have adequate access to capital.

## Medicare payments and providers' costs

As part of the update framework, we assess the relationship between Medicare payments and providers' costs by considering whether current costs approximate what efficient providers are expected to spend on delivering high-quality care. Medicare margins illuminate the relationship between Medicare payments and providers' costs. We examined margins through the 2010 cost-reporting year, the latest period for which cost report data and claims data are available. To understand the variation in margins across providers, we also examined the variation in costs per day across providers.

### Hospice costs

Hospice costs per day vary substantially by type of provider (Table 12-9, p. 278), which is one reason for differences in hospice margins across provider types. In 2010, hospice costs per day were $143 on average across all hospice providers, a very slight increase from $142 per day in 2009.[17] Freestanding hospices had lower costs per day than home-health-based hospices and hospital-based hospices. For-profit, above-cap, and rural hospices also had lower costs per day than their respective counterparts.

The differences in costs per day among freestanding, home-health-based, and hospital-based hospices largely reflect differences in average length of stay and indirect costs. Our analysis of the Medicare cost report data indicates that, across all hospice types, those with longer average lengths of stay have lower costs per day.

Case 3:13-cv-00672   Document 1   Filed 07/09/13   Page 43 of 96 PageID #: 43

TABLE
12-9

**Hospice costs per day vary by type of provider, 2010**

| | | Percentile | | |
|---|---|---|---|---|
| | Average | 25th | 50th | 75th |
| All hospices | $143 | $110 | $134 | $167 |
| Freestanding | 138 | 108 | 130 | 157 |
| Home health based | 151 | 114 | 139 | 184 |
| Hospital based | 181 | 117 | 161 | 210 |
| For profit | 130 | 104 | 125 | 154 |
| Nonprofit | 157 | 121 | 147 | 184 |
| Above cap | 119 | 93 | 114 | 136 |
| Below cap | 145 | 112 | 137 | 170 |
| Urban | 146 | 113 | 137 | 170 |
| Rural | 126 | 102 | 126 | 160 |

Note:    Data reflect aggregate cost per day for all types of hospice care combined (routine home care, continuous home care, general inpatient care, and inpatient respite care). Data are not adjusted for differences in the case mix or wages across hospices.

Source:    MedPAC analysis of Medicare hospice cost reports and Medicare Provider of Services data from CMS.

Freestanding hospices have longer stays than provider-based hospices, which accounts for some but not all of the difference in costs per day. Another substantial factor is the higher level of indirect costs among provider-based hospices. A few examples of indirect costs are management and administrative costs, accounting and billing, and capital costs. In 2010, indirect costs made up 34 percent of total costs for freestanding hospices, compared with 40 percent of total costs for home-health-based hospices and 43 percent of total costs for hospital-based hospices. The higher indirect costs among provider-based hospices suggest that their costs may be inflated because of the allocation of overhead costs from the parent provider.[18]

### Hospice margins

From 2004 to 2010, the aggregate hospice Medicare margin oscillated from as low as 4.6 percent to as high as 7.5 percent (Table 12-10).[19] As of 2010, the aggregate hospice Medicare margin was 7.5 percent, up from 7.4 percent in 2009. Margins varied widely across individual hospice providers. In 2010, the Medicare margin was −11.5 percent at the 25th percentile, 6.9 percent at the 50th

percentile, and 19.9 percent at the 75th percentile. Our estimates of Medicare margins from 2004 to 2010 exclude overpayments to above-cap hospices and are calculated based on Medicare-allowable, reimbursable costs consistent with our approach in other Medicare sectors.[20]

We excluded nonreimbursable bereavement costs from our margin calculations. The statute requires that hospices offer bereavement services to family members of their deceased Medicare patients, but it prohibits Medicare payment for these services (section 1814(i)(1)(A) of the Social Security Act). Hospices report their costs associated with providing bereavement services on the Medicare cost report in a nonreimbursable cost center. If we included these bereavement costs from the cost report in our margin estimate, it would reduce the 2010 aggregate Medicare margin by at most 1.4 percentage points.[21] This estimate of 1.4 percentage points is likely an overestimate of the bereavement costs associated with Medicare hospice patients because we are not able to separately identify the bereavement costs related to hospice patients from the costs of community bereavement services provided to the family and friends of decedents not enrolled in hospice.

We also excluded nonreimbursable volunteer costs from our margin calculations. As discussed in more detail in our March 2012 report, the statute requires Medicare hospice providers to use some volunteers in the provision of hospice care. Costs associated with recruiting and training volunteers are generally included in our margin calculations because they are reported in reimbursable cost centers. The only volunteer costs that would be excluded from our margins are those associated with nonreimbursable cost centers. It is unknown what types of costs are included in the volunteer nonreimbursable cost center. If nonreimbursable volunteer costs were included in our margin calculation, it would reduce the aggregate Medicare margin by 0.3 percentage point.

Freestanding hospices have higher margins (10.7 percent) than home-health-based and hospital-based hospices (3.2 percent and −16.0 percent, respectively). Provider-based hospices have lower margins than freestanding providers due in part to their higher indirect costs (e.g., general and administrative expenses, capital costs), which are likely inflated because of the allocation of overhead costs from the parent provider. If home-health-based and hospital-based hospices had indirect cost structures similar to those of freestanding hospices, we estimate that the aggregate Medicare margin would be up to 8 percentage points higher for home-health-based hospices and 13

Case 3:13-cv-00672   Document 1   Filed 07/09/13   Page 44 of 96 PageID #: 44

TABLE
12-10

**Hospice Medicare margins by selected characteristics, 2004–2010**

| Category | Percent of hospices 2010 | Medicare margin | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
| All | 100% | 5.0% | 4.6% | 6.4% | 5.8% | 5.5% | 7.4% | 7.5% |
| Freestanding | 69 | 8.3 | 7.2 | 9.7 | 8.7 | 8.3 | 10.2 | 10.7 |
| Home health based | 13 | 3.1 | 3.1 | 3.8 | 2.3 | 3.4 | 5.9 | 3.2 |
| Hospital based | 17 | −11.6 | −9.1 | −12.7 | −10.9 | −11.3 | −12.2 | −16.0 |
| For profit (all) | 56 | 11.8 | 9.9 | 12.0 | 10.4 | 10.3 | 11.7 | 12.4 |
| Freestanding | 51 | 12.3 | 10.3 | 12.7 | 11.3 | 11.5 | 12.9 | 13.4 |
| Nonprofit (all) | 38 | 0.3 | 1.0 | 1.5 | 1.6 | 0.7 | 3.8 | 3.2 |
| Freestanding | 17 | 3.7 | 3.8 | 5.8 | 5.6 | 3.7 | 6.6 | 7.6 |
| Government (all) | 14 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Urban | 71 | 5.9 | 5.1 | 7.1 | 6.3 | 5.9 | 7.9 | 7.8 |
| Rural | 29 | −2.3 | 0.2 | 0.8 | 1.4 | 2.1 | 3.7 | 5.3 |
| Patient volume (quintile) | | | | | | | | |
| Lowest | 20 | −6.1 | −6.6 | −5.1 | −7.9 | −8.4 | −6.5 | −5.2 |
| Second | 20 | −1.2 | −1.6 | 0.3 | 1.0 | 0.1 | 2.0 | 4.0 |
| Third | 20 | 1.1 | 1.9 | 2.4 | 3.0 | 4.4 | 4.5 | 7.2 |
| Fourth | 20 | 2.8 | 4.4 | 5.8 | 5.8 | 7.2 | 6.8 | 7.1 |
| Highest | 20 | 7.2 | 5.9 | 8.1 | 7.0 | 6.1 | 9.0 | 8.4 |
| Below cap | 89.9 | 5.6 | 5.1 | 7.0 | 6.1 | 5.9 | 7.9 | 7.8 |
| Above cap (excluding cap overpayments) | 10.1 | −3.4 | −0.8 | 0.3 | 2.5 | 1.2 | 1.4 | 3.2 |
| Above cap (including cap overpayments) | 10.1 | 18.9 | 20.7 | 20.7 | 20.5 | 19.0 | 18.3 | 17.3 |

Note: Margins for all provider categories exclude overpayments to above-cap hospices, except where specifically indicated. Margins are calculated based on Medicare-allowable, reimbursable costs. Margins for government-owned providers are not shown. They operate in a different context from other providers, so their margins are not necessarily comparable.

Source: MedPAC analysis of Medicare hospice cost reports, 100 percent hospice claims standard analytical file, and Medicare Provider of Services data from CMS.

percentage points higher for hospital-based hospices, and the industry-wide aggregate Medicare margin would be up to 1.9 percentage points higher.[22] We intend to continue to examine the differences in the levels of indirect costs across providers and consider whether issues with the allocation of overhead from the parent provider warrant the exclusion of provider-based hospices from our margin calculations.

Hospice margins also vary by other provider characteristics, such as type of ownership, patient volume, and urban or rural location. The aggregate Medicare margin was considerably higher for for-profit hospices (12.4 percent) than for nonprofit hospices (3.2 percent). However, freestanding nonprofit hospices, which are not affected by overhead allocation issues, had a higher margin (7.6 percent) than nonprofits overall. Generally, hospices' margins vary by the provider's volume; hospices

with more patients have higher margins on average. Overall, hospices in urban areas have a higher aggregate Medicare margin (7.8 percent) than those in rural areas (5.3 percent).

Hospice financial performance also varies by length of stay (Table 12–11, p. 280). In 2010, hospices with longer stays had higher margins (with margins dropping some for hospices in the longest stay category because some hospices in that category exceeded the cap and our model assumes the return of cap overpayments by these hospices).[23] As noted previously, the higher profitability of long stays reflects a mismatch between the Medicare payment system and hospices' level of effort throughout an episode. The Commission's recommendation to revise the hospice payment system to pay relatively higher rates per day at the beginning and end of the episode (near the time of the patient's death) and lower rates in the

Case 3:13-cv-00672   Document 1   Filed 07/09/13   Page 45 of 96 PageID #: 45

TABLE
12-11

**Hospice Medicare margins by length of stay and patient residence, 2010**

| Hospice characteristic | Medicare margin |
|---|---|
| Average length of stay | |
| Lowest quintile | –8.9% |
| Second quintile | 0.8 |
| Third quintile | 10.1 |
| Fourth quintile | 14.1 |
| Highest quintile | 11.6 |
| | |
| Percent of stays > 180 days | |
| Lowest quintile | –8.3 |
| Second quintile | 1.5 |
| Third quintile | 10.6 |
| Fourth quintile | 14.7 |
| Highest quintile | 11.3 |
| | |
| Percent of patients in nursing facilities | |
| Lowest quartile | 1.5 |
| Second quartile | 6.8 |
| Third quartile | 6.8 |
| Highest quartile | 13.5 |
| | |
| Percent of patients in assisted living facilities | |
| Lowest quartile | 2.1 |
| Second quartile | 1.9 |
| Third quartile | 8.8 |
| Highest quartile | 11.4 |

Note: Margins for all provider categories exclude overpayments to above-cap hospices. Margins are calculated based on Medicare-allowable, reimbursable costs.

Source: MedPAC analysis of Medicare hospice cost reports, Medicare Beneficiary Database, 100 percent hospice claims standard analytical file, and Medicare Provider of Services data from CMS.

intervening period would better align payments and costs and would likely reduce the variation in profitability across hospices and patients.

Hospices with a high share of patients in nursing facilities and assisted living facilities also have higher margins than other hospices. For example, in 2010, hospices in the top quartile of the percent of their patients residing in nursing facilities had a 13.5 percent margin compared with a margin of 6.8 percent in the middle quartiles and a 1.5 percent margin in the bottom quartile (Table 12-11).

Margins also vary by the share of a provider's patients in assisted living facilities, with a margin ranging from roughly 2 percent in the lowest two quartiles to about 11 percent in the highest quartile. Some of the difference in margins among hospices with different percentages of nursing facility and assisted living facility patients is driven by differences in the diagnosis profile and length of stay of patients in these hospices. However, there may also be efficiencies in the nursing facility setting, possibly from treatment of patients in a centralized location (e.g., lower mileage costs and staff time required for travel when a hospice treats more patients in a single location), and from overlap in aide services, supplies, and equipment provided by the hospice and nursing facility.

The OIG recently completed a report on hospices that have a large share of their patients in nursing facilities. These providers are more likely to be for profit, have longer lengths of stay, and treat patients with diagnoses that require less complex care (Office of Inspector General 2011). They also noted an overlap in payments provided to hospices and nursing facilities for aide services. The OIG recommended that CMS monitor hospices that focus on nursing facilities and reduce payments for hospice care in nursing facilities. In the Commission's letter to the Congress on repeal of the sustainable growth rate and possible offsets, the Commission included a placeholder policy to implement the OIG's recommendation for a reduction in hospice rates in nursing homes (see Appendix B, pp. 371–392).

**Projecting margins for 2013**

To project the aggregate Medicare margin for 2013, we model the policy changes that went into effect between 2010 (the year of our most recent margin estimates) and 2013. The policies include:

- a market basket update of 2.6 percent for fiscal year 2011, 3.0 percent for fiscal year 2012, and 2.6 for fiscal year 2013;

- a 1.0 percentage point reduction to the market update in 2013 (reflecting a productivity adjustment of –0.7 percentage point and an additional adjustment of –0.3 percentage point);

- years two through four of the seven-year phase-out of the wage index budget-neutrality adjustment factor, which reduced payments to hospices by 0.6 percentage point in each of the three fiscal years from 2011 through 2013;

Case 3:13-cv-00672   Document 1   Filed 07/09/13   Page 46 of 96 PageID #: 46

- additional wage index changes, which reduced payments in fiscal years 2011 and 2013 and increased payments in fiscal year 2012;[24] and

- additional net costs associated with the face-to-face visit requirement for recertification of patients in the third and subsequent benefit periods beginning in 2011 and the quality reporting program beginning in 2013.

Taking these policy changes into account and assuming that hospice costs in 2012 and 2013 grow at a rate similar to forecasted input price growth, we project an aggregate Medicare margin for hospices of 6.3 percent in fiscal year 2013. In recent years, hospice costs have grown more slowly than market basket, and if that trend continues, the 2013 margin would be higher than we have projected. This margin projection excludes the nonreimbursable costs associated with bereavement services and volunteers (which would lower the aggregate margin at most by 1.4 percentage points and 0.3 percentage point, respectively). It also does not include any adjustment for the higher indirect costs observed among hospital-based and home-health-based hospices (which would increase the industry-wide aggregate Medicare margin by up to 1.9 percentage points).

In considering the 2013 margin projection as an indicator of the adequacy of current payment rates for 2014, one policy of note is the continued phase-out of the wage index budget-neutrality adjustment. Our 2013 margin projection reflects the first four years (through 2013) of the seven-year phase-out of the wage index budget-neutrality adjustment. In 2014, the fifth year of this phase-out will result in an additional 0.6 percentage point reduction in payments.

## How should Medicare payments change in 2014?

On the basis of our review of payment adequacy for hospice services, the Commission recommends that the Congress eliminate the update to the hospice payment rates for fiscal year 2014.

## Update recommendation

### RECOMMENDATION 12

**The Congress should eliminate the update to the hospice payment rates for fiscal year 2014.**

### RATIONALE 12

Our payment indicators for hospice are generally positive. The number of hospices has increased in recent years because of the entry of for-profit providers. The number of beneficiaries enrolled in hospice also continues to increase, while growth in average length of stay has leveled off. Access to capital appears adequate. The projected 2013 aggregate Medicare margin is 6.3 percent.

### IMPLICATIONS 12

#### Spending

- Under current law, hospices would receive an update in fiscal year 2014 equal to the hospital market basket index (currently estimated at 2.6 percent), less an adjustment for productivity (currently estimated at 0.5 percent). Hospices may also face an additional 0.3 percentage point reduction in the fiscal year 2014 update, depending on whether certain targets for health insurance coverage among the working-age population are met. As a result, hospices would receive a net update of 1.8 percent or 2.1 percent (based on current estimates). Our recommendation to eliminate the payment update in fiscal year 2014 would decrease federal program spending relative to the statutory update by between $50 million and $250 million over one year and between $1 billion and $5 billion over five years.

#### Beneficiary and provider

- We do not expect this recommendation to have adverse effects on beneficiaries' access to care. This recommendation is not expected to affect providers' willingness and ability to care for Medicare beneficiaries. ∎

Case 3:13-cv-00672  Document 1  Filed 07/09/13  Page 47 of 96 PageID #: 47

# Endnotes

1   If a beneficiary does not have an attending physician, then the beneficiary can initially elect hospice based on the certification of the hospice physician alone.

2   When first established under TEFRA, the Medicare hospice benefit limited coverage to 210 days of hospice care. The Medicare Catastrophic Coverage Repeal Act of 1989 and the Balanced Budget Act of 1997 eased this limit.

3   CMS interpreted the 180th-day recertification and each subsequent recertification to mean the recertification prior to the third benefit period and each subsequent benefit period. The first two benefit periods are 90 days (unless the patient is discharged in the middle of the benefit period), so the third benefit period typically begins after 180 days.

4   The OIG has also released or planned studies on other hospice issues. The OIG recently released a study examining use of certain Medicare Part D drugs by patients in hospices and concluded that some drugs that should be covered by hospice may be currently billed to Part D (Office of Inspector General 2012). The OIG's 2013 work plan also includes an examination of the appropriateness of general inpatient hospice care and an assessment of Medicare payments when patients are transferred from acute care hospitals to hospice general inpatient care.

5   The average annual payment cap is calculated for the period November 1 through October 31 each year. There are two methodologies for calculating the beneficiary count used in the cap calculation: a streamlined methodology and proportional methodology. For years prior to cap year 2012, the streamlined methodology is used unless the hospice has filed a lawsuit or appeal regarding the methodology, in which case the proportional methodology is used for the challenged year going forward. Beginning in cap year 2012, the proportional methodology will be used for all hospices unless they elect to remain with the streamlined methodology. In the streamlined methodology, beneficiaries are counted in a given year if they have filed an election to receive care from the hospice during the period beginning on September 28 before the beginning of the cap period and ending on September 27 before the end of the cap period. If a beneficiary receives care from more than one hospice, that beneficiary is included in the beneficiary count for a hospice and a cap year as a fraction that represents the beneficiary's total hospice days provided by that hospice in that cap year as a percent of the beneficiary's total hospice days across all hospices and all cap years. The proportional approach uses the streamlined formula for counting beneficiaries who switched hospices and applies it to all of the hospice's patients, including those who do not switch hospices.

6   This 2012 cap threshold is equivalent to an average length of stay of 168 days of routine home care for a hospice with a wage index of 1.

7   The beneficiary may stay enrolled in the MA plan after enrollment in hospice. The rate Medicare pays to the MA plan would be reduced to include only the Part D premium (assuming an MA–Prescription Drug plan) and rebate dollars. The MA plan would be responsible for providing the beneficiary with any plan supplemental benefits and any Part D drugs unrelated to the terminal condition. If the beneficiary needs Part A or Part B services for a condition not related to the terminal illness, the MA plan can provide those services or the beneficiary can seek those services from a Medicare FFS provider. If such services were provided by the MA plan, the plan would be paid the Medicare FFS rate for those services by the Medicare program, but the services would be subject to the level of cost sharing of the MA benefit package (not the FFS cost-sharing levels).

8   In 2009, cancer was the cause of death for about 22 percent of decedents age 65 or older (Centers for Disease Control and Prevention 2012). As hospice use among beneficiaries with noncancer diagnoses has grown, the share of hospice decedents with cancer has declined from 52 percent in 2000 to 32 percent in 2011. Thus, the share of hospice decedents with cancer has become increasingly similar over time to the share of deaths attributed to cancer.

9   In late 2007, CMS issued guidance to state survey and certification agencies indicating that surveys of new hospices applying to be Medicare providers (as well as other types of providers that have the option of obtaining Medicare status through accreditation rather than state surveys) should be in the lowest tier of their workload priorities. While accreditation continues to be an option for obtaining Medicare status, the financial costs associated with pursuing accreditation may have slowed entry among some providers.

10  In this report, we count hospice providers by type of ownership by matching hospice claims data to the cost report data on provider ownership type, or in cases where cost report data were not available, matched to the Provider of Services file. In previous reports, we used data on type of ownership from CMS's Providing Data Quickly (PDQ) system. We believe the cost reports more accurately distinguish hospice ownership type than the PDQ in situations where a hospice changes ownership due to an acquisition or merger or in situations where the PDQ records the hospice's ownership as "other" but the cost report indicates a specific ownership type (i.e., for profit, nonprofit, government).

11  In this report, provider type (freestanding, hospital based, home health based, and SNF based) is based on the type of cost report submitted for the hospice. In prior reports, we used the hospice's self-reported type (freestanding, hospital based, home health based, and SNF based) from the CMS PDQ system. We

MEDPAC

believe the cost report data provide a more accurate reflection of the type of hospice than the PDQ data because some hospices in the PDQ data report being home health based even though they are included in a hospital's cost report.

12  The type of cost report filed—freestanding, home health, hospital, or SNF—does not necessarily reflect the location of individual patients served by the hospice. For example, all four types of hospices may serve some patients in nursing facilities.

13  These figures focus on beneficiaries entering the second benefit period and reflect the percentage of those beneficiaries whose second benefit period ended with a live discharge. Another way to look at live discharge rates is to focus on all hospice discharges in a year and calculate the share accounted for by live discharges. In 2011, just over 17 percent of hospice discharges involved patients who were discharged alive.

14  Above-cap hospices are more likely to be for-profit, freestanding providers and to have smaller patient loads than below-cap hospices.

15  The estimates of hospices over the cap are based on the Commission's analysis and are not identical to those of the CMS claims processing contractors. While the estimates are intended to approximate those of the contractors, differences in available data and methodology have the potential to lead to different estimates. An additional difference between our estimates and those of the CMS contractors relates to the alternative cap methodology that CMS established in the fiscal year 2012 hospice final rule (Centers for Medicare & Medicaid Services 2011). Based on that regulation, for cap years before 2012, hospices that challenged the cap methodology in court or made an administrative appeal will have their cap payments calculated (or recalculated) from the challenged year going forward using the alternative methodology. At the time of writing this report, the 2010 hospice cap calculations have not been finalized by the contractors and appeals are still possible, so uncertainty exists about which cap formula will be used to calculate cap overpayments for 2010 for individual providers. In light of this uncertainty, for estimation purposes we have assumed that the original cap methodology is used for the 2010 cap calculation for all hospices. This approach is conservative and likely results in our overstating the amount of cap overpayments and understating our margin estimates slightly.

16  Because of refinements to our methodology for calculating cap overpayments in 2008 through 2010 (due to changes in data availability and efforts to match as closely as possible the Medicare claims processing contractors' cap calculation approach), the cap estimates displayed in Table 12-8 are not entirely comparable across time. Nevertheless, on the basis of additional analyses we performed using a comparable methodology across time, we found that the percent of hospices exceeding the cap increased through 2009 and declined in 2010,

while the percent of total hospice payments over the cap and the average amount of the overpayment per above-cap hospice has declined since 2006.

17  The cost-per-day calculation reflects aggregate costs for all types of hospice care combined (routine home care, continuous home care, general inpatient care, and inpatient respite care). Days reflect the total number of days the hospice is responsible for care for Medicare patients, regardless of whether the patient received a visit on a particular day. The cost-per-day estimates are not adjusted for differences in case mix or wages across hospices.

18  In general, hospices with a larger volume of patients have lower indirect costs as a share of total costs. While patient volume explains some of the difference in indirect costs across providers, freestanding hospices have lower indirect costs than provider-based hospices when comparing providers with similar patient volumes.

19  The aggregate Medicare margin is calculated by the following formula: ((sum of total payments to all providers) – (sum of total costs to all providers))/(sum of total payments to all providers). Data on total costs come from the Medicare cost reports. Data on total Medicare payments and total cap overpayments come from Medicare claims data. We present margins for 2010 because of time lags in the claims data. We have complete claims data for all hospices only through the 2010 cost-reporting year (which for some hospices includes part of calendar year 2011).

20  Hospices that exceed the Medicare aggregate cap are required to repay the excess to Medicare. We do not consider the overpayments to be hospice revenues in our margin calculation.

21  Bereavement costs are generally similar across most types of hospices; however, nonprofits report higher costs than for profits (1.9 percent and 1.0 percent of total costs in 2010, respectively).

22  These estimates are adjusted to account for differences in patient volume across freestanding and provider-based hospices.

23  Our assumption of full return of overpayments likely understates margins slightly because not all hospices fully return overpayments. For example, a hospice provider last year closed reportedly to avoid repayment of overpayments (Waldman 2012).

24  Hospices' payments increase or decrease slightly from one year to the next because of the annual recalibration of the hospital wage index. The annual wage index recalibration was expected to reduce Medicare hospice payments by 0.2 percent in 2011 and 0.1 percent in 2013 and increase payments by 0.1 percent in 2012, according to estimates in the CMS final rules or notices establishing the hospice payment rates for those years.

Case 3:13-cv-00672   Document 1   Filed 07/09/13   Page 49 of 96 PageID #: 49

# References

Barnato, A. E., D. L. Anthony, J. Skinner, et al. 2009. Racial and ethnic differences in preferences for end-of-life treatment. *Journal of General Internal Medicine* 24, no. 6 (June): 695–701.

Braff Group. 2012a. Perspectives: 2012 second quarter. http://www.thebraffgroup.com/Articles/articlespdfs/perspectives/Q22012.pdf.

Braff Group. 2012b. Perspectives: 2012 third quarter. http://www.thebraffgroup.com/Articles/articlespdfs/perspectives/Q32012.pdf.

Centers for Disease Control and Prevention. 2012. *National vital statistics reports.* Vol. 61, no. 7 (October 26).

Centers for Medicare & Medicaid Services, Department of Health and Human Services. 2011. Medicare program; hospice wage index for fiscal year 2012. Notice of CMS ruling. *Federal Register* 76, no. 89 (May 9): 26731–26735.

Cohen, L. L. 2008. Racial/ethnic disparities in hospice care: A systematic review. *Journal of Palliative Medicine* 11, no. 5 (June): 763–768.

Crawley, L., R. Payne, J. Bolden, et al. 2000. Palliative and end-of-life care in the African American community. *Journal of the American Medical Association* 284, no. 19 (November 15): 2518–2521.

Government Accountability Office. 2004. *Medicare hospice care: Modifications to payment methodology may be warranted.* GAO–05–42. Washington, DC: GAO.

Hoyer, T. 2007. The future of hospice. *Caring,* November 6–8.

Krakauer, R., C. M. Spettell, L. Reisman, et al. 2009. Opportunities to improve the quality of care for advanced illness. *Health Affairs* 28, no. 5 (September–October): 1357–1359.

Medicare Payment Advisory Commission. 2012. *Report to the Congress: Medicare payment policy.* Washington, DC: MedPAC.

Medicare Payment Advisory Commission. 2011. *Report to the Congress: Medicare payment policy.* Washington, DC: MedPAC.

Medicare Payment Advisory Commission. 2010. *Report to the Congress: Medicare payment policy.* Washington, DC: MedPAC.

Medicare Payment Advisory Commission. 2009. *Report to the Congress: Medicare payment policy.* Washington, DC: MedPAC.

Medicare Payment Advisory Commission. 2008. *Report to the Congress: Reforming the delivery system.* Washington, DC: MedPAC.

Office of Inspector General, Department of Health and Human Services. 2011. *Medicare hospices that focus on nursing facility residents.* OEI–02–10–00070. Washington, DC: OIG.

Office of Inspector General, Department of Health and Human Services. 2012. *Medicare could be paying twice for prescription drugs for beneficiaries in hospice.* A–06–10–00059. Washington, DC: OIG.

Waldman, P. 2012. Hospices dump patients: Escape millions owed. *Bloomberg News,* February 14.

Case 3:13-cv-00672   Document 1   Filed 07/09/13   Page 50 of 96 PageID #: 50

# Medicare Benefit Policy Manual
## Chapter 9 - Coverage of Hospice Services Under Hospital Insurance

### Table of Contents
*(Rev. 156, 06-01-12)*

**Transmittals for Chapter 9**

10 - Requirements - General

20 - Certification and Election Requirements

    20.1 - Timing and Content of Certification

    20.2 - Election, Revocation, and Change of Hospice

        20.2.1 - Hospice Discharge

    20.3 - Election by Skilled Nursing Facility (SNF) and Nursing Facilities (NFs) Residents and Dually Eligible Beneficiaries

    20.4 - Election by HMO Enrollees

30 - Coinsurance

    30.1 - Drugs and Biologicals Coinsurance

    30.2 - Respite Care Coinsurance

40 - Benefit Coverage

    40.1 - Covered Services

        40.1.1 - Nursing Care

        40.1.2 - Medical Social Services

        40.1.3 - Physicians' Services

            40.1.3.1 - Attending Physician Services

            40.1.3.2 - Nurse Practitioners as Attending Physicians

        40.1.4 - Counseling Services

        40.1.5 - Short-Term Inpatient Care

        40.1.6 - Medical Appliances and Supplies

        40.1.7 - Hospice Aide and Homemaker Services

        40.1.8 - Physical Therapy, Occupational Therapy, and Speech-Language Pathology



EXHIBIT
B

                40.1.9 - Other Items and Services

        40.2 - Special Services

                40.2.1 - Continuous Home Care (CHC)

                40.2.2 - Respite Care

                40.2.3 - Bereavement Counseling

                40.2.4 - Special Modalities

        40.3 - Contracting With Physicians

        40.4 - Core Services

                40.4.1 - Contracting for Core Services

                40.4.1.1 - Contracting for Highly Specialized Nursing Services

                40.4.2 - Waiver for Certain Core Staffing Requirements

                    40.4.2.1 - Waiver for Certain Core Nursing Services

        40.5 - Non-Core Services

50 - Limitation on Liability of Beneficiaries for Certain Hospice Coverage Denials

60 - Provision of Hospice Services to Medicare/Veteran's Eligible Beneficiaries

70 – Hospice Contracts with An Entity for Services not Considered Hospice Services

        70.1 - Instructions for the Contractual Arrangement

80 – Hospice Pre-Election Evaluation and Counseling Services

        80.1 – Documentation

        80.2 - Payment

*90 - Caps and Limitations on Hospice Payments*

        *90.1 - Limitation on Payments for Inpatient Care*

        *90.2 - Aggregate Cap on Overall Reimbursement to Medicare-certified Hospices*

                *90.2.1 - Actual Medicare Payments Counted*

                *90.2.2 - New Hospices*

                *90.2.3 - Counting Beneficiaries for Calculation*

                *90.2.4 - Changing Aggregate Cap Calculation Methods*

                *90.2.5 - Other Issues*

                *90.2.6 - Updates to the Cap Amount*

        *90.3 - Administrative Appeals*

## 10 - Requirements - General
### (Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)

Hospice care is a benefit under the hospital insurance program. To be eligible to elect hospice care under Medicare, an individual must be entitled to Part A of Medicare and be certified as being terminally ill. An individual is considered to be terminally ill if the medical prognosis is that the individual's life expectancy is 6 months or less if the illness runs its normal course.

Section §1814(a)(7) of the Social Security Act (the Act) specifies that certification of terminal illness for hospice benefits shall be based on the clinical judgment of the hospice medical director or physician member of the interdisciplinary group (IDG) and the individual's attending physician, if he/she has one, regarding the normal course of the individual's illness. No one other than a medical doctor or doctor of osteopathy can certify or re-certify a terminal illness. Predicting of life expectancy is not always exact. The fact that a beneficiary lives longer than expected in itself is not cause to terminate benefits. "Attending physician" is further defined in section 20.1 and 40.1.3.1.

An individual (or his authorized representative) must elect hospice care to receive it. The first election is for a 90-day period. An individual may elect to receive Medicare coverage for an unlimited number of election periods of hospice care. The periods consist of two 90-day periods, and an unlimited number of 60-day periods. If the individual (or authorized representative) elects to receive hospice care, he or she must file an election statement with a particular hospice. Hospices obtain elections from the individual and forward them to the Medicare contractor, which transmits them to the Common Working File (CWF) in electronic format. Once the initial election is processed, CWF maintains the beneficiary in hospice status until death or until an election termination is received.

An individual must waive all rights to Medicare payments for the duration of the election/revocation of hospice care for the following services:

- Hospice care provided by a hospice other than the hospice designated by the individual (unless provided under arrangements made by the designated hospice); and

- Any Medicare services that are related to the treatment of the terminal condition for which hospice care was elected or a related condition or services that are equivalent to hospice care, except for services provided by:

  1. The designated hospice (either directly or under arrangement);

  2. Another hospice under arrangements made by the designated hospice; or

3. The individual's attending physician, who may be a nurse practitioner (NP) if that physician or nurse practitioner is not an employee of the designated hospice or receiving compensation from the hospice for those services.

Medicare services for a condition completely unrelated to the terminal condition for which hospice was elected remain available to the patient if he or she is eligible for such care.

## 20 - Certification and Election Requirements
**(Rev. 1, 10-01-03)**
**A3-3141, HO-204**

## 20.1 - Timing and Content of Certification
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

For the first 90-day period of hospice coverage, the hospice must obtain, no later than 2 calendar days after hospice care is initiated, (that is, by the end of the third day), oral or written certification of the terminal illness by the medical director of the hospice or the physician member of the hospice IDG, and the individual's attending physician if the individual has an attending physician.

The attending physician is a doctor of medicine or osteopathy or a nurse practitioner and is identified by the individual, at the time he or she elects to receive hospice care, as having the most significant role in the determination and delivery of the individual's medical care. A nurse practitioner is defined as a registered nurse who performs such services as legally authorized to perform (in the state in which the services are performed) in accordance with State law (or State regulatory mechanism provided by State law) and who meets training, education, and experience requirements described in 42 CFR 410.75.

Note that a rural health clinic (RHC) or federally qualified healthcare clinic (FQHC) physician can be the patient's attending physician but may only bill for services as a physician under regular Part B rules. These services would not be considered RHC or FQHC services or claims (e.g., the physicians do not bill under the RHC provider number but they bill under their own provider number).

Written certification must be on file in the hospice patient's record prior to submission of a claim to the Medicare contractor.

Initial certifications may be completed up to 15 days before hospice care is elected. If these requirements are not met, no payment is made for the days prior to the certification. Instead, payment begins with the day of certification, i.e., the date verbal certification (or written certification if that is done first) is obtained. If the physician forgets to date the certification a notarized statement or some other acceptable documentation can be obtained to verify when the certification was obtained.

For the subsequent periods, recertifications may be completed up to 15 days before the next benefit period begins. For subsequent periods, the hospice must obtain, no later than 2 calendar days after the first day of each period, a written certification statement from the medical director of the hospice or the physician member of the hospice's IDG. If the hospice cannot obtain written certification within 2 calendar days, it must obtain oral certification within 2 calendar days. A written certification must be on file in the hospice patient's record prior to submission of a claim to the Medicare contractor.

The written certification must include:

1. The statement that the individual's medical prognosis is that their life expectancy is 6 months or less if the terminal illness runs its normal course;

2. Specific clinical findings and other documentation supporting a life expectancy of 6 months or less; and

3. The signature(s) of the physician(s), the date signed, and the benefit period dates that the certification or recertification covers.

4. As of October 1, 2009, the physician's brief narrative explanation of the clinical findings that supports a life expectancy of 6 months or less as part of the certification and recertification forms, or as an addendum to the certification and recertification forms.

- If the narrative is part of the certification or recertification form, then the narrative must be located immediately above the physician's signature.

- If the narrative exists as an addendum to the certification or recertification form, in addition to the physician's signature on the certification or recertification form, the physician must also sign immediately following the narrative in the addendum.

- The narrative shall include a statement directly above the physician signature attesting that by signing, the physician confirms that he/she composed the narrative based on his/her review of the patient's medical record or, if applicable, his or her examination of the patient.

- The narrative must reflect the patient's individual clinical circumstances and cannot contain check boxes or standard language used for all patients. The physician must synthesize the patient's comprehensive medical information in order to compose this brief clinical justification narrative.

- For recertifications on or after January 1, 2011, the narrative associated with the third benefit period recertification and every subsequent recertification must include an explanation of why the clinical findings of the face-to-face encounter support a life expectancy of 6 months or less.

5. Face-to-face encounter. For recertifications on or after January 1, 2011, a hospice physician or hospice nurse practitioner must have a face-to-face encounter with each hospice patient prior to the beginning of the patient's third benefit period, and prior to each subsequent benefit period. Failure to meet the face-to-face encounter requirements specified in this section results in a failure by the hospice to meet the patient's recertification of terminal illness eligibility requirement. The patient would cease to be eligible for the benefit.

The face to face encounter requirement is satisfied when the following criteria are met:

a. Timeframe of the encounter: The encounter must occur no more than 30 calendar days prior to the start of the third benefit period and no more than 30 calendar days prior to every subsequent benefit period thereafter (refer to section 20.1.5.d below for an exception to this timeframe).

b. Attestation requirements: A hospice physician or nurse practitioner who performs the encounter must attest in writing that he or she had a face-to-face encounter with the patient, including the date of the encounter. The attestation, its accompanying signature, and the date signed, must be a separate and distinct section of, or an addendum to, the recertification form, and must be clearly titled. Where a nurse practitioner performed the encounter, the attestation must state that the clinical findings of that visit were provided to the certifying physician, for use in determining whether the patient continues to have a life expectancy of 6 months or less, should the illness run its normal course.

c. Practitioners who can perform the encounter: A hospice physician or a hospice nurse practitioner can perform the encounter. A hospice physician is a physician who is employed by the hospice or working under contract with the hospice. A hospice nurse practitioner must be employed by the hospice. A hospice employee is one who receives a W-2 from the hospice or who volunteers for the hospice.

d. Timeframe exceptional circumstances for new hospice admissions in the third or later benefit period: In cases where a hospice newly admits a patient who is in the third or later benefit period, exceptional circumstances may prevent a face-to-face encounter prior to the start of the benefit period. For example, if the patient is an emergency weekend admission, it may be impossible for a hospice physician or NP o see the patient until the following Monday. Or, if CMS data systems are unavailable, the hospice may be unaware that the patient is in the third benefit period. In such documented cases, a face to face encounter which occurs within 2 days after admission will be considered to be timely. Additionally, for such documented exceptional cases, if the patient dies within 2 days of admission without a face to face encounter, a face to face encounter can be deemed as complete.

The hospice must retain the certification statements.

These requirements also apply to individuals who had been previously discharged during a benefit period and are being recertified for hospice care.

## 20.2 - Election, Revocation, and Change of Hospice
### (Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)

Each hospice designs and prints its election statement. The election statement must include the following items of information:

- Identification of the particular hospice that will provide care to the individual;

- The individual's or representative's (as applicable) acknowledgment that the individual has been given a full understanding of hospice care, particularly the palliative rather than curative nature of treatment;

- The individual's or representative's (as applicable) acknowledgment that the individual understands that certain Medicare services are waived by the election;

- The effective date of the election; and

- The signature of the individual or representative.

An individual or representative may revoke the election of hospice care at any time in writing. To revoke the election of hospice care, the individual must file a document with the hospice that includes a signed statement that the individual revokes the election for Medicare coverage of hospice care for the remainder of that election period and the effective date of that revocation. Note that a verbal revocation of benefits is NOT acceptable. The individual forfeits hospice coverage for any remaining days in that election period. An individual may not designate an effective date earlier than the date that the revocation is made.

Upon revoking the election of Medicare coverage of hospice care for a particular election period, an individual resumes Medicare coverage of the benefits waived when hospice care was elected. An individual may at any time elect to receive hospice coverage.

An individual may change, once in each election period, the designation of the particular hospice from which he or she elects to receive hospice care. The change of the designated hospice is not considered a revocation of the election. To change the designation of hospice programs, the individual must file, with the hospice from which he or she has received care and with the newly designated hospice, a signed statement that includes the following information: the name of the hospice from which the individual has received care, the name of the hospice from which they plan to receive care and the date the change is to be effective. (A change of ownership of a hospice is not considered

a change in the patient's designation of a hospice and requires no action on the patient's part.)

Medicare beneficiaries enrolled in managed care plans may elect hospice benefits. Federal regulations require that the Medicare contractor assigned the hospice specialty workload maintain payment responsibility for hospice services and may pay for other claims if that contractor is the geographically assigned Medicare contractor for the managed care enrollees who elect hospice; for specifics, see regulations at 42 CFR 417, Subpart P, 417.585, Special Rules: Hospice Care (b), and 42 CFR 417.531 Hospice Care Services (b). Institutional claims for services not related to the terminal illness would otherwise be the responsibility of another geographically assigned Medicare contractor.

Managed care enrollees who have elected hospice may revoke hospice election at any time, but claims will continue to be paid by fee-for-service contractors as if the beneficiary were a fee-for-service beneficiary until the first day of the month following the month in which hospice was revoked. As specified above, by regulation, the duration of payment responsibility by fee-for-service contractors extends through the remainder of the month in which hospice is revoked by hospice beneficiaries.

See Pub. 100-04, Medicare Claims Processing Manual, Chapter 2, "Admission and Registration" and Chapter 11, "Processing Hospice Claims," for requirements for hospice reporting to the Medicare contractor.

## 20.2.1 - Hospice Discharge
### (Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)

The hospice benefit is available only to individuals who are terminally ill; therefore, a hospice may discharge a patient if it discovers that the patient is not terminally ill. Discharge may also be necessary when the patient moves out of the service area of the hospice. The hospice notifies the Medicare contractor of the discharge so that hospice services and billings are terminated as of that date. In this situation, the patient loses the remaining days in the benefit period. However, there is no increase cost to the beneficiary. General coverage under Medicare is reinstated at the time the patient revokes the benefit or is discharged.

Once a hospice chooses to admit a Medicare beneficiary, it may not automatically or routinely discharge the beneficiary at its discretion, even if the care promises to be costly or inconvenient, or the State allows for discharge under State requirements. The election of the hospice benefit is the beneficiary's choice rather than the hospice's choice, and the hospice cannot revoke the beneficiary's election. Neither should the hospice request or demand that the patient revoke his/her election.

In most situations, discharge from a hospice will occur as a result of one the following:

- The beneficiary decides to revoke the hospice benefit;

- The beneficiary moves away from the geographic area that the hospice defines in its policies as its service area;

- The beneficiary transfers to another hospice;

- The beneficiary's condition improves and he/she is no longer considered terminally ill. In this situation, the hospice will be unable to recertify the patient; or

- The beneficiary dies.

There may be extraordinary circumstances in which a hospice would be unable to continue to provide hospice care to a patient. These situations would include issues where patient safety or hospice staff safety is compromised. The hospice must make every effort to resolve these problems satisfactorily before it considers discharge an option. All efforts by the hospice to resolve the problem(s) must be documented in detail in the patient's clinical record and the hospice must notify the Medicare contractor and State Survey Agency of the circumstances surrounding the impending discharge. The hospice may also need to make referrals to other relevant state/community agencies (i.e., Adult Protective Services) as appropriate.

## 20.3 - Election by Skilled Nursing Facility (SNF) and Nursing Facilities (NFs) Residents and Dually Eligible Beneficiaries
(Rev. 1, 10-01-03)
HO-204.2

A Medicare beneficiary who resides in an SNF or NF may elect the hospice benefit if:

- The residential care is paid for by the beneficiary; or

- The beneficiary is eligible for Medicaid and the facility is being reimbursed for the beneficiary's care by Medicaid, and

- The hospice and the facility have a written agreement under which the hospice takes full responsibility for the professional management of the individual's hospice care and the facility agrees to provide room and board to the individual.

A beneficiary could be in a SNF under the SNF benefit for a condition unrelated to the terminal condition and simultaneously be receiving hospice for the terminal condition.

The State Medicaid Agency pays the hospice the daily amount allowed by the State for room and board while the patient is receiving hospice care, and the hospice pays the facility. Room and board services include the performance of personal care services, assistance in activities of daily living, socializing activities, administration of medication, maintaining the cleanliness of a resident's room, and supervising and assisting in the use of durable medical equipment and prescribed therapies.

Whenever Medicaid is involved, the hospice sends a copy of the election form to the State Medicaid Agency at the time of election, and also notifies this agency when the patient is no longer receiving hospice care.

In States that offer the hospice benefit under the Medicaid program, dually eligible beneficiaries must elect the benefit under both programs at once.

## 20.4 - Election by HMO Enrollees
**(Rev. 22, Issued: 09-24-04, Effective: 12-08-03, Implementation: 06-28-04)**

An HMO enrollee may elect the hospice benefit. After the hospice election, Medicare pays the hospice for hospice services and pays the HMO for services of the attending physician, who may be a nurse practitioner, (as defined in section 20.1 of this manual) and services not related to the patient's terminal illness. (See 42 CFR 417.531 and 417.585.)

## 30 - Coinsurance
**(Rev. 1, 10-01-03)**
A3-3142

Hospices may charge individuals for the applicable coinsurance amounts. An individual who has elected hospice care is liable for the following coinsurance payments.

## 30.1 - Drugs and Biologicals Coinsurance
**(Rev. 1, 10-01-03)**
A3-3142.A

An individual is liable for a coinsurance payment for each palliative drug and biological prescription furnished by the hospice while the individual is not an inpatient. The amount of coinsurance for each prescription approximates five percent of the cost of the drug or biological to the hospice, determined in accordance with the drug copayment schedule established by the hospice, except that the amount of coinsurance for each prescription may not exceed $5.00. The cost of the drug or biological may not exceed what a prudent buyer would pay in similar circumstances. The drug copayment schedule must be periodically reviewed for reasonableness and approved by the intermediary before it is used.

## 30.2 - Respite Care Coinsurance
**(Rev. 1, 10-01-03)**
A3-3142.B

The amount of coinsurance for each respite care day is equal to five percent of the payment made by CMS for a respite care day. The amount of the individual's coinsurance liability for respite care during a hospice coinsurance period may not exceed

the inpatient hospital deductible applicable for the year in which the hospice coinsurance period began.

The individual hospice coinsurance period begins on the first day an election is in effect for the beneficiary and ends with the close of the first period of 14 consecutive days on each of which an election is not in effect for the beneficiary.

Thus, if a beneficiary elects to use all three of his/her election periods consecutively (without a 2-week break), they are subject to a maximum coinsurance for respite care equal to the hospital inpatient deductible. Similarly, if a break between election periods exceeds 14 days, the maximum coinsurance for respite care doubles, triples, or quadruples (depending on the number of election periods used and the timing of subsequent elections).

**EXAMPLE:** Mr. Brown elected an initial 90-day period of hospice care. Five days after the initial period of hospice care ended, he began another period of hospice care under a subsequent election. Immediately after the period ended, he began a third period of hospice care. Mr. Brown received inpatient respite care during all three periods of hospice care. Since these election periods were not separated by 14 consecutive days, they constitute a single hospice coinsurance period. Therefore, a maximum coinsurance for respite care during all three periods of hospice care may not exceed the amount of the inpatient hospital deductible for the year in which the first period began.

## 40 - Benefit Coverage
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

For an individual to receive covered hospice services, a certification of the individual's terminal illness must have been completed as set forth in §20.1, and a plan of care must be established before services are provided. Services must be consistent with the plan of care and reasonable and necessary for the palliation or management of the terminal illness and related conditions.

A nurse practitioner serving as an attending physician should participate as a member of the IDG that establishes and/or or updates the individual's plan of care. The nurse practitioner may not serve as or replace the medical director or physician designee.

Hospices are paid a per diem rate based on the number of days and level of care provided during the election period. Levels of care are defined as:

- Routine home care (refer to §40.2.1);

- Continuous home care (refer to §40.2.1);

- Inpatient respite care (refer to §40.1.5 and §40.2.2); and

- General inpatient care (refer to §40.1.5).

Hospices are expected to furnish the following services to the extent specified by the plan of care for the individual. The categories listed above are used in billing to describe the acuity of the services furnished. See Pub. 100-04, Medicare Claims Processing Manual, Chapter 11, "Processing Hospice Claims," for a description of billing procedures.

## 40.1 - Covered Services
### (Rev. 1, 10-01-03)
A3-3143.1, HO-230.1

Appropriately qualified personnel must perform all services, but it is the nature of the service, rather than the qualification of the person who provides it, that determines the coverage category of the service. The following services are covered hospice services.

## 40.1.1 - Nursing Care
### (Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)

To be covered as nursing services, the services must require the skills of a registered nurse, a licensed practical nurse (LPN) or a licensed vocational nurse (LVN) under the supervision of a registered nurse, and must be reasonable and necessary to the treatment of the patient's illness or injury.

Services provided by a nurse practitioner (NP) who is not the patient's attending physician, are included under nursing care. This means that, in the absence of an NP, a registered nurse (RN) would provide the service. Since the services are nursing, payment is encompassed in the hospice per diem rate and may not be billed separately regardless of whether the services are provided by an NP or an RN. The following are examples of some services that traditionally are provided by an RN, which could also be provided by an NP, for which separate payment is not made:

> a. A patient with a terminal diagnosis of lung cancer complains of leg pain. In the absence of an NP, an RN would assess the patient.

> b. Assessment of pain and or symptoms for the determination for the need of medications, other treatments, continuous home care, general inpatient care etc. In the absence of an NP, an RN would assess the patient.

> c. Administration of medications through intravenous (e.g., PICC, central, etc.), intrathecal or any other means. In the absence of an NP, an RN would administer the medication.

> d. Family counseling. In the absence of an NP, an RN, social worker or counselor would provide this service.

e. Providing a home visit for assessment or provision of care to a patient who is not his/her patient. In the absence of the NP, the service would be provided by an RN, LPN or LVN. Therefore the NP cannot bill separately for the service.

## 40.1.2 - Medical Social Services
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

Medical social services must be provided by a person who meets the criteria given in the Conditions of Participation at 42CFR418.114(b)(3).

Services of these professionals which may be covered include, but are not limited to:

1. Assessment of the social and emotional factors related to the patient's illness, need for care, response to treatment and adjustment to care;

2. Assessment of the relationship of the patient's medical and nursing requirements to the patient's home situation, financial resources and availability of community resources;

3. Appropriate action to obtain available community resources to assist in resolving the patient's problem (**NOTE**: Medicare does not cover the services of a medical social worker to complete or assist in the completion of an application for Medicaid because Federal regulations require the State to provide assistance in completing the application to anyone who chooses to apply for Medicaid.);

4. Counseling services that are required by the patient; and

5. Medical social services furnished to the patient's family member or caregiver on a short-term basis when the hospice can demonstrate that a brief intervention (that is, two or three visits) by a medical social worker is necessary to remove a clear and direct impediment to the effective palliation and management of the patient's terminal illness and related conditions. To be considered "clear and direct," the behavior or actions of the family member or caregiver must plainly obstruct, contravene, or prevent the patient's medical treatment. Medical social services to address general problems that do not clearly and directly impede treatment, as well as long-term social services furnished to family members, such as ongoing alcohol counseling, are not covered.

## 40.1.3 - Physicians' Services
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

A physician must perform physicians' services (as defined in 42 CFR 410.20(b)(1)(1)), except that the services of the hospice medical director or the physician member of the interdisciplinary group must be performed by a doctor of medicine or osteopathy. Nurse practitioners may not serve as a medical director or as the physician member of the

interdisciplinary group.  Nurse practitioners may not bill for medical services other than those described in 40.1.3.2.

### 40.1.3.1 - Attending Physician Services

The attending physician is a doctor of medicine or osteopathy or a nurse practitioner and is identified by the individual, at the time he or she elects to receive hospice care, as having the most significant role in the determination and delivery of the individual's medical care.

### 40.1.3.2 - Nurse Practitioners as Attending Physicians
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

A nurse practitioner is defined as a registered nurse who is permitted to perform such services as legally authorized to perform (in the state in which the services are performed) in accordance with State law (or State regulatory mechanism provided by State law) and who meets training, education and experience requirements described in 42 CFR 410.75.

If a beneficiary does not have an attending physician or a nurse practitioner who has provided primary care prior to or at the time of the terminal diagnosis, the beneficiary may choose to be served by either a physician or a nurse practitioner who is employed by the hospice.  The beneficiary must be provided with a choice of a physician or a nurse practitioner.

Services provided by a nurse practitioner that are medical in nature must be reasonable and necessary, be included in the plan of care and must be services that, in the absence of a nurse practitioner, would be performed by a physician.  If the services performed by a nurse practitioner are such that a registered nurse could perform them in the absence of a physician, they are not considered attending physician services and are not separately billable.  Services that are duplicative of what the hospice nurse would provide are not separately billable.

Nurse practitioners cannot certify a terminal diagnosis or the prognosis of 6 months or less, if the illness or disease runs its normal course, or re-certify terminal diagnosis or prognosis.  In the event that a beneficiary's attending physician is a nurse practitioner, the hospice medical director and/or physician designee may certify or re-certify the terminal illness.

Hospice nurse practitioners may conduct face-to-face encounters as described in §20.1(5) as part of the certification process, but are still prohibited by statute from certifying the terminal illness.

### 40.1.4 - Counseling Services
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

Counseling services are provided to the terminally ill individual and the family members or other persons caring for the individual at home. Counseling, including dietary counseling, may be provided both for the purpose of training the individual's family or other caregiver to provide care, and for the purpose of helping the individual and those caring for the individual to adjust to the individual's approaching death. Bereavement counseling is available to the patient and his or her immediate family to provide emotional, psychosocial, and spiritual support and services before and after the death of the patient and to assist with issues related to grief, loss, and adjustment for up to 1 year after the patient's death. Also, see §40.5 regarding waivers under certain conditions for making dietary counseling available.

## 40.1.5 - Short-Term Inpatient Care
**(Rev. 22, Issued: 09-24-04, Effective: 12-08-03, Implementation: 06-28-04)**

Short-term inpatient care may be provided in a participating hospice inpatient unit, or a participating SNF or NF that additionally meets the special hospice standards regarding patient and staffing areas. Medicare payment cannot be made for inpatient hospice care provided in a VA facility to Medicare beneficiaries eligible to receive Veteran's health services. Services provided in an inpatient setting must conform to the written plan of care. However, dually eligible veterans residing at home in their community may elect the Medicare Hospice Benefit. See §60.

Medicare covers two levels of inpatient care: respite care for relief of the patient's caregivers, and general inpatient care which is for pain control and symptom management.

General inpatient care may be required for procedures necessary for pain control or acute or chronic symptom management that cannot feasibly be provided in other settings. Skilled nursing care may be needed by a patient whose home support has broken down if this breakdown makes it no longer feasible to furnish needed care in the home setting.

General inpatient care under the hospice benefit is not equivalent to a hospital level of care under the Medicare hospital benefit. For example, a brief period of general inpatient care may be needed in some cases when a patient elects the hospice benefit at the end of a covered hospital stay. If a patient in this circumstance continues to need pain control or symptom management, which cannot be feasibly provided in other settings while the patient prepares to receive hospice home care, general inpatient care is appropriate.

Other examples of appropriate general inpatient care include a patient in need of medication adjustment, observation, or other stabilizing treatment, such as psycho-social monitoring, or a patient whose family is unwilling to permit needed care to be furnished in the home.

Inpatient respite care may be furnished to provide respite for the individual's family or other persons caring for the individual at home.

Note that hospice inpatient care in an SNF or NF serves to prolong current benefit periods for general Medicare hospital and SNF benefits. This could potentially affect patients who revoke the hospice benefit.

If a hospice patient receives general inpatient care for 3 days or more, and elects to revoke hospice, then the 3 day stay (although not equivalent to a hospital level of care) would still qualify the beneficiary for covered SNF services.

## 40.1.6 - Medical Appliances and Supplies
**(Rev. 1, 10-01-03)**
**A3-3143.1.F, HO-230.1.F**

Medical appliances and supplies may be provided, including drugs and biologicals. Only drugs as defined in §1861(t) of the Act and which are used primarily for the relief of pain and symptom control related to the individual's terminal illness are covered. Appliances may include covered durable medical equipment as described in 42 CFR 410.38 as well as other self-help and personal comfort items related to the palliation or management of the patient's terminal illness. Equipment is provided by the hospice for use in the patient's home while the patient is under hospice care. Medical supplies include those that are part of the written plan of care.

## 40.1.7 - Hospice Aide and Homemaker Services
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

A hospice aide is a person who meets the requirements described in the Conditions of Participation. Hospice aides may provide personal care services. Aides may also perform household services to maintain a safe and sanitary environment in areas of the home used by the patient, such as changing the bed or light cleaning and laundering essential to the comfort and cleanliness of the patient. Hospice aides are assigned to a specific patient by a registered nurse who is a member of the interdisciplinary group. Written patient care instructions for a hospice aide must be prepared by a registered nurse who is responsible for the supervision of a hospice aide.

CMS' Conditions of Participation define a qualified homemaker as an individual who meets the requirements described in 42CFR418.202(g) and who has successfully completed hospice orientation addressing the needs and concerns of patients and families coping with a terminal illness. Homemaker services may include assistance in maintenance of a safe and healthy environment and services to enable the individual to carry out the plan of care.

## 40.1.8 - Physical Therapy, Occupational Therapy, and Speech-Language Pathology
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

Physical therapy, occupational therapy, and speech-language pathology services may be provided for purposes of symptom control or to enable the individual to maintain

activities of daily living and basic functional skills. Also, see §40.5 regarding waivers available under certain conditions for provision of these services.

## 40.1.9 - Other Items and Services
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

Any other item or service which is included in the plan of care and for which payment may otherwise be made under Medicare, in accordance with title XVIII of the Social Security Act, is a covered service under the Medicare hospice benefit. The hospice is responsible for providing any and all services indicated in the plan of care as necessary for the palliation and management of the terminal illness and related conditions.

The hospice Interpretive Guidelines for 42 CFR 418.54(a), published via a Survey and Certification letter (S & C 09-19, Advance Copy-Hospice Program Interpretive Guidance Version 1.1), require that the initial assessment be conducted in the location where hospice services will be provided. The plan of care is developed from that initial assessment and from the comprehensive assessment. Ambulance transports to a patient's home which occur on the effective date of the hospice election (i.e., the date of admission), would occur prior to the initial assessment and therefore prior to the plan of care's development. As such, these transports are not the responsibility of the hospice. Medicare will pay for ambulance transports of hospice patients to their home, which occur on the effective date of hospice election, through the ambulance benefit rather than through the hospice benefit. Ambulance transports of a hospice patient, which are related to the terminal diagnosis and which occur after the effective date of election, are the responsibility of the hospice.

**EXAMPLE:**

A hospice determines that an existing patient's condition has worsened and has become medically unstable. An inpatient stay will be necessary for proper palliation and management of the condition. The hospice adds this inpatient stay to the plan of care and decides that, due to the patient's fragile condition, the patient will need to be transported to the hospital by ambulance. In this case, the ambulance service becomes a covered hospice service.

## 40.2 - Special Services
**(Rev. 1, 10-01-03)**
**A3-3143.2, HO-230.3**

## 40.2.1 - Continuous Home Care (CHC)
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

Continuous home care may be provided only during a period of crisis. A period of crisis is a period in which a patient requires continuous care which is primarily nursing care to achieve palliation or management of acute medical symptoms. If a patient's caregiver has been providing a skilled level of care for the patient and the caregiver is unwilling or

unable to continue providing care, this may precipitate a period of crisis because the skills of a nurse may be needed to replace the services that had been provided by the caregiver. This type of care can also be given when a patient is in a long term care facility.

The hospice must provide a minimum of 8 hours of care during a 24-hour day, which begins and ends at midnight. This care need not be continuous, e.g., 4 hours could be provided in the morning and another 4 hours in the evening. But a need for an aggregate of 8 hours of primarily nursing care is required. The care must be predominately nursing care provided by either an RN, an LPN, or an LVN. Services provided by a nurse practitioner that, in the absence of a nurse practitioner, would be performed by an RN, LPN, or LVN, are nursing services and are paid at the same continuous home care rate. This means that at least half of the hours of care are provided by an RN, LPN, or LVN. Homemaker or hospice aide services may be provided to supplement the nursing care.

**NOTE:** When fewer than 8 hours of care are required, the services are covered as routine home care rather than continuous home care.

Nursing care in the hospice setting can include skilled observation and monitoring when necessary and skilled care is needed to control pain and other symptoms.

The development of the CHC rate included the daily costs of therapy visits, drugs, supplies and equipment, and the average daily cost of the hospice IDG. The computation of the required 8 hours for the CHC level of care applies only to direct patient care provided by a nurse, a homemaker, or a hospice aide and, in general, assumes that one hourly payment would be made per hour. While in the majority of situations, one individual would provide continuous care during any given hour, there may be circumstances where the patient's needs require direct interventions by more than one covered discipline resulting in an overlapping of hours between the nurse and hospice aide. In these circumstances, the overlapping hours would be counted separately. The hospice would need to ensure that these direct patient care services are clearly documented and are reasonable and necessary. Computation of hours of care should also reflect the total hours of direct care provided to an individual that support the care that is needed and required. This means that all nursing and aide hours should be included in the computation for CHC and when the aide hours exceed the nursing hours, CHC would be denied and routine payment will be made. The statutory definition of continuous home care is meant to include the full range of services needed to achieve palliation and management of acute medical situations. Deconstructing what is provided in order to meet payment rules is not allowed. In other words, hospices cannot discount any portion of the hours provided in order to qualify for a continuous home care day.

Documentation of care, modification of the plan of care and supervision of aides or homemakers would not qualify as direct care nor would it qualify as necessitating the services of more than one provider. In addition, the services provided by other disciplines such as medical social workers or pastoral counselors are an integral part of the care provided to a hospice patient, however, these services are not included in the

statutory definition of continuous care and are not counted towards total hours of continuous care. However, the services of social workers and pastoral counselors would be expected during these periods of crisis, if warranted as part of hospice care and are included in the provisions of routine hospice care.

The following are used to illustrate circumstances that may qualify as CHC. This list is not all-inclusive nor does it indicate that if a patient presents with similar situations, that it would constitute CHC.

### 1. Frequent medication adjustment to control symptoms/collapse of family support system

**Situation A:** The patient has had a central venous catheter inserted to provide access for continuous Fentanyl drip for pain control and for the administration of antiemetic medication to control continuous nausea and vomiting. The nurse spends 2 hours teaching the family members how to administer IV medications. She returns in the evening for 1 hour. The hospice aide provides 3 hours of care. The nurse spends 2 hours phoning physicians, ordering medications, documenting and revising the plan of care.

**Determination:** Despite 8 hours of service, this does not constitute CHC since 2 of the 8 hours were not activities related to direct patient care.

**Situation B:** The patient experiences new onset seizures. He continues to have episodes of vomiting. The nurse remains with the patient for 4 hours (10 AM – 2 PM) until the seizures cease. During that time she provides skilled care and family teaching. The patient's wife states she is unable to provide any more care for her husband. A hospice aide is assigned to the patient for monitoring for 24 hours, beginning at 2:00 PM, with a total of 8 hours of direct care in the first day. The nurse returns intermittently for a total of an additional 5 hours to administer medications, assess the patient and to relieve the aide for breaks. The social worker provides 3 hours of services to work with the patient's wife in identifying alternative methods to care for the patient.

**Determination:** This qualifies as a continuous home care day. This constitutes a medical crisis, including collapse of family structure. The caregiver has been providing skilled care and the change in the patient's condition requires the nurse's interventions. Since there is no overlap in nursing care, 17 hours of care (i.e., 9 hours of nursing care and 8 hours of aide care) would be computed as CHC. The social worker hours would not be incorporated. If the caregiver had been providing custodial care and his medical crisis resolved within a short time frame, this situation would not have qualified as CHC.

### 2. Symptom management/rapid deterioration/imminent death

**Situation A**: 77-year-old patient with lung cancer whose caregiver is 80 years old. The caregiver has been caring for this patient for 4 months and is now exhausted and scared. The care provided consists of assisting with bathing, assisting the patient to ambulate, preparing meals, housekeeping and administering oral medications. Since the patient is dyspneic at rest, she requires assistance in all ADLs, which equates to 9 hours of assistance within a 24-hour period.

**Determination**: This would not qualify as CHC since there is little nursing care that requires a nurse. The patient would however be a candidate for an inpatient respite level of care.

**Situation B**: The patient's condition deteriorates. The patient now has circumoral cyanosis, respiratory rate of 44 and labored with intermittent episodes of apnea. The nurse performs a complete assessment and teaches the caregiver on methods to make the patient comfortable. The nurse returns twice within the 24 - hour period to assess the patient. She revises the plan of care after conferring with the patient's attending physician and with the hospice physician. The homemaker and hospice aide are sent to assist the caregiver. Within the 24-hour period, the direct care provided by the nurse equates to 3 hours, homemaker with 2 hours, and hospice aide of 6 hours.

**Determination**: Since only 3 of the 11 hours were skilled care requiring the services of a nurse, this would not constitute CHC. In this situation, the care required is not predominantly nursing but are comprised of services provided by a hospice aide. In addition, it would not be correct to discount any portion of the hospice aide's hours or to provide these services gratis in order to qualify for the CHC benefit.

**Situation C**: The next day, the patient's condition deteriorates further. She has increased periods of apnea and air hunger. In addition she is experiencing continuous vomiting and increasing pain. Her blood pressure is beginning to decrease and her respirations are increasing. The nurse remains at the patient's bedside for 4 hours while attempting to control her pain and symptoms. The hospice aide provides care during 1 hour of this period. The nurse leaves and the hospice aide remains at the bedside for 3 hours. The social worker comes and talks with the caregiver and remains for 1 hour. The nurse returns while the aide leaves. The nurse remains with the patient for 2 hours until she dies. The social worker returns and stays with the caregiver for 1 hour until the mortuary arrives.

**Determination**: The nurse provided 6 hours of direct skilled nursing care; the aide provided 4 hours of direct care resulting in a total of 10 hours of registered nurse and hospice aide care. Since at least 6 of the 10 hours were direct nursing care, and since nursing care was the predominant service provided during the 10 hours, the care meets the criteria for CHC. In addition, since the nurse and the aide provided direct care for the patient simultaneously, it would be appropriate to

bill for each resulting in total of 10 billable hours. The patient received 12 hours of care. The 2 hours for the social worker are not counted towards the CHC hours.

Medicare's requirements for coverage of CHC are that at least 8 hours of primarily nursing care are needed in order to manage an acute medical crisis as necessary to maintain the individual at home. When a hospice determines that a beneficiary meets the requirements for CHC, appropriate documentation must be available to support the requirement that the services provided were reasonable and necessary and were in compliance with an established plan of care in order to meet a particular crisis situation. This would include the appropriate documentation of the situation and the need for continuous care services consistent with the plan of care.

Continuous home care is covered only as necessary to maintain the terminally ill individual at home.

### 40.2.2 - Respite Care
**(Rev. 1, 10-01-03)**
**A3-3143.2.B, HO-230.3.B**

Respite care is short-term inpatient care provided to the individual only when necessary to relieve the family members or other persons caring for the individual at home. Respite care may be provided only on an occasional basis and may not be reimbursed for more than five consecutive days at a time.

### 40.2.3 - Bereavement Counseling
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

Bereavement counseling consists of counseling services provided to the individual's family before and after the individual's death. Bereavement counseling is a required hospice service, provided for a period up to 1 year following the patients' death. It is not separately reimbursable.

Bereavement specifics are found in Pub. 100-07, State Operations Manual, Appendix M, 42CFR 418.64(d)(1), L596.

### 40.2.4 - Special Modalities
**(Rev. 1, 10-01-03)**
**Hospice 230.3.D**

A Hospice may use chemotherapy, radiation therapy, and other modalities for palliative purposes if it determines that these services are needed. This determination is based on the patient's condition and the Hospice care giving philosophy. No additional Medicare payment may be made regardless of the cost of the services.

## 40.3 - Contracting With Physicians
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

Section 1861(dd)(2) of the Act allows hospices to contract for physician services. Medical directors and physician members of the IDG are not required to be employed by the hospice. These physicians can be "under contract" with the hospice. Although the Act does not specify what the terms of that contract must be, requirements at 42CFR 418.64(a), 418.100(e), and 418.102(a) are applicable to hospice, as well as all other responsibilities under the hospice conditions of participation. Hospices retain professional management responsibilities for these services and must ensure that qualified persons furnish them in a safe and effective manner. All physician employees and those under contract must function under the supervision of the hospice medical director. Since nurse practitioners are not included in the definition of a physician, this section does not apply to nurse practitioners.

## 40.4 - Core Services
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

With the exception of physician services, substantially all core services must be provided directly by hospice employees on a routine basis. These services must be provided in a manner consistent with acceptable standards of practice. The following are hospice core services:

- Physician services.

- Nursing services, (routinely available and/or on call on a 24-hour basis, 7 days a week) provided by or under the supervision of an RN functioning within a plan of care developed by the hospice IDG in consultation with the patient's attending physician, if the patient has one.

- Medical social services by a qualified social worker under the direction of a physician.

- Counseling (including, but not limited to, bereavement, dietary, and spiritual counseling) with respect to care of the terminally ill individual and adjustment to death. The hospice must make bereavement services available to the family and other individuals identified in the bereavement plan of care up to 1 year following the death of the patient.

The hospice may contract for physician services as specified in the Conditions of Participation.

## 40.4.1 - Contracting for Core Services
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

A hospice may use contracted staff, if necessary, to supplement hospice employees in order to meet the needs of patients under extraordinary or other non-routine circumstances.

Arrangements made by a hospice to furnish items or services must be such that receipt of payment by the hospice for the services relieves the beneficiary of liability or any other persons to pay for the services. Whether the services and items are furnished by the hospice itself or by another organization under arrangements made by the hospice, both must agree not to charge the patient for covered services and items and must agree to return money incorrectly collected.

A hospice that has a written agreement with another agency, individual, or organization to furnish any services under arrangement must retain administrative and financial management, and oversight of staff and services for all arranged services, to ensure the provision of quality care. Arranged services must be supported by written agreements that require that all services be--

(1) Authorized by the hospice;

(2) Furnished in a safe and effective manner by qualified personnel; and

(3) Delivered in accordance with the patient's plan of care.

## 40.4.1.1 - Contracting for Highly Specialized Nursing Services
### (Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)

A hospice may contract for the services of a registered nurse if the services are highly specialized, provided non-routinely, and so infrequently that the provision of such services directly would be impracticable and prohibitively expensive. Highly specialized services are determined by the nature of the service and the nursing skill level required to be proficient in the service. For example, a hospice may need to contract with a pediatric nurse if it cares for pediatric patients infrequently and if employing a pediatric nurse would be impracticable and expensive. Continuous care is not a highly specialized service, because while time intensive, it does not require highly specialized nursing skills.

## 40.4.2 - Waiver for Certain Core Staffing Requirements
### (Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)

Hospices are prohibited from contracting with other hospices and non-hospice agencies on a routine basis for the provision of the core services of nursing, medical social services and counseling to hospice patients. A hospice may, however, enter into arrangements with another hospice program or other entity for the provision of these core services in extraordinary, exigent, or other non-routine circumstances. An extraordinary circumstance generally would be a short-term temporary event that was unanticipated. Examples of such circumstances might include unanticipated periods of high patient loads, caused by an unexpectedly large number of patients requiring continuous care

simultaneously, temporary staffing shortages due to illness, receiving patients evacuated from a disaster such as a hurricane or a wildfire, or temporary travel of a patient outside the hospice's service area. The hospice that contracts for services must maintain professional management responsibility for all services provided under arrangement or contract at all times and in all settings. Regulations at 42CFR418.100(e) discuss the professional management responsibilities of the hospice for services provided under arrangement.

Hospices must maintain evidence of the extraordinary circumstances that required them to contract for the core services and comply with the following:

(a) The hospice must ensure that contracted staff is providing care that is consistent with the hospice philosophy and the patient's plan of care and is actively participating in the coordination of all aspects of the patient's hospice care.

Hospices may not routinely contract for a specific level of care (e.g., continuous care) or for specific hours of care (e.g., evenings and week-ends).

## 40.4.2.1 - Waiver for Certain Core Nursing Services
### (Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)

The Conditions of Participation allow CMS to waive the requirement that a hospice provide nursing services directly, if the hospice is located in a non-urbanized area. The location of a hospice that operates in several areas is considered to be the location of its central office. The hospice must provide evidence to CMS that it has made a good faith effort to hire a sufficient number of nurses to provide services. CMS may waive the requirement that nursing services be furnished by employees based on the following criteria:

- The location of the hospice's central office is in a non-urbanized area as determined by the Bureau of the Census.

- There is evidence that the hospice was operational on or before January 1, 1983, including the following:

  - Proof that the organization was established to provide hospice services on or before January 1, 1983;

  - Evidence that hospice-type services were furnished to patients on or before January 1, 1983; and

  - Evidence that hospice care was a discrete activity rather than an aspect of another type of provider's patient care program on or before January 1, 1983.

- By virtue of the following evidence that a hospice made a good faith effort to hire nurses:

    - Copies of advertisements in local newspapers that demonstrate recruitment efforts;

    - Job descriptions for nurse employees;

    - Evidence that salary and benefits are competitive for the area; and

    - Any other recruiting activities (e.g., recruiting efforts at health fairs and contacts with appropriate personnel at other providers in the area).

A waiver remains in effect for a 1-year period. A waiver may be extended for two additional 1-year periods. Prior to each additional year, the hospice must request the extension and certify that the employment market for appropriate personnel has not changed significantly since the initial waiver was granted if this is the case. No additional evidence is required with this certification.

Waiver requests and any extensions with supporting documentation must be sent to the regional office for review. Regional offices have the authority to review, and approve, or deny the waiver application.

## 40.5 - Non-core Services
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

In addition to the hospice core services (physician services, nursing services, medical social services, and counseling), the following services must be provided by the hospice, either directly or under arrangements, to meet the needs of the patient and family:

- Physical and occupational therapy and speech-language pathology services.

- Hospice aide services. A hospice aide employed by a hospice, either directly or under contract, must meet the qualifications required by §1891(a)(3) of the Act and implemented at 42CFR418.76.

- Homemaker services.

- Volunteers.

- Medical supplies (including drugs and biologicals on a 24-hour basis) and the use of medical appliances related to the terminal diagnosis and related conditions.

- Short-term inpatient care (including respite care and interventions necessary for pain control and acute and chronic symptom management) in a Medicare/Medicaid participating facility.

Section 1861(dd)(5) of the Act allows CMS to permit certain waivers of the requirements that the hospice make physical therapy, occupational therapy, speech language pathology services, and dietary counseling available (as needed) on a 24-hour basis. CMS is also allowed to waive the requirement that hospices provide dietary counseling directly. These waivers are available only to an agency or organization that is located in an area which is not an urbanized area (as defined by the Bureau of Census) and that can demonstrate to CMS that it has been unable, despite diligent efforts, to recruit appropriate personnel.

## 50 - Limitation on Liability of Beneficiaries for Certain Hospice Coverage Denials
**(Rev. 1, 10-01-03)**
**PM-A-97-11**

Section 1879 of the Act provides protections from liability for charges for certain denied claims to beneficiaries who, acting in good faith, receive inpatient or outpatient services from Medicare Part A providers, or items or services from Medicare Part B suppliers which accept assignment. Likewise, providers and suppliers may also be protected from liability under §1879 of the Act when it is determined that they did not know and could not reasonably have been expected to know that Medicare would deny payment. When the beneficiary is held not liable and the provider also is held to be not liable, payment may be made for a denied claim under §1879, as if the service were covered.

Section 1879(g) of the Act extends limitation on liability protection to a beneficiary enrolled in a hospice when there is a denial of claims due to a determination that the individual is not terminally ill, effective for services furnished on or after August 5, 1997.

When a denial of payment for hospice services is based upon a determination that the beneficiary is not terminally ill, the contractor will apply the usual procedures of the limitation on liability provision.

See the Medicare Claims Processing Manual, Chapter 30, "Limitation on Liability."

## 60 - Provision of Hospice Services to Medicare/Veteran's Eligible Beneficiaries
**(Rev. 1, 10-01-03)**
**CCP/DCPC Comments - Tom Saltz, Carol Blackford, Terrie Deutsch**

Medicare beneficiaries that are dually eligible veterans, and reside at home in their community may elect the Medicare Hospice Benefit and have hospice services paid for under the Medicare Hospice Benefit. See §1853(c) and 1814(d) of the Act.

If a duly eligible veteran, who had been receiving Medicare hospice services in his/her home, is admitted to a VA owned and operated inpatient facility, the beneficiary must

revoke the Medicare hospice benefit. Medicare is not allowed to pay for those services for which another federal entity is primary payer (§1853(c) and 1814(d)).

Dually eligible veterans may elect to receive Medicare hospice services while residing in community nursing homes and state homes and have those services paid for under the Medicare hospice benefit. (This is similar to paying for hospice care if a beneficiary lives in a nursing facility. See §20.3.)

## 70 – Hospice Contracts with An Entity for Services not Considered Hospice Services
### (Rev. 1, 10-01-03)
### A-02-102

The law governing the provision of Medicare hospice services is found at §1861(dd) of the Act. This law specifies the services covered as hospice care and the conditions a hospice program must meet in order to participate in the Medicare program. One of the conditions a hospice program must meet is that it be "primarily engaged" in providing hospice care and services to terminally ill individuals. The law further clarifies that "terminally ill individuals" are individuals having a "medical prognosis that their life expectancy is six months or less if the illness runs its normal course." Although the law does not explicitly define its expectations for "primarily engaged," CMS has interpreted it to mean exactly what it says, that a hospice provider must be primarily engaged in providing hospice care and services (§1861(dd)(2)(A)(i)). "Primarily" does not mean "exclusively." This requirement does not preclude provision of non-hospice services to terminally ill individuals who are not hospice patients or services to individuals, who are not terminally ill, so long as the primary activity of the hospice is the provision of hospice services to terminally ill individuals.

The CMS recognizes that there may be circumstances in which another health care entity may wish to "purchase" some of the highly specialized staff time or services of a hospice to better meet the needs of its specific patient population. In these cases, the services are not "hospice" services in terms of Medicare payment but become part of the service package of the provider under whose care the patient is. Examples of such circumstances are provided below.

**EXAMPLE 1:**

A dually eligible Medicare/Medicaid beneficiary enrolled in the Program of All-Inclusive Care for the Elderly (PACE) program for approximately 2 years has been diagnosed with a life limiting terminal illness with a prognosis of six months or less. In the course of routine assessments, the PACE provider recognizes that the beneficiary would benefit from the specialized services of a pain management specialist or a grief counselor. The PACE provider would then enter into a contractual arrangement with a Medicare certified hospice to purchase these specialized services. The hospice provider would bill the PACE provider for the services, and the PACE provider would in turn pay the hospice provider directly. Neither provider type would be allowed to bill Medicare separately for

the contracted services (which in this example are PACE services and included in the PACE provider's capitated rate). In this example, the PACE provider would maintain a medical record on the patient and the hospice provider would submit any documentation related to the care of the PACE patient to the PACE provider.

**EXAMPLE 2:**

A Medicare beneficiary is receiving skilled services from a Medicare certified home health agency (HHA). The beneficiary has been diagnosed with a life limiting terminal illness, but chooses to continue curative treatments, thereby rendering him ineligible for the Medicare hospice benefit. The beneficiary is experiencing a period of intractable pain, and the HHA wishes to purchase specialized pain control services from the hospice provider. The HHA would then enter into a contractual arrangement with a Medicare certified hospice to purchase specialized nursing services. The hospice would bill the HHA and the HHA would pay the hospice provider directly. Neither provider type would be allowed to bill Medicare separately for the contracted services (which, in this example, are home health services and therefore included in the HHA's episode payment). In this example, the HHA would maintain a medical record on the patient, and the hospice submits any documentation related to the pain management to the HHA.

**EXAMPLE 3:**

A Medicare beneficiary (non-dual eligible) resides in a skilled nursing facility (SNF) and has a diagnosis of Alzheimer's disease. The beneficiary's disease process has progressed to a stage in which he/she can no longer ingest food or fluids. The beneficiary's family has been approached by the SNF regarding the placement of a feeding tube and has been told, "their loved one may not live much longer." The family is struggling with this concept and has requested assistance from the SNF regarding hospice care and grief counseling. The SNF has provided information about the Medicare hospice benefit to the family, but the patient's legal representative has made a decision not to elect hospice care at this time. The SNF does not have a trained grief counselor or full-time social worker on staff, but has a business relationship with a local hospice and has requested the services of a pastoral or grief counselor. The SNF and hospice enter into a contractual arrangement for the provision of grief counseling to this beneficiary's family by a pastoral care counselor. The hospice provider would bill the SNF, and the SNF would pay the hospice provider directly. Neither provider type would be allowed to bill Medicare Part A or B separately for the pastoral care services (which in this example are included in the Medicare's Resource Utilization Group or RUG payments to the SNF). The SNF maintains the medical record on this patient and the hospice provider would submit any documentation related to the pastoral care services provided to the SNF.

In all of the examples provided above, the billing and payment for the services are between each of the providers. Medicare must not be billed separately for any of the contracted services referred to in the examples provided above.

## 70.1 - Instructions for the Contractual Arrangement
**(Rev. 1, 10-01-03)**

A contractual agreement between both parties must be on file and available for review by the state survey agency responsible for conducting surveys on behalf of CMS to assess compliance with the relevant conditions of participation for the provider contracting for the hospice services. Where a PACE organization contracts with a hospice organization, the contract, which is reviewed by CMS, must meet the requirements specified in 42 CFR 460.70. The agreement must specify each of the services to be provided, the credentials required for any of the professionals providing the services, the billing method and payment amounts, and any required documentation.

## 80 - Hospice – Pre-Election Evaluation and Counseling Services
**(Rev. 28, Issued: 12-03-04, Effective: 01-01-05, Implementation: 01-03-05)**

Effective January 1, 2005, section 512 of the MMA amends section 1812(a)(1)(5) of the Act which, provides for a one-time payment to be made to a hospice for evaluation and counseling services furnished by a physician who is either the medical director of or employee of a hospice agency. In order to be eligible to receive this service, a beneficiary must:

- be determined to have a terminal illness (which is defined as having a prognosis of 6 months or less if the disease or illness runs its normal course;

- not have made a hospice election, and

- not previously received the pre-election hospice services

- Services under this benefit are comprised of:

- evaluating the individual's need for pain and symptom management;

- counseling the individual regarding hospice and other care options, and may include;

- advising the individual regarding advanced care planning.

The services that comprise this benefit are currently available through other Medicare benefits. For example, evaluation and counseling are often provided by an individual's physician as well as by other sources such as discharge planners, case managers, social workers and nonphysician providers. Therefore, this service may not be reasonable and necessary for all individuals. To the extent that beneficiaries have already received Medicare-covered evaluation and counseling with respect to end-of-life care, the hospice pre-election benefit would seem duplicative. However, if a beneficiary or the beneficiary's physician deem it necessary to seek the expertise of a hospice medical

director or physician employee, this benefit is available to assure that a beneficiary's end-of-life options for care and pain management are addressed.

Since the decision to utilize this benefit is determined by the beneficiary or the beneficiary's physician, the evaluation and counseling service may not be initiated by the hospice, that is, the entity receiving payment for the service. Payments by hospice agencies to physicians or others in a position to refer patients for services furnished under this provision may implicate the Federal anti-kickback statute.

If the beneficiary's physician is also the medical director or physician employed by a hospice or possesses expertise in the provision of palliative or hospice care, that physician already possesses the expertise necessary to furnish end-of-life services and will have received payment for these services through the use of evaluation and management codes.

For example:

A thoracic surgeon has diagnosed a patient hospitalized in an acute care facility, with end-stage lung cancer with a prognosis of 6 months or less, if the disease runs its normal course. The patient has been informed of this diagnosis. The physician, with the patient's concurrence, requests a consult by the hospital's palliative care team. The team meets with the patient, discusses options, evaluates the patient's pain and symptoms, and makes recommendations including hospice care. Utilization of the evaluation and consultation benefit would be duplicative.

A patient with terminal cervical cancer has been receiving aggressive curative care as an outpatient, which has not been successful. The patient's physician, nurse and social worker have discussed the possibility of hospice. The patient decides to seek information from a hospice. Utilization of the evaluation and consultation benefit would be appropriate.

Hospice A receives referrals from various physicians and facilities that the patients are certified as having a terminal illness and wish to elect the hospice benefit. Hospice A utilizes the evaluation and consultation benefit for every patient as a preliminary evaluation, prior to the actual election of the benefit. Utilization of the evaluation and consultation benefit would not be appropriate.

Nursing home B contacts Hospice C providing them with a list of patients that can be certified as having a terminal illness. The medical director of Hospice C makes "rounds" on these patients, many of whom are unable to communicate and whose symptoms are being managed well. Utilization of the evaluation and consultation benefit would not be appropriate.

A patient is being treated by a physician for end-stage COPD. The patient is experiencing distressing symptoms, but has not been able to make any definitive decision as to advanced directive decisions. The patient's physician feels that the expertise of the

medical director in Hospice D would be able to provide recommendations as to symptom management and advance directive decisions. The medical director provides the evaluation and consultation services. The patient does not elect the hospice benefit, but is able to make determinations as to his wishes and the physician has recommendations to assist in his provision of care. Utilization of the evaluation and consultation benefit would be appropriate.

## 80.1 - Documentation
**(Rev. 28, Issued: 12-03-04, Effective: 01-01-05, Implementation: 01-03-05)**

If the beneficiary's physician initiates the request for the evaluation and counseling service, appropriate documentation guidelines should be followed, including the determination of the terminal diagnosis. Since this provision is not a prerequisite of or part of the hospice benefit, certification of the terminal diagnosis is not required. The request or referral should be in writing, and the hospice medical director or physician employee would be expected to provide a written note on the patient's medical chart as well as maintaining a written record of this service.

If the beneficiary initiates the request for the service, the hospice agency should maintain a written record of the service and communication with the beneficiary's physician, with the beneficiary's permission, would occur, to the extent necessary to ensure continuity of care.

## 80.2 - Payment
**(Rev. 141, Issued: 03-02-11, Effective: 01-01-11: Implementation: 03-23-11)**

Section 512(b) of the MMA amends section 1814(i) of the Act and establishes payment for this service. The statute specifies that the payment will be made to the hospice for services provided by the hospice medical director or physician employed by the hospice. The provision of these services may not be delegated to other hospice personnel (i.e., nurse practitioners, registered nurses, social workers, etc.) and may not be furnished by a physician under contract with the hospice. CMS intends to monitor data regarding the use of this benefit.

Since the evaluation and counseling provision is not a service within the hospice benefit, payment for these services is not included in the hospice payment cap.

Payment to the hospice agency for the provision of this evaluation and counseling service is made using HCPCS code G0337. The national payment amounts for this service for FY 2005 was $54.57. Future changes in the rate will be identified in the Physician Fee Schedules. See Pub 100-04, Medicare Claims Processing Manual, chapter 11, section 10.1, for claims processing instructions.

## 90 – Caps and Limitations on Hospice Payments
*(Rev. 156, Issued: 06-01-12, Effective: 04-14-11 for the 2011 Cap Year and Prior Cap Years; October 1, 2011 for the 2012 Cap Year and Subsequent Cap Years; Implementation Date: 07-02-12)*

*The statute requires that hospice payments be limited by an inpatient cap and by an aggregate cap. Medicare contractors make the cap calculations annually, after the end of the aggregate cap year, which runs from November 1st to October 31st. Contractors send each provider a cap determination letter, which serves as a notice of program reimbursement under 42 CFR §405.1803(a)(3), showing the results of those calculations. Any amounts in excess of either cap are considered to be overpayments, and must be repaid to Medicare. Contractors compute the inpatient cap and the aggregate cap in order to determine whether a provider has exceeded the allowable hospice cap amount. The contractor shall issue a demand for the overpayment from hospices that exceeded the allowable hospice cap amount.*

## 90.1 – Limitation on Payments for Inpatient Care
*(Rev. 156, Issued: 06-01-12, Effective: 04-14-11 for the 2011 Cap Year and Prior Cap Years; October 1, 2011 for the 2012 Cap Year and Subsequent Cap Years; Implementation Date: 07-02-12)*

*Payments to a hospice for inpatient care are subject to a limitation on the number of days of inpatient care furnished to Medicare patients. During the 12-month period beginning November 1 of each year and ending October 31, the aggregate number of inpatient days for general inpatient care and inpatient respite care may not exceed 20 percent of the aggregate number of days of hospice care provided to all Medicare beneficiaries in that hospice during that same period. This limitation is applied once each year, at the end of the hospices' "cap period" (November 1 - October 31). The inpatient cap is calculated by the contractor as follows:*

1. *The maximum allowable number of inpatient days is calculated by multiplying the total number of days of Medicare hospice care by 0.20.*

2. *If the total number of days of inpatient care furnished to Medicare hospice patients is less than or equal to the maximum, no adjustment is necessary.*

3. *If the total number of days of inpatient care exceeds the maximum allowable number, the limitation is determined by:*

   - *Calculating the ratio of the maximum allowable inpatient care days to total inpatient care days reported on the Provider Statistical and Reimbursement Report (PS&R). The calculated ratio is multiplied by the total reimbursement for inpatient care (general inpatient and inpatient respite reimbursement) paid to the provider.*

- *Multiplying the excess inpatient care days by the routine home care (RHC) rate, wage adjusted for the location of the hospice.*

- *Adding together the amounts calculated in the two bullets above to derive the total allowable payments for inpatient care.*

- *Comparing the total allowable payments for inpatient care in bullet 3 above with actual payments made to the hospice for inpatient care during the "cap period" in order to determine the overpayments paid to the provider.*

*Any excess reimbursement must be refunded by the hospice.*

**EXAMPLE:** *Assume that:*

*40,000 total hospice days x 0.20 = 8,000 = the maximum allowable inpatient care days.*

*10,000 inpatient care days were reported and paid to the hospice.*

*The ratio of maximum allowable days to the number of actual days equals 8,000 to 10,000 or 0.80.*

*Assume the total reimbursement for inpatient care revenue codes 0655 and 0656 for services provided between November 1st and October 31st is $4,000,000.*

*$4,000,000 x 0.80 = $3,200,000 = payments for allowable inpatient care days.*

*Excess inpatient days = (10,000 actual days) − (8,000 allowable days) = 2,000. Multiply the excess inpatient care days by the routine home care rate (wage adjusted for a hospice located in Redding, California, using the FY 2012 Wage Index value of 1.4631): 2,000 x $199.09 = $398,180 = allowable payments for the excess inpatient care days.*

*Add the allowable inpatient payments and the allowable payments for excess days to derive the inpatient cap: $3,200,000 + $398,180 = $3,598,180 = inpatient cap.*

*Compare $3,598,180 inpatient cap with $4,000,000 actually paid for inpatient revenue codes.*

*The hospice must refund $4,000,000 - $3,598,180 = $401,820*

## 90.2 – Aggregate Cap on Overall Reimbursement to Medicare-certified Hospices

*(Rev. 156, Issued: 06-01-12, Effective: 04-14-11 for the 2011 Cap Year and Prior Cap Years; October 1, 2011 for the 2012 Cap Year and Subsequent Cap Years; Implementation Date: 07-02-12)*

*Overall aggregate Medicare payments made to a Medicare-certified hospice are subject to an aggregate cap, calculated by the contractor at the end of the hospice cap period. The cap year is from November 1ˢᵗ of each year to October 31ˢᵗ of the next year. The aggregate cap is calculated by multiplying a Medicare beneficiary count during the period by a statutory "cap amount." The Medicare beneficiary count is determined using either the proportional method or the streamlined method, as described in section 90.2.3 below. The hospice cap amount for the cap year ending October 31, 2011, is $24,527.69. This amount is adjusted annually to reflect the percentage increase or decrease in the medical care expenditure category of the Consumer Price Index (CPI) for all urban consumers. The computation of the cap amount is explained in section 90.2.6 below.*

*The total actual Medicare payments made for services furnished to Medicare beneficiaries during the cap year (November 1ˢᵗ to October 31ˢᵗ) are compared to the aggregate cap for this period. Any actual Medicare payments in excess of the aggregate cap must be refunded by the hospice.*

*All Medicare-certified hospices are subject to the aggregate cap calculation. When a beneficiary receives hospice care from more than one hospice, only the care provided by the Medicare-certified hospice(s) is considered when computing the aggregate cap.*

### 90.2.1 – Actual Medicare Payments Counted
*(Rev. 156, Issued: 06-01-12, Effective: 04-14-11 for the 2011 Cap Year and Prior Cap Years; October 1, 2011 for the 2012 Cap Year and Subsequent Cap Years; Implementation Date: 07-02-12)*

*"Total actual Medicare payments made for services furnished to Medicare beneficiaries during the cap year" refers to Medicare payments for services rendered beginning November 1 and ending October 31, regardless of when payment is actually made. All payments made to hospices on behalf of all Medicare hospice beneficiaries receiving services during the cap year are counted, regardless of which year(s) the beneficiary is counted in determining the cap, using the best data available at the time of the calculation. For example, payments made to a hospice for an individual initially electing hospice care on October 5, 2011 and dying on October 25, 2011, pertain to services rendered in the cap year beginning November 1, 2010, and ending October 31, 2011, and are counted as payments made during the 2011 cap year (November 1, 2010 - October 31, 2011), even though the beneficiary would be counted in the 2012 cap year if that hospice used the streamlined method (the period for counting beneficiaries using the streamlined method is September 28, 2011 to September 27, 2012).*

### 90.2.2 – New Hospices
*(Rev. 156, Issued: 06-01-12, Effective: 04-14-11 for the 2011 Cap Year and Prior Cap Years; October 1, 2011 for the 2012 Cap Year and Subsequent Cap Years; Implementation Date: 07-02-12)*

*The hospice aggregate cap is calculated in a different manner for new hospices entering the Medicare program if the hospice has not participated in the program for an entire cap year. In this situation, the initial cap calculations for newly certified hospices must cover a period of at least 12 months but less than 24 months. For example, the first cap period for a hospice entering the program on October 1, 2010, is from October 1, 2010 through October 31, 2011. Similarly, the first cap period for hospice providers entering the program after November 1, 2009, but before November 1, 2010, ends October 31, 2011.*

*Contractors shall use the proportional method when calculating the aggregate cap for all hospices which are Medicare-certified on or after October 1, 2011.*

### 90.2.3 – Counting Beneficiaries for Calculation
*(Rev. 156, Issued: 06-01-12, Effective: 04-14-11 for the 2011 Cap Year and Prior Cap Years; October 1, 2011 for the 2012 Cap Year and Subsequent Cap Years; Implementation Date: 07-02-12)*

*From the inception of the benefit in 1983 until April 14, 2011, the original method for counting beneficiaries for use in the aggregate cap calculation remained unchanged. That method is described below:*

> *Each hospice's cap amount is calculated by the contractor multiplying the adjusted cap amount by the number of Medicare beneficiaries who elected to receive hospice care from that hospice during the cap period. For purposes of this calculation, the number of Medicare beneficiaries includes—*

> *(1) Those Medicare beneficiaries who have not previously been included in the calculation of any hospice cap and who have filed an election to receive hospice care from the hospice during the period beginning on September 28 (34 days before the beginning of the cap period) and ending on September 27 (35 days before the end of the cap period).*

> *(2) In the case in which a beneficiary has elected to receive care from more than one hospice, each hospice includes in its number of Medicare beneficiaries only that fraction which represents the portion of a patient's total stay in all hospices that was spent in that hospice.*

*The following descriptions of CMS policies outlining procedures for counting beneficiaries used in the hospice cap calculation were described in CMS Ruling 1355-R and in the FY 2012 Hospice Wage Index Final Rule. The policies differ by timeframe, so*

*note carefully the timeframe and cap years mentioned. The two methods for counting beneficiaries are the streamlined method and the proportional method, and are explained below.*

**A. Hospice Appeals for Review of an Overpayment Determination (Ruling CMS-1355-R):**

*Effective April 14, 2011, a CMS Ruling entitled "Medicare Program; Hospice Appeals for Review of an Overpayment Determination" (CMS-1355-R), and also published in the **Federal Register** as CMS-1355-NR (76 FR 26731, May 9, 2011, found at http://www.gpo.gov/fdsys/pkg/FR-2011-05-09/pdf/2011-10694.pdf#page=1), was issued related to the aggregate cap calculation for hospices. This ruling provided for application of a proportional method to hospices that have challenged the original method of counting beneficiaries (shown at the beginning of section 90.2.3) for the aggregate cap calculation. Specifically, the Ruling provides that, for any hospice which has a timely-filed administrative appeal of the method used to determine the number of Medicare beneficiaries used in the aggregate cap calculation for a cap year ending on or before October 31, 2011, the Medicare contractors shall recalculate that year's cap determination using the proportional method. The proportional method is described in section 90.2.3.C below.*

**B. Cap year ending October 31, 2011 (the 2011 cap year) and all prior cap years:**

*Ruling CMS-1355-R applies only to the 2011 cap year and any prior cap year(s) for which a hospice received an overpayment determination and filed a timely qualifying appeal. For any hospice that received relief through Ruling CMS-1355-R in the form of a recalculation of one or more of its cap determinations, or for any hospice that receives relief from a court after challenging the validity of the cap regulation, the hospice's cap determination for any subsequent cap year is also calculated using a proportional method, as opposed to the original method described at the beginning of this section. The proportional method is defined below in section 90.2.3.C.*

*Additionally, there are hospices that have not filed an appeal of an overpayment determination challenging the validity of the original method for counting beneficiaries and which are waiting for CMS to make a cap determination for cap years ending on or before October 31, 2011. Any such hospice provider, as of October 1, 2011, may elect to have its final cap determination for such cap year(s), and all subsequent cap years, calculated using the proportional method.*

*Finally, those hospices which would like to continue to have the original method (hereafter called the streamlined method) used to determine the number of beneficiaries in a given cap year would not need to take any action, and would have their cap calculated using the streamlined method for cap years ending on or before October 31, 2011. The streamlined method is defined in section 90.2.3.C below.*

***C. Cap year ending October 31, 2012 (the 2012 cap year) and subsequent cap years:***

*For cap years ending on or after October 31, 2012, and all subsequent cap years, the hospice aggregate cap is calculated using the proportional method, except that eligible hospices can make a one-time election up to 60 days after receiving their 2012 cap determination to have their aggregate cap calculated using the streamlined method, as described later in this section. Contractors shall provide hospices with details on how to make that one-time election.*

***Proportional Method:*** *Under the proportional method, for each hospice, the contractor shall include in its number of Medicare beneficiaries only that fraction which represents the portion of a patient's total days of care in all hospices and all years that was spent in that hospice in that cap year (November 1st to October 31st), using the best data available at the time of the calculation (subject to revision at a later time based on updated data). The whole and fractional shares of Medicare beneficiaries' time in a given cap year are then summed to compute the total number of Medicare beneficiaries served by that hospice in that cap year.*

*When a hospice's cap is calculated using the proportional method, and a beneficiary included in that calculation survives into another cap year, the contractor may need to make adjustments to prior cap determinations. Reopening is allowed for up to 3 years from the date of the cap determination notice, except in the case of fraud, where reopening is unlimited. A revised cap determination letter issued as a result of a reopening may itself be reopened, subject to the 3 year limitation on reopening.*

***Streamlined Method:*** *Eligible hospices can exercise a one-time election to have its cap determination for cap years 2012 and beyond calculated using the streamlined method. The option to elect the continued use of the streamlined method for cap years 2012 and beyond is available only to hospices that have had their cap determinations calculated using the streamlined method for all cap years prior to cap year 2012.*

- ***When a beneficiary receives care from only one hospice:*** *The hospice includes in its number of Medicare beneficiaries those Medicare beneficiaries who have not previously been included in the calculation of any hospice cap, and who have filed an election to receive hospice care during the period beginning on September 28 (34 days before the beginning of the cap year) and ending on September 27 (35 days before the end of the cap year), using the best data available at the time of the calculation.*

  *Once a beneficiary has been included in the calculation of a hospice cap, he or she may not be included in the cap for that hospice again, even if the number of covered days in a subsequent cap year exceeds that of the period where the beneficiary was included (this could occur when the beneficiary has breaks between periods of election).*

- *When a beneficiary receives care from more than one Medicare-certified hospice during a cap year or years:* Each Medicare-certified hospice includes in its number of Medicare beneficiaries only that fraction which represents the portion of a patient's total days of care in all Medicare-certified hospices and all years that was spent in that hospice in that cap year (November 1st to October 31st), using the best data available at the time of the calculation. Cap determinations are subject to reopening/adjustment to account for updated data. The streamlined method cap calculation for a Medicare beneficiary who has been in more than one Medicare-certified hospice is identical to the proportional method.

### D. Beneficiary Counting Examples

*The following examples are for illustrative purposes only. As the examples indicate, if a hospice transitions from the streamlined method to the proportional method during the 2012 cap year, the transition might result in particular beneficiaries being counted a total of less or more than 1.0. As the examples illustrate, if the proportional method is applied for a given year, then every beneficiary who receives services in that year is counted based on the number of days of care furnished to the beneficiary in that year, relative to the total days of care for the beneficiary for all years.*

**Example 1.** *Jane Smith, a Medicare beneficiary, initially elected hospice care from Hospice A beginning on June 1, 2011. Her condition improved, and she was discharged from Hospice A on August 15, 2011, as she was no longer terminally ill. However, in January 2012 Ms. Smith's condition worsened; she re-elected hospice at Hospice A on January 15, 2012, and subsequently died on February 26, 2012.*

*Streamlined Method: Hospice A would count Ms. Smith as 1 in its 2011 cap year, but would not count Ms. Smith again in its 2012 cap year. Medicare payments for hospice care provided would be counted in the cap year in which those services were provided, regardless of when payments were actually made, using the best data available at the time of the calculation.*

*Proportional Method: Ms. Smith would be counted as follows:*

| | | | |
|---|---|---|---|
| *2011 cap year (June 1st – August 15th):* | *76 days* | = 76/119 = | *0.64* |
| *2012 cap year (Jan 15th – Feb 26th):* | *43 days* | = 43/119 = | *0.36* |
| *Total days:* | *119 days* | = | *1.00* |

*The contractor uses the best data available at the time the cap is calculated to determine the proportional allocation of Ms. Smith's time. Because the contractor calculates the cap after allowing time for claims and adjustments to flow through the claims processing system, and assuming Hospice A files its claims without delay, by the time the 2011 cap is calculated the contractor would have information about Ms. Smith's complete hospice stay. Therefore, the contractor is able to correctly count Ms. Smith's stay for the 2011*

*and 2012 cap determinations, without having to make prior year adjustments to her proportional shares.*

*Had Ms. Smith lived until August 25, 2012, the contractor would consider the information it has at the time it makes the cap calculation when determining proportional shares. For example, if the contractor calculated the 2011 cap on June 30, 2012, using claims for dates of service through April 30, 2012, Ms. Smith's total stay would have been 183 days, and the 2011 proportional share would be 76 / 183 = 0.42. When calculating the 2012 cap determination, the contractor would be able to re-open the 2011 cap determination and correct the proportional allocation made in the previous cap year, to reflect a final allocation of 76/300 = 0.25 for the 2011 cap determination and 224/300 = 0.75 in the 2012 cap determination.*

***Transitioning from the Streamlined Method to the Proportional Method:*** *There are advantages and disadvantages for hospices transitioning from the streamlined method to the proportional method. When a transition to the proportional method occurs for the 2012 cap year, contractors shall not re-open the cap determination for prior cap years to pro-rate beneficiaries calculated under the streamlined method, who are included in beneficiary count for the 2012 cap year, unless those beneficiaries were in more than one hospice. Contractors shall consider all days of hospice care for these beneficiaries, including those in the previous cap year(s), when computing the proportional share of a beneficiary headcount using the proportional method. Therefore, some beneficiaries that were previously counted as 1 may be counted as more than 1 as a result of the transition.*

*When a hospice that elects to continue to have the streamlined method used for its cap calculation in 2012, later elects to change to the proportional method for the 2013 cap year or a later cap year, contractors can reopen cap determinations for the 2012 and later cap years. Reopening is allowed for up to 3 years from the date of the applicable cap determination, except in the case of fraud, where reopening is unlimited.*

*Additionally, when a transition to the proportional method is made, the timeframe for counting beneficiaries changes from September 28th – September 27th to November 1st – October 31st. As a result, there is a 34 day period from September 28th to October 31st, 2011 in the transition year where beneficiaries who elect hospice and die within that period are not counted in the total number of beneficiaries for either the 2011 or the 2012 cap year. However, the payments associated with those beneficiaries are counted in the 2011 cap year.*

*When a hospice transitions from the streamlined method to the proportional method, the beneficiaries' days of care from September 28 – October 31, 2011 (34 days) would not be included in the numerator for the beneficiary count calculation. However, that 34-day period would be included in the denominator because the proportional method includes in the denominator all days of hospice care provided to a beneficiary in order to prorate the beneficiary correctly. As such, any beneficiary that elected hospice care during the 34-day period would be counted as less than 1, since the numerator only includes days of service in the new cap year, but the denominator includes all days of care, including the*

*days in the 34-day transition period. The counting of these beneficiaries as less than 1 could be offset (in whole or in part) by other beneficiaries that will be carried over from years prior to the 2012 cap year that would be counted as more than 1 (one) beneficiary.*

**Example 2.** *Hospice A's cap was calculated using the streamlined method for the 2011 cap year, but Hospice A changed to the proportional method for the 2012 cap year. Ms. Jones is a beneficiary who elected Hospice A on September 1, 2011, and who died November 15, 2011. Ms. Jones was counted as 1 in the 2011 cap determination, using the streamlined method. When computing the 2012 cap determination using the proportional method, the contractor does not re-open the 2011 cap determination to adjust Ms. Jones' count. Ms. Jones was in hospice care for a total of 76 days. In the 2012 cap year calculation using the proportional method, the contractor would count Ms. Jones as 15 / 76 = 0.20. In this case, Ms. Jones was counted as 1.20 beneficiaries.*

**Example 3.** *Jason Smith, a Medicare beneficiary, initially elected hospice care from Hospice A in June 2012. He received hospice care for 30 days, but revoked the benefit to try a new treatment. The treatment put his disease into remission until 2016. Mr. Smith elected hospice at Hospice B in January 2016, and died 30 days later. The cap determination letter for the 2012 cap year was issued on December 29, 2013, and December 1, 2017 for the 2016 cap year. Mr. Smith received a total of 60 days of hospice care, with 30 days in the 2012 cap year and 30 days in the 2016 cap year. The contractor counted Mr. Smith in Hospice A's 2012 cap determination as 1. That 2012 cap determination is subject to reopening limitations because the 3 year reopening timeframe from the date of the cap determination letter has passed. The contractor for Hospice B counted Mr. Smith as 0.50, because Hospice B provided 30 days of care out of a total of 60 days of care. In this case, Mr. Smith was counted as 1.5 beneficiaries.*

*Had Mr. Smith re-elected the hospice benefit for 30 days in 2014 instead of 2016, and then died, then the contractor would reopen Hospice A's 2012 cap determination and re-compute the cap after reducing the total beneficiary count by 0.5, to account for the adjustment to Mr. Smith's time. Hospice B's contractor would also count Mr. Smith as 0.5 in its 2014 cap calculation. Between the 2 hospices and the different years, Mr. Smith is counted as 1 in total.*

**Example 4.** *Mark Williams, a Medicare beneficiary, initially elected hospice care from Hospice A in June 2012. He received hospice care for 30 days, but revoked the benefit to try a new treatment, which put his disease into remission until 2014. Mr. Williams again elected hospice at Hospice A in January 2014, and died 30 days later. Hospice A has its contractor use the streamlined method. The contractor counted Mr. Williams in Hospice A's 2012 cap determination as 1. When computing the 2014 cap, the contractor would count Mr. Williams as 0, because the streamlined method requires that a beneficiary who receives care from a single hospice be counted in the initial year of election only.*

**Example 5.** *Marla Jackson, a Medicare beneficiary, initially elects hospice care from Hospice A on September 2, 2011. Ms. Jackson stays in Hospice A until October 1, 2011, (30 days) at which time she changes her election and transfers to Hospice B. Ms.*

*Jackson stays in Hospice B for 70 days until her death on December 9, 2011. Each hospice can count the day of transfer in its total days of care. The contractor determines that the total length of hospice stay for Ms. Jackson is 100 days (30 days in Hospice A and 70 days in Hospice B).*

*Since Ms. Jackson was in more than one hospice, it doesn't matter which calculation method Hospice A or B uses: the calculation is identical and is proportional. The timeframe for counting beneficiaries using the proportional method follows that of the cap year: November 1st to October 31st. Therefore, Ms. Jackson's hospice stay not only occurred in 2 hospices, but also in 2 cap years.*

*Since Ms. Jackson was in Hospice A for 30 days in the 2011 cap year only, Hospice A counts 0.3 of a Medicare beneficiary for her in its hospice cap calculation (30 days/100 days). Hospice B counts 0.7 of a Medicare beneficiary in its cap calculation (70 days/100 days), but Ms. Jackson's stay in Hospice B must also be allocated to the appropriate cap year:*

|  | **Hospice A** | **Hospice B** |
|---|---|---|
| *Total stay: 9/2/2011 – 12/9/2011* | *9/2/2011 – 10/1/2011* | *10/1/2011 – 12/9/2011* |
| *Total days: 100* | *30 days* | *70 days* |
|  |  |  |
| *2011 Cap year (11/1/2010 – 10/31/2011)* | *30/100 = 0.30* | *31/100 = 0.31* |
| *2012 Cap year (11/1/2011 – 10/31/2012)* | *----* | *39/100 = 0.39* |
| ***Total*** | ***0.30*** | ***0.70*** |

*If Hospice A was not Medicare certified, then the contractor would only consider Ms. Jackson's time in Hospice B.*

***Example 6.*** *Hospice A decided that it would like its contractor to calculate its cap using the proportional method beginning with the 2012 cap year. Hospice A admitted Susan Brown on October 1, 2011, and she passed away on October 20, 2011. In computing Hospice A's cap for the 2011 cap year, the contractor uses the streamlined method, which counts beneficiaries for the aggregate cap based on the date of initial election. Since Ms. Brown initially elected the Medicare hospice benefit on October 1st, she would not be included in Hospice A's beneficiary count for 2011, but the payments associated with her would be included in the total payments for the 2011 cap calculation. When the contractor calculates the 2012 cap using the proportional method, beneficiaries are counted based on the cap year timeframe (November 1, 2011 to October 31, 2012). As such, Ms. Brown is not included in the 2012 beneficiary count.*

*In the 2012 cap year, the transition from the streamlined method to the proportional method, beneficiaries who initially elect hospice and pass away during the 34 day period between September 28th and October 31st 2011, would not be included in either the count of beneficiaries for the prior year's streamlined cap calculation or in the approaching year's proportional cap calculation. However, the Medicare payments to the hospice*

*associated with those beneficiaries are included in the total actual payments used in the 2011 cap calculation.*

*Had Ms. Brown lived until November 15, 2011, she would have been included in Hospice A's cap calculation for the 2012 cap year. Her total hospice stay would then have been 46 days, with 15 of those days occurring during the 2012 cap year. Ms. Brown would be counted in the 2012 cap determination as 15/46=0.33.*

### 90.2.4 – Changing Aggregate Cap Calculation Methods
**(Rev. 156, Issued: 06-01-12, Effective: 04-14-11 for the 2011 Cap Year and Prior Cap Years; October 1, 2011 for the 2012 Cap Year and Subsequent Cap Years; Implementation Date: 07-02-12)**

*Hospices are not allowed to switch back and forth between cap calculation methods, as doing so would greatly complicate the cap determination calculation, would be difficult to administer, and could lead to inappropriate switching by hospices seeking merely to maximize Medicare payments. Additionally, in the year of a change in the calculation method or when a previous cap determination cannot be re-opened, there is a potential for over-counting some beneficiaries. Allowing hospices to switch back and forth between methods would perpetuate the risk of over-counting beneficiaries. Therefore:*

*1) Those hospices that have their cap determination calculated using the proportional method for any cap year prior to the 2012 cap year will continue to have their cap calculated using the proportional method for the 2012 cap year and all subsequent cap years; and,*

*2) All other hospices would have their cap determinations for the 2012 cap year and all subsequent cap years calculated using the proportional method unless they make a one-time election to have their cap determinations for cap year 2012 and beyond calculated using the streamlined method. Contractors do not reopen cap determinations for the 2011 cap year and prior cap years as a result of a hospice transition from the streamlined to the proportional method for the 2012 cap year.* **NOTE:** *this does not apply to hospices that appealed their cap determination.*

*3) A hospice would be able to elect the streamlined method no later than 60 days following the receipt of its 2012 cap determination.*

*4) Hospices which elected to have their cap determination calculated using the streamlined method may later elect to have their cap determinations calculated using the proportional method by either:*

*a. electing to change to the proportional method (if the election is made prior to receipt of the cap determination associated with the cap year where the change is desired); or*

*b. appealing a cap determination calculated using the streamlined method to*

*determine the number of Medicare beneficiaries.*

5) *If a hospice elected the streamlined method, and changed to the proportional method for a subsequent cap year, the hospice's aggregate cap determination for that cap year (i.e., the cap year of the change) and all subsequent cap years would be calculated using the proportional method. Past cap year determinations for the 2012 cap year and later cap years are subject to reopening; existing re-opening rules allow reopening for up to 3 years from the date of the cap determination, except in cases of fraud, where reopening is unlimited. A revised cap determination letter issued as a result of reopening may itself be reopened, subject to the 3 year limitation on reopening.*

## 90.2.5 – Other Issues
**(Rev. 156, Issued: 06-01-12, Effective: 04-14-11 for the 2011 Cap Year and Prior Cap Years; October 1, 2011 for the 2012 Cap Year and Subsequent Cap Years; Implementation Date: 07-02-12)**

*The computation and application of the aggregate cap is made by the contractor after the cap year ends. The updated PS&R system enables each hospice's contractor to correctly determine proportional allocations. For all cap years through the 2011 cap year, hospices are responsible for reporting the number of Medicare beneficiaries electing hospice care during the period to the contractor. This must be done within 30 days after the end of the cap period. For the 2012 cap year and beyond, hospices no longer need to report the number of Medicare beneficiaries to be counted in the aggregate cap calculation due to the updated PS&R system.*

*Hospices can obtain instructions regarding the cap determination method election process from their contractors. Regardless of which method is used, the contractor shall continue to demand any additional overpayment amounts due to CMS at the time of the hospice cap determination. Cap determinations are subject to the existing CMS reopening regulations, which allow reopening for up to 3 years from the date of the cap determination letter, except in cases of fraud, where reopening is not limited.*

## 90.2.6 – Updates to the Cap Amount
**(Rev. 156, Issued: 06-01-12, Effective: 04-14-11 for the 2011 Cap Year and Prior Cap Years; October 1, 2011 for the 2012 Cap Year and Subsequent Cap Years; Implementation Date: 07-02-12)**

*The original cap amount of $6,500 per year is increased or decreased for accounting years that end after October 1, 1984, by the same percentage as the percentage of increase or decrease in the medical care expenditure category of the consumer price index for all urban consumers (CPI-U, United States city average), published by the Bureau of Labor Statistics, from March 1984 to the fifth month of the accounting year. The hospice cap is calculated on the basis of a cap year beginning November 1 and ending the following October 31.*

*For example, for the cap amount for the cap year ending October 31, 2011, calculate using the March 2011 CPI-U in the medical care expenditures category of 397.726 and divide by the March 1984 CPI-U in the medical care expenditures category of 105.4 to yield an index of 3.773491 (rounded). The new hospice cap amount is the product of $6,500 (base year cap) multiplied by 3.773491. Therefore, the cap amount for the period ending October 31, 2011, is $24,527.69.*

*In those situations where a hospice begins participation in Medicare at any time other than the beginning of a cap year (November 1st), and hence has an initial cap calculation for a period in excess of 12 months, a weighted average cap amount is used. The following example illustrates how this is accomplished.*

### EXAMPLE

*10/01/10 - Hospice A is Medicare certified.*

*10/01/10 to 10/31/11 - First cap period (13 months) for hospice A.*

*Statutory cap amount for first Medicare cap year (11/01/09 - 10/31/10) = $23,874.98*

*Statutory cap amount for second Medicare cap year (11/01/10 - 10/31/11) = $24,527.69*

*Weighted average cap amount calculation for hospice A:*

*One month (10/01/10 - 10/31/10) at $23,874.98 = $23,874.98*

*12 months (11/01/10 - 10/31/11) at $24,527.69 = $294,332.28*

*13 month period $318,207.26 divided by 13 = $24,477.48 (rounded)*

*In this example, $24,477.48 is the weighted average cap amount used in the initial cap calculation for Hospice A for the period October 1, 2010, through October 31, 2011.*

**NOTE:** *If Hospice A had been certified in mid-month, a weighted average cap amount based on the number of days falling within each cap period is used.*

### 90.3 – Administrative Appeals
**(Rev. 156, Issued: 06-01-12, Effective: 04-14-11 for the 2011 Cap Year and Prior Cap Years; October 1, 2011 for the 2012 Cap Year and Subsequent Cap Years; Implementation Date: 07-02-12)**

*The applicable contractor shall issue a letter to notify hospice providers of the results of the contractor's cap calculations and to serve as the provider's determination of program reimbursement. If there is a cap overpayment, there shall be an accompanying demand for repayment. As indicated in 42 CFR 418.311, a hospice that believes that its*

*payments have not been properly determined may request a review from the applicable contractor or the Provider Reimbursement Review Board (PRRB). Each determination of program reimbursement shall include language describing the provider's appeal rights.*

*The above described letter, serving as the provider's determination of program reimbursement, shall include the following language:*

*"This notice is the contractor's final determination for purposes of appeal rights. If you disagree with this determination, you may file an appeal, in accordance with 42 CFR 418.311 and 42 CFR, part 405, subpart R. The appeal should be filed with either the applicable contractor (FI, RHHI, or A/B MAC) or the Provider Reimbursement Review Board (PRRB), depending on the amount in controversy. Appeal requests must be in writing and be filed within 180 days from the date of this determination."*

## Transmittals Issued for this Chapter

| Rev # | Issue Date | Subject | Impl Date | CR# |
|-------|-----------|---------|-----------|-----|
| R156BP | 06/01/2012 | Updates to Caps and Limitations on Hospice Payments | 07/02/2012 | 7838 |
| R141BP | 03/02/2011 | New Hospice Certification Requirements and Revised Conditions of Participation (CoPs) | 03/23/2011 | 7337 |
| R121BP | 02/05/2010 | Medicare Systems Edits Refinements Related to Hospice Services | 07/06/2010 | 6778 |
| R28BP | 12/03/2004 | Hospice Pre-Election Evaluation and Counseling Services | 01/03/2005 | 3585 |
| R22BP | 10/24/2004 | Nurse Practitioners As Attending Physicians in the Medicare Hospice Benefit | 06/28/2004 | 3226 |
| R15BP | 06/15/2004 | Nurse Practitioners As Attending Physicians in the Medicare Hospice Benefit | N/A | 3226 |
| R1BP | 10/01/2003 | Introduction to the Benefit Policy Manual | N/A | N/A |

Back to top of Chapter