UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel LISA PENCE, LISA ADKINS, ROBIN DILLON TEAGUE, and AMY CARNELL,<br><br>        Plaintiffs,<br><br>   v.<br><br>CURO HEALTH SERVICES HOLDINGS, INC., CURO HEALTH SERVICES LLC f/k/a CURO HEALTH SERVICES, INC., TNMO HEALTHCARE, LLC d/b/a AVALON HOSPICE, and REGENCY HEALTH CARE GROUP LLC,<br><br>        Defendants. | Case No. 3:13-cv-00672<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT [31 U.S.C. §§ 3729 et seq.]**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Robin Teague, Lisa Pence, Lisa Adkins, and Amy Carnell (collectively, "Relators") hereby file this Complaint against Curo Health Services Holdings, Inc., Curo Health Services, LLC f/k/a Curo Health Services, Inc., TNMO Healthcare, Inc. d/b/a Avalon Hospice ("Avalon"), and Regency Healthcare Group LLC. (collectively, "Defendants").

## INTRODUCTION

1.      This action is based on Defendants' scheme to defraud the United States of millions of dollars annually through fraudulent billing practices and representations.

2.      The Medicare laws and regulations governing hospice provide that to qualify for hospice, a patient must have a terminal illness and have less than six months to live. Hospices provide patient care and assume all financial responsibility for medical treatment related to the terminal illness; in exchange, hospices are paid a per diem amount for qualified enrolled patients.

3.      Defendants engage in fraudulent practices by improperly enrolling or "qualifying" patients for hospice who are not actually eligible to receive hospice care, such as patients who do not meet the Medicare guidelines for receiving hospice care because they are not in the end stages of a sufficiently grave illness.  Improperly qualifying patients for hospice care results in Medicare paying false bills for hospice services.

## JURISDICTION AND VENUE

4.      This is a civil action arising under the laws of the United States to redress violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq*.  Relators are authorized to bring this private action on behalf of themselves and the United States under 31 U.S.C § 1330(b)(1) and (h).

1082298.10

5.      This case is further brought under the Tennessee Public Protection Act found at Tennessee Code Annotated §50-1-304 and under Tennessee common law for retaliation after reporting and refusing to participate in illegal activities.  The Tennessee Public Protection Act, ("TPPA"), commonly known as the "whistleblower" statute, provides a cause of action for employees who are terminated "solely for refusing to participate in, or for refusing to remain silent about, illegal activities." *Tenn. Code Ann.* §50-1-304(b).  Tennessee common law provides a cause of action for employees whose refusal to participate in, or remain silent about, illegal activities was a substantial factor in their termination.

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. § 3732(a), the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

7.      Venue is proper in this District because: (a) Defendants, or at least one of them, can be found, reside, or transact or have transacted business in the Middle District of Tennessee; and (b) many of the acts proscribed by 31 U.S.C. §3729 occurred in the Middle District of Tennessee. Defendants operate at least three hospice offices in the Middle District of Tennessee (Nashville, Cookeville, and Dickson) wherein the prohibited conduct occurred.

## THE PARTIES

8.      Relator Robin Teague served as a Team Assistant and Office Manager in the Jackson, Tennessee office of Avalon Hospice from October 2010 until January 16, 2012.

9. Relator Lisa Pence served as a Team Assistant/Licensed Practical Nurse and Supervisor of Clinical Staff in the Jackson, Tennessee office of Avalon Hospice from June 27, 2011 until March 12, 2012.

10. Relator Lisa Adkins served as a Hospice Care Consultant, colloquially referred to as a "patient recruiter," in the Jackson, Tennessee office of Avalon Hospice from March 2011 until July 11, 2012. In that position, Ms. Adkins was responsible for recruiting patients to receive hospice care.

11. Relator Amy Carnell served as a Registered Nurse in the Jackson, Tennessee office of Avalon Hospice from May 2011 through February 2012.

12. Defendant Curo Health Services Holdings, Inc. is a Delaware Corporation, headquartered at 491 Williamson Rd Suite 204, Mooresville, NC 28117-9255.

13. Defendant Curo Health Services, LLC ("Curo"), formerly known as Curo Health Services Inc., is a Delaware Corporation, headquartered at 491 Williamson Road, Mooresville, North Carolina, 28117. Curo is a portfolio company of a Chicago private equity group, GTCR. Curo operates six hospice groups in various states, including hospices located in the Middle District of Tennessee.

14. Defendant TNMO Healthcare, LLC ("TNMO") is a Delaware Corporation, headquartered at 491 Williamson Road, Suite 204, Mooresville, North Carolina, 28117-9255, doing business as Avalon Hospice. TNMO Healthcare is, upon information and belief, wholly-owned by Curo.

15. Relators allege that the above Defendants are alter egos of one another and are under common control. Curo Health Services Holdings, LLC, TNMO, and Avalon are

1082298.10

headquartered at the same address in North Carolina. Internal reports used by Defendants for its hospices, such as the Jackson office of Avalon, use "Curo," "Regency Health Care," and "Avalon" interchangeably. Curo's website calls "Avalon" one of its hospice brands. Defendants' termination documents sent to Relator Lisa Adkins were on "Avalon" letterhead, had a return address for "Curo," and stated that her employment with "TNMO" was being terminated. Executive Director Lora Harnack's published resume reads that she was, at the times at issue in this case, employed by "Curo."

16.     Defendant Regency Health Care Group LLC ("Regency") is a Delaware Corporation. On information and belief, Regency acquired the Avalon locations in Tennessee in 2008, at which point they were converted into Defendant TNMO Healthcare, LLC.

## FACTUAL ALLEGATIONS

### A.     Hospice Care

17.     Hospice care is defined as palliative care for patients with less than six months to live. Hospice care is a relatively new element of health care in the United States. Medicare first paid for hospice care in 1983. Medicare Payment Advisory Commission, *Report to Congress: Medicare Payment Policy* March 2013, ch. 12 p. 263 (hereinafter "MEDPAC 2013") (excerpts attached hereto as Ex. A). Hospice care has become a very fast-growing segment of the health care market.

18.     In 2011, an estimated 1.2 million patients received services from hospice. *Id*. In 2011, Medicare paid approximately $13.8 billion for hospice care, more than four-times

what Medicare paid in 2000. *Id.* In 2011, 45.2 percent of Medicare beneficiaries who died

that year used hospice, up from 23 percent in 2000. *Id.* at 269.

19.     Hospice is the only Medicare benefit that includes pharmaceuticals, medical

equipment, 24 hour/seven day a week access to palliative care, and support for loved ones

following a death.

20.     Patients must "elect" to receive the Medicare hospice benefit. Centers for

Medicare and Medicaid Services, *Medicare Benefit Policy Manual*, CMS Pub. 100-02,

(hereinafter "MPBM") Chap. 9, Sec. 10 (Rev. 141, Mar. 2, 2011); available at

http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/bp102c09.pdf

accessed July 5, 2013 (excerpts attached hereto as Ex. B). By doing so, they agree to forgo

Medicare coverage for intensive conventional treatment for the terminal illness. *Id.*

Medicare continues to cover items and services unrelated to the terminal illness. *Id.*

21.     Beneficiaries elect hospice for defined benefit periods. *Id.* Under current

Medicare rules, the first hospice benefit period is 90 days. *Id.* If the patient's life expectancy

remains six months or less, the patient can be recertified for another 90 days. After the

second 90-day period, the patient can be recertified for an unlimited number of 60-day

periods, as long as he or she remains eligible to receive government-funded hospice care

under applicable guidelines. *Id.*

22.     For recertification, only the hospice physician (medical director) has to certify

that the patient's life expectancy is six months or less.

23.     Medicare pays a daily rate to hospice providers for each day a beneficiary is

enrolled in hospice, about $153 per day in 2013. MEDPAC, ch. 12 p. 263.

24.     The hospice assumes all financial risk for costs and services associated with care related to the patient's terminal illness, including the cost of hospitalizations.  *Id.*

25.     The hospice provider receives payment for every day a patient is enrolled, regardless of whether the hospice staff visited the patient each day.  *Id.*  This payment design is intended to encompass not only the cost of visits but also other costs a hospice incurs related to on-call services, care planning, drugs, medical equipment, and supplies related to the patient's terminal condition, patient transportation between sites of care, and other less frequently used services.  *Id.*

26.     A patient may voluntarily disenroll from hospice care at any time.  MPBM Sec. 20.2 (Rev. 141 Mar. 2, 2011).  When the patient disenrolls or, in the colloquial, is "revoked," Medicare again pays for their medical care according to its customary rules.  *Id.*

27.     Another significant trend is the growth of for-profit hospices.  In 2000, for-profit hospices made up about 30% of all hospice providers; by 2011, for-profit hospice providers made up almost 57% of hospice providers.  MEDPAC at 270.

28.     The financial incentives for hospice providers are straightforward:  get as many patients on the hospice rolls as possible and avoid paying for expensive medical care.  Thus, for-profit hospices seek to enroll as people who are less sick, because less sick patients will tend to live longer and thereby allow the hospice to earn more Medicare per-diem payments, while also tending to require less medical care.

**B.**     **Qualifying Unqualified Patients for Hospice Care**

29.     Defendants employ hospice care consultants—or recruiters—whose sole job is to identify potential hospice patients and induce the patients to seek hospice care from

Avalon. During the time relevant to these allegations, the recruiters were paid about $100 per patient admitted to hospice.

30.     Defendants' recruiters visit nursing homes, hospitals, doctor's offices, and assisted living facilities in an effort to identify potential patients. Once the patient is identified by the recruiter, the recruiter works with the patient and/or the patient's family to get the treating physician to sign a form that states that the person *may* be eligible for hospice care.

31.     From the perspective of the treating physician, if a patient or their family requests hospice care, the physician has no incentive to refuse to sign the form that says the patient "may" be eligible and has every incentive to accommodate the patient in seeking the kind of care hospice theoretically provides.

32.     Once the patient is "referred" for an evaluation for hospice care, the hospice sends a nurse to evaluate the patient. Defendants' nurses were handed a "cheat sheet" that listed the symptoms that would qualify a patient for hospice care. The nurse would have no reason to have such a cheat sheet if the nurse were objectively assessing a patient.

33.     After Defendants' nurses completed an evaluation, the evaluation would be sent to the hospice medical director to determine whether the patient qualified for hospice– that is, whether the patient had a terminal disease and had less than six months to live.

34.     Defendants' management would review the evaluation completed by the nurse and, if it didn't include sufficient symptoms to establish that the patient qualified for hospice, management would alter it to include additional symptoms.

35.     After the records were altered, they were sometimes sent to the medical director to sign and approve. Blank forms pre-signed by the medical directors would often be used (the medical directors would "robo-sign" batches of these), or the medical director's signature would even be forged.

36.     One indicator that Defendants have qualified many unqualified patients is the average length of stay of the patients. The national average length of stay in 2010 was 86 days; the median length of stay during 2011 was approximately 17 days. MEDPAC ch. 12, p. 271. On information and belief, the average length of stay at Avalon was significantly longer.

37.     Further, a significant number of the patients were ultimately discharged from hospice without dying. Far from being on their deathbeds, Defendants' hospice patients have been seen driving around in Tennessee and attending a concert.

38.     In the Jackson office, these instructions for this fraudulent activity came from Barbara Gordon, the Director of Operations. Curo's Executive Director, Lora Harnack, who had operational oversight responsibility over the Nashville, Jackson, Cookeville, Tullahoma, and Knoxville Curo/Avalon offices, had knowledge of the wrongful conduct and played a role in directing the conduct. Relators and other employees reported this activity to corporate executives, including, but not limited to, Curo Regional Director Travis Glade, Curo Vice-President James Cocke, and Curo's corporate compliance office, yet the only action that was taken was that Relators were terminated.

39.     Examples of patients who did not qualify for hospice and were wrongfully admitted include, but are not limited to, the following:

8

a.      Patient A:  MR#87857 - - attending physician was Dr. William Jennings.  Although admitted to hospice October 27, 2011 for lung cancer, patient did not qualify for hospice.

b.      Patient B:  MR#89304 - - attending physician was Dr. William Jennings.  Although admitted hospice December 14, 2011 for cerebral vascular disease, patient did not qualify for hospice.

c.      Patient C:  MR#88653 - - attending physician was Dr. William Jennings. Although admitted to hospice November 18, 2911 for cardiomyopathy, patient did not qualify for hospice.

d.      Patient D:  MR#88390 - - attending physician was Dr. Conrad Sioson. Although admitted to hospice November 17, 2011 for bladder cancer, patient did not qualify for hospice.

e.      Patient E:  MR#88144 - - attending physician was Dr. Kevin Stroup. Although admitted to hospice November 7, 2011 for CVA, patient did not qualify for hospice.

f.      Patient F: MR#88709 - - attending physician was Dr. William Jennings.  Although admitted to hospice November 22, 2011 for CVA, patient did not qualify for hospice.

g.      Patient G: MR#88685 - - attending physician was Dr. William Jennings.  Although admitted to hospice November 20, 2011 for AFTT, patient did not qualify for hospice.

h.      Patient H: MR#78194 - - attending physician was Dr. Festus Arinze. Although admitted to hospice November 18, 2010 for CAD, patient did not qualify for hospice.

i.      Patient I: MR#69945 - - attending physician was Dr. Clarey Dowling. Although admitted to hospice January 28, 2010 for Alzheimer, patient did not qualify for hospice.

j.      Patient J: MR#88929 - - attending physician was Dr. William Jennings.  Although admitted to hospice December 1, 2011 for prostate cancer, patient did not qualify for hospice.

k.      Patient K: MR#86038 - - attending physician was Dr. William Jennings.  Although admitted to hospice August 19, 2011 for CHF, patient did not qualify for hospice.

l.      Patient L: MR#87055 - - attending physician was Dr. Bryan Merrick. Although admitted to hospice September 28, 2011 for ALS, patient did not qualify for hospice.

m.      Patient M: MR#83527 - - attending physician was Dr. Bryan Merrick. Although admitted to hospice June 27, 2011 for obstructed bronchitis, patient did not qualify for hospice.

n.      Patient N: MR#77645 - - attending physician was Dr. Jean. Lessly. Although admitted to hospice October 29, 2010 for dementia, patient did not qualify for hospice.

o. Patient O: MR#85226 - - attending physician was Dr. Bryan Merrick. Although admitted to hospice July 27, 2011 for CAD, patient did not qualify for hospice.

p. Patient P: MR#86753 - - attending physician was Dr. William Jennings. Although admitted to hospice January 17, 2012 for diastolic HF, patient did not qualify for hospice.

q. Patient Q: MR#71146 - - attending physician was Dr. Bryan Merrick. Although admitted to hospice March 6, 2010 for CAD, patient did not qualify for hospice.

r. Patient R: MR#86457 - - attending physician was Dr. William Jennings. Although admitted to hospice September 1, 2011 for CHF, patient did not qualify for hospice.

s. Patient S: MR#74230 - - attending physician was Dr. Bryan Merrick. Although admitted to hospice June 29, 2010 for CHF, patient did not qualify for hospice.

t. Patient T: MR#82147 - - attending physician was Dr. James Williams. Although admitted to hospice April 12, 2011 for AFTT, patient did not qualify for hospice.

u. Patient U: MR#84693 - - attending physician was Dr. Bryan Merrick. Although admitted to hospice July 11, 2011 for AFTT, patient did not qualify for hospice.

v.      Patient V: MR#89544 - - attending physician was Dr. Clarey Dowling. Although admitted to hospice December 20, 2011 for COPD, patient did not qualify for hospice.

**D.      State Claims  -- Robin Teague**

40.     Plaintiff Robin Teague is a former employee of Defendants, having been employed from on or about September, 2010 until Defendants terminated Teague's employment on or about January 16, 2012.

41.     Plaintiff was terminated by Defendants for refusing to perform the illegal tasks Defendants required her to do and for reporting Defendants' illegal activities.    Soon after Teague made numerous complaints to her superiors making clear references to activities occurring in the Jackson office that she was ethically and legally prohibited from doing, Defendants terminated her employment, stating the reason was "lack of work.",

42.     In addition to the Medicare fraud alleged above, additional illegal activities in which Teague refused to participate, about which she reported to superiors, and which violate Tennessee Code Annotated §63-6-214 and Tenn. Comp. R. & Regs. R. §§ 1200-08-27-.06,include, but are not limited to, the following:

a.   requiring unlicensed medical personnel to perform medical services that only licensed medical personnel are allowed to perform;

b.   falsifying medical records to falsely indicate that patients were qualified for hospice when they were not;

c.   wrongfully revocating patients when hospitalization was required and then signing them back up for hospice after they returned from the hospital;

d.  falsification of time sheets; and

e.  falsification and forging of doctor's orders.

43.     After Teague began notifying upper management and refusing to participate in
the illegal activities in the Jackson office, she was terminated from her employment.
Previous to her refusals to participate in the illegal activities and her complaints, she had a
stellar employment record.  The reporting and refusal to participate in illegal activity was the
sole cause of her termination.

44.     Teague's refusal to participate in the illegal activity and her reporting of the
illegal activity furthered the public interest.

45.     Based upon the foregoing, Teague has experienced loss of business
opportunity, humiliation, degradation, embarrassment, loss of income, mental anguish, and
other damages.

   **E.      State Claims – Lisa Pence**

46.     Plaintiff Lisa Pence is a former employee of Defendants, having been
employed from on or about June 27, 2011 until Defendants terminated Pence's employment
on or about March 10, 2012.

47.     Pence was terminated by Defendants for refusing to perform the illegal tasks
Defendants required her to do and for reporting Defendants' illegal activity.  Soon after
Pence made numerous complaints to her superiors making clear references to activities
occurring in the Jackson office that were fraudulent and illegal and in which she was
ethically and legally prohibited from participating, Defendants terminated her employment.
In her termination statement, Pence was cited for "disruptive behavior" and "negativity."

48.     In addition to the Medicare fraud alleged above, additional illegal activities in which Pence refused to participate, about which she reported to superiors, and which violate Tennessee Code Annotated §63-6-214 and Tenn. Comp. R. & Regs. R. §§ 1200-08-27-.06, include, but are not limited to, the following:

      a.     Sending unlicensed personnel to perform patient services that only licensed personnel may perform;

      b.     falsifying medical records to falsely indicate that patients were qualified for hospice when they were not;

      c.     wrongfully revocating patients when hospitalization was required so that Curo would not have to pay for that hospitalization and then signing the patients back up when they return from the hospital;

      b.     Falsification of time sheets; and

      c.     Falsely representing that physicians had given oral orders when no such orders were given and forgery of physicians' signatures

49.     After Pence began notifying upper management about the illegal activities in the Jackson office and refusing to participate in the illegal activity, she began receiving write-ups which were undeserved.  The second write-up resulted in her termination.  Previous to her refusals to participate in the illegal activities and her complaints, she had a stellar employment record.   Shockingly, it was corporate officials who labeled her as "negative," "insubordinate," and "disruptive" after her reports to them.  Corporate officials wrote Pence up for "making false malicious statements" about her supervisor's leadership.

The reporting and refusal to participate in illegal activity was the sole cause of her termination.

50.     Pence's refusal to participate in the illegal activity and her reporting of the illegal activity furthered the public interest.

51.     Based upon the foregoing, Pence has experienced loss of business opportunity, humiliation, degradation, embarrassment, loss of income, mental anguish, and other damages.

**F.     State Claims – Lisa Adkins**

52.     Plaintiff Lisa Adkins is a former employee of Defendants, having been employed from on or about March 8, 2011 until Defendants terminated Adkins' employment on or about July 10, 2012.

53.     Adkins was placed on administrative leave after she reported illegal activities to her superiors, refused to participate in the illegal activity, and then reported to the Tennessee Bureau of Investigation about Defendants' illegal activity.  Adkins' complaints to her superiors made clear references to activities that were fraudulent and illegal.   One of these reports was sent via letter to Rob Hewlett, her district manager, who forwarded her letter to corporate officials.  Adkins' reports and refusals to participate in illegal activity further the public interest.

54.     When two patients died after Defendants' failure to provide them services, Adkins obtained legal counsel and requested an appointment with the TBI so that she could report what Defendants were doing.  And, after informing her supervisor that she had made this report to the TBI, Adkins was placed on administrative leave.

1082298.10

55.     In addition to the Medicare fraud alleged above, a summary of some of the illegal activities in which Adkins refused to participate in, about which she reported to superiors and/or the TBI, and which violate Tennessee Code Annotated §63-6-214 and Tenn. Comp. R. & Regs. R. §§ 1200-08-27-.06 and include, but are not limited to the following:

a.  Defendants accepted and billed for patient services that were not provided. After accepting hospice patients, some of whom were in critical need of immediate services, Defendants would often fail to order the necessary medical supplies in a timely manner, leaving these patients without care.

b.  Defendants would also refuse to service many patients due to the Jackson office being short-staffed. Defendants nonetheless certified to Medicare/Medicaid that the services would be provided and insurance companies were being billed as though these services occurred. Adkins' letter to District Manager Rob Hewlett dated March 7, 2012 specifically addressed this and referred him to the previous week when twelve patients failed to receive services and two of those patients died.

c.  Adkins complained about and reported to her superiors that patients were offered free supplies and/or money by the Jackson office if they would remain as Defendants' patients. Adkins was instructed to offer free supplies at the Jackson office's expense if a patient would remain as its patient. Adkins was handed cash by the local manager to purchase these supplies, but Adkins

refused to do so.   Adkins knew the seriousness of these violations and wrote to Hewlett about them in her letter dated March 7, 2012.

d.  Defendants falsified documents showing patient services that never occurred. So that Medicare/Medicaid/insurance companies could be billed for services, documents were falsified showing patient services that never were provided.

e.  Defendants re-created documents with fraudulent signatures.   To attempt to cover-up previous illegalities, many documents were "re-created."  During the "re-creation" process, doctors' signatures would be fraudulently entered in the file.

f.  Adkins complained about the falsification of new diagnoses for patients whose health had improved and would no longer qualify for hospice without a new diagnosis.   These patients were told what types of new health complaints to make although no treatment for these new complaints was provided.  This system kept recovered patients as patients under hospice care.    Adkins discovered that a medication was being provided to the Director's husband that was not medically necessary.

56.    After Adkins began complaining to her superiors, she was told that she was not qualified for a promotion, although she had more than adequate credentials.   She was also told by her supervisor that "we don't want any whistleblowers."   Adkins' district manager told her that her complaints had been relayed to corporate and Adkins knows of approximately seven additional times that corporate received such reports.

57.     Defendants' terminated Adkins' employment solely because she refused to participate in illegal activity and because of her reports of Defendants' illegal activity.

58.     Based upon the foregoing, Adkins has experienced loss of business opportunity, humiliation, degradation, embarrassment, loss of income, mental anguish, and other damages.

### F.     State Claims – Amy Carnell

59.     Plaintiff Amy Carnell is a former employee of Defendants, having been employed as an RN from on or about May, 2011 until Defendants constructively terminated Carnell's employment on or about February 24, 2012.

60.     Carnell's constructive termination by Defendants was a result of Carnell's refusal to perform the illegal tasks Defendants required her to do and her reports of Defendants' illegal activities.   Carnell made numerous complaints to her superiors making clear references to activities occurring in the Jackson office that were fraudulent and illegal and in which she was ethically and legally prohibited from participating.    Carnell knew that the activities in which Defendants were requiring her to participate violated state law, federal law, and hospice and nursing regulations.

61.     In addition to the Medicare fraud alleged above, other illegal activities in which Carnell refused to participate, about which she reported to superiors, and which violate Tennessee Code Annotated §63-6-214 and Tenn. Comp. R. & Regs. R. §§ 1200-08-27-.06 and, include, but are not limited to, the following:

   a.   Requiring unlicensed medical personnel to perform medical services that only licensed medical personnel are authorized to perform;

1082298.10

     b.   Falsification of timesheets;

     c.   Falsification of doctor's orders; and

     d.   Falsification of nurses' signatures.

62.    Although Carnell began notifying upper management about the illegal activities in the Jackson office, upper management failed to take action to rectify the illegal activities.  Due to the restraints of her nursing license and state and federal law, Carnell was forced to resign and therefore was constructively terminated.  This was the sole cause of her termination.

63.    Based upon the foregoing, Carnell has experienced loss of business opportunity, humiliation, degradation, embarrassment, loss of income, mental anguish, and other damages.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## False Claims Act, 31 U.S.C. § 3729(a)(1)

67.    Relators repeat and reallege each and every allegation contained in all preceding paragraphs as though fully set forth herein.

68.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

69.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for payment or approval within the meaning of 31 U.S.C. § 3729(a)(1)(A).

70.     By virtue of the acts described above, Defendants knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim within the meaning of 31 U.S.C. § 3729(a)(1)(B).

71.     The United States, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid claims that it would not have paid but for Defendants' fraudulent conduct.

72.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial

73.     Additionally, the United States is entitled to the maximum penalty of $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus three times the amount of damages which the Government sustains because of Defendants' conduct described herein.  31 U.S.C. § 3729(a)(1)(G).

## SECOND CAUSE OF ACTION

### Retaliation, 31 U.S.C. § 3730(h)

74.     Relators repeat and reallege each and every allegation contained in all preceding paragraphs as though fully set forth herein.

75.     This is a claim for damages and relief available under a provision of the federal False Claims Act, 31 U.S.C. § 3730(h).

76.     Relators are entitled to relief, as Defendants discharged them and discriminated against them in the terms and conditions of their employment because of their lawful acts in furtherance of an action under 31 U.S.C. § 3730 or their efforts to stop violations of the False Claims Act.

## THIRD CAUSE OF ACTION

**Tennessee State Whistleblower Statute, Tenn. Code Ann. § 50-1-304(a), (d)(1), and Tennessee Common Law**

77.     Relators repeat and reallege each and every allegation contained in all preceding paragraphs as though fully set forth herein.

78.     This is a claim for damages and relief available under the Tennessee State Whistleblower Statute, Tenn. Code Ann. § 50-1-304.

79.     By virtue of the acts described above, Defendants discharged or terminated Relators solely for refusing to participate in, or refusing to remain silent about, illegal activities, within the meaning of Tenn. Code Ann. § 50-1-304.

80.     By virtue of the acts described above, Relators refused to participate in or remain silent about activities in violation of the laws of the United States, or the State of Tennessee, or other regulations intended to protect the public health, safety and welfare, within the meaning of Tenn. Code Ann. § 50-1-304(c).

81.     This is also a claim for damages and relief available under Tennessee common law for retaliatory discharge based on whistleblowing and refusal to participate in illegal activities.

82.     Defendants' conduct has violated both Tenn. Code Ann. § 50-1-304(c) and the common law duties imposed on employers precluding discharging employees for refusing to participate in, or refusing to remain silent about, illegal activities.

83.     By reason of Defendants' acts, the Relators have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

## **PRAYER**

84.     WHEREFORE, Relators pray for judgment against Defendants as follows:

a.      Judgment in an amount equal to three times the amount of each false claim for compensation by Defendants, plus a civil penalty of $10,000 for each violation of 31 U.S.C. § 3729(a)(1);

b.      An award to each Relator of the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

c.      All relief to which Relators are entitled under 31 U.S.C. § 3730(h);

d.      Damages to each Relator pursuant to Tenn. Code Ann. § 50-1-304(d)(1);

e.      Damages to each Relator pursuant to Tennessee common law;

f.      Attorneys' fees, expenses and costs of suit herein incurred, pursuant to 31 U.S.C. § 3730(d) and Tenn. Code Ann. § 50-1-304(d)(2);

g.      Back pay and front pay;

h.      An injunction against each of the Defendants for any continuing conduct violating 31 U.S.C. § 3729(a)(1);

i.      An order directing Defendants to cease and desist from violating 31 U.S.C. § 3729(a)(1);

j.      Punitive damages, where applicable; and

k.      Such other and further relief as the Court deems just and proper.

Dated: June 1, 2021

Respectfully submitted,

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

By: _____

Mark P. Chalos

Mark P. Chalos (TN State Bar No. 19328)
mchalos@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
150 Fourth Avenue, North, Suite 1650
Nashville, TN  37219-2423
Telephone:  (615) 313-9000
Facsimile:  (615) 313-9965

Teresa A. Luna (TN State Bar No. 26447)
tluna@spraginslaw.com
SPRAGINS, BARNETT & COBB, PLC
P.O. Box 2004, 312 E. Lafayette Street
Jackson, TN 38302
Telephone: (731) 424-0461
Facsimile:  (731) 424-0562

Attorneys for Relators

Robert J. Nelson (CA State Bar No. 132797)
rnelson@lchb.com
Lexi J. Hazam (CA State Bar No. 224457)
lhazam@lchb.com

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008
*To be admitted pro hac vice*

1082298.10