# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA ex rel.** | ) | |
| **RACHEL CAROL ANDERSON and** | ) | |
| **STEVEN TROY MATHIS,** | ) | |
| | ) | |
| **STATE OF TENNESSEE ex rel.** | ) | |
| **RACHEL CAROL ANDERSON and** | ) | |
| **STEVEN TROY MATHIS,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:13-cv-00672 (Lead)** |
| | ) | **Case No. 3:20-cv-00168 (Member)** |
| **CURO HEALTH SERVICES HOLDINGS,** | ) | **Judge Aleta A. Trauger** |
| **INC., CURO HEALTH SERVICES LLC** | ) | |
| **f/k/a CURO HEALTH SERVICES, INC.,** | ) | |
| **TNMO HEALTHCARE, LLC d/b/a** | ) | |
| **AVALON HOSPICE, and REGENCY** | ) | |
| **HEALTH CARE GROUP LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Three motions to dismiss are pending in this case. First, the defendants have filed a Renewed Motion to Dismiss the Consolidated Complaint in Intervention of the United States and Tennessee (Doc. No. 147), to which the United States and Tennessee have filed a Response (Doc. No. 153), and the defendants have filed a Reply (Doc. No. 163). Second, the defendants have filed a Renewed Motion to Dismiss the First Amended Complaint of Plaintiff-Relators [Robin Dillon] Teague, [Lisa] Pence, [Lisa] Adkins, and [Amy] Carnell (Doc. No. 148), to which those relator-plaintiffs have filed a Response (Doc. No. 154), and the defendants have filed a Reply (Doc. No. 164). Finally, the defendants have filed a Motion to Dismiss the Third Amended Complaint of Plaintiff-Relators Rachel Carol Anderson and Steven Troy Mathis (Doc. No. 165), to which those relator-plaintiffs have filed a Response (Doc. No. 168), and the defendants have filed a Reply

(Doc. No. 170). For the reasons set out herein, the motion directed at the governments' claims will be denied, the motion directed at the claims of Teague *et al.* will be denied partially on the merits and partially as moot, and the motion regarding the claims of Anderson and Mathis will be granted in part and denied in part.

## **I. BACKGROUND**[1]

In order to address the unique difficulties facing patients with terminal illnesses and their loved ones, the medical profession has developed a model of care known as hospice, which is designed, not to cure or even halt the patient's disease, but to use medical technologies and methods, as well as other supports, to ease the patient's final days, months, or, in some cases, years of life. *See* 42 C.F.R. § 418.3. But hospice is expensive, and many dying people cannot afford it on their own. For certain qualifying patients, the costs of hospice are shouldered, at least in part, by government healthcare programs such as Medicare and Medicaid.

This case is about a group of Tennessee hospice providers that, the plaintiffs allege, helped themselves to a portion of the money available from those programs for hospice care by falsely certifying that patients' illnesses had reached a terminal stage, when, in fact, they had not. The defendants do not argue—at least at this point—that the fraud claims against them should be dismissed in their entirety. Rather, they ask the court to "narrow" the case in a number of ways, based on the law governing how such causes of action should be pleaded. The defendants also ask the court to dismiss a handful of additional claims, brought by former employees who helped bring this situation to light, alleging retaliatory discharge.

---

[1] There are three operative complaints in this case (Doc. Nos. 98, 100, 160), and, while these facts are mostly taken from the governments' Consolidated Complaint in Intervention (Doc. No. 100), which states the central fraud allegations around which this case mostly revolves, each complaint's allegations are taken as true for the purposes of the motion to dismiss directed at that complaint's claims.

2

**A. Structure of Hospice Benefits Under Medicare and Medicaid**

"To be eligible for hospice care under Medicare or Medicaid, a patient must be certified by a physician as 'terminally ill'—meaning that the patient's prognosis 'is for a life expectancy of 6 months or less if the terminal illness runs its normal course.'" *U.S. ex rel. Holloway v. Heartland Hospice, Inc.*, 960 F.3d 836, 842 (6th Cir. 2020) (quoting 42 C.F.R. §§ 418.20(b), 418.22(b)(1)). The decision to admit a Medicare or Medicaid patient into hospice must be made on the recommendation of the hospice provider's "medical director in consultation with, or with input from, the patient's attending physician (if any)." 42 C.F.R. § 418.25(a). In making that decision, the medical director must consider "(1) [d]iagnosis of the terminal condition of the patient[;] (2) [o]ther health conditions, whether related or unrelated to the terminal condition[; and] (3) [c]urrent clinically relevant information supporting all diagnoses." 42 C.F.R. § 418.25(b). The determination that an individual is hospice-eligible is documented and memorialized in a document known as a "certification of terminal illness," or "COTI," which must initially be signed by the patient's "attending physician, if the individual has an attending physician," as well as either the medical director or a physician member of the hospice's "interdisciplinary group," or "IDG." 42 C.F.R. § 418.22(c)(1). The IDG is a group of various types of professionals—including at least one social worker and at least one pastor or counselor—"who work together to meet the physical, medical, psychosocial, emotional, and spiritual needs of the hospice patients and families facing terminal illness and bereavement." 42 C.F.R. § 418.56(a)(1).

Some patients go into hospice with only a very short amount of time left. Other patients, however, face a more uncertain calendar. Medicare and Medicaid measure the duration of hospice placements in terms of "election periods," so-called because they represent periods in which the patient has elected to forego curative treatment in favor of palliative care. The initial election

3

period is 90 days; the second election period is another 90 days; and, after that, a qualifying patient may remain in government-supported hospice for "[a]n unlimited number of subsequent 60–day periods," as long as his condition remains terminal, as defined by the relevant statutes and regulations. 42 C.F.R. § 418.21. A fresh COTI must be completed at the beginning of each election period, 42 C.F.R. § 418.22(a)(1), but, after the first COTI, only one physician's signature is required on each subsequent COTI, *see* 42 C.F.R. § 418.22(c)(2).

Although these policies originated in the Medicare program, Tennessee's Medicaid program, known as "TennCare," follows them as well. *See* Tenn. Comp. Rules & Regs. 1200-13-13-.04(1)(b)(11) (adopting "Medicare Hospice requirements"). (*See also* Doc. No. 100 ¶ 63 (citing TennCare Policy Manual, Policy No. BEN 07-001 (Rev. 7)).) Under TennCare, however, hospice eligibility has an additional level of significance in terms of a patient's covered services, because a valid COTI qualifies an eligible patient for residential nursing facility care, without that patient's having to go through TennCare's ordinary Pre-Admission Screening and Resident Review process. *See* Tenn. Comp. R. & Regs. 1200-13-01-.10(2)(c)(7), (i), (3); Tenn. Comp. R. & Regs. 1200-13-01.-23(2)(d)(3).

If a patient's illness progresses as originally expected—that is, if the patient dies before the end of the six months concluding at the end of the second election period—then the patient's COTI can be based on a review of the patient's health information, without an additional face-to-face assessment. However, unless there is a public health emergency, "a hospice physician or hospice nurse practitioner must have a face-to-face encounter with each hospice patient whose total stay across all hospices is anticipated to reach the 3rd benefit period." 42 C.F.R. § 418.22(a)(4)(i). These face-to-face evaluations, which are performed for the purpose of allowing the practitioner to "gather clinical findings to determine continued eligibility for hospice care," must occur "no

4

more than 30 calendar days prior to . . . the 3rd benefit period recertification" and must be repeated for "every benefit period recertification thereafter." *Id.*

A COTI must meet the following requirements in order for Medicare or Medicaid to pay for the patient's hospice care:

(1) The certification must specify that the individual's prognosis is for a life expectancy of 6 months or less if the terminal illness runs its normal course.

(2) Clinical information and other documentation that support the medical prognosis must accompany the certification. . . .

(3) The physician must include a brief narrative explanation of the clinical findings that support[] a life expectancy of 6 months or less as part of the certification and recertification forms, or as an addendum to the certification and recertification forms. . . .

(4) The physician or nurse practitioner who performs the face-to-face encounter with the patient [if required] must attest in writing that he or she had a face-to-face encounter with the patient, including the date of that visit. The attestation of the nurse practitioner or a non-certifying hospice physician shall state that the clinical findings of that visit were provided to the certifying physician for use in determining continued eligibility for hospice care.

(5) All certifications and recertifications must be signed and dated by the physician(s), and must include the benefit period dates to which the certification or recertification applies.

42 C.F.R. § 418.22(b); *see also* 42 U.S.C. § 1395f(a)(7). Pursuant to those requirements, the COTI must not only contain certain information and be prepared in a certain way, *see* 42 C.F.R. § 418.22(b)(1), (3)–(5), but it must also be retained in a certain way—specifically, by inclusion in the hospice agency's own medical record for that patient, *see* 42 C.F.R. § 418.22(b)(2). Those medical records, in turn, must themselves be "legible, clear, complete, and appropriately authenticated," or else the hospice can be found to be out of compliance with Medicare requirements. 42 C.F.R. § 418.104. The effect of those requirements is that, if a hospice agency is complying with Medicare and Medicaid rules, then either the agency or an authorized third party—

5

such as an auditor or investigator—should be able to refer to the record of each Medicare or Medicaid patient in the agency's care at any time and know immediately (1) the full and precise basis of that patient's eligibility for hospice; and (2) the important details of the patient's care and condition. (*See* Doc. No. 100 ¶ 57.)

Even the most detailed regimen of paperwork and recordkeeping, however, cannot change the fact that it is often hard to predict how much time a person—even a very sick one—has left to live. Medicare and Medicaid acknowledge the uncertainty of such predictions; that is why, even though hospice care is generally reserved, under those programs, for individuals expected to live only six or fewer more months, the programs expressly allow for such patients' care to be extended—and paid for—indefinitely, over the course of however many election periods are required. There is, in short, nothing inherently wrong with a patient's being in hospice care for much longer than six months. Nevertheless, in an effort to ensure that the programs' hospice eligibility requirements are consistently, fairly, and accurately applied, the Center for Medicare and Medicaid Services ("CMS") has frequently provided guidance to assist physicians in determining whether a patient's prognosis falls within the six-month window required to meet the definition of terminal illness. *See, e.g.*, 79 Fed. Reg. 26538, 26556 (May 8, 2014); 78 Fed. Reg. 48234, 48247 (Aug. 7, 2013).

Among the sources that hospice agencies are expected to rely on are "local coverage determinations," or "LCDs," propounded by Medicare Administrative Contractors, or "MACs," with whom CMS contracts on a regional basis to "process and make payments on valid claims." *PHHC, LLC v. Azar*, No. 1:18CV1824, 2018 WL 5754393, at *4 (N.D. Ohio Nov. 2, 2018). The MACs to which the relevant agencies were assigned for the period relevant to this case—Cahaba Government Benefit Administrator, LLC ("Cahaba") and Palmetto GBA, LLC ("Palmetto")—

issued LCDs "set[ting] forth clinical indicators for determining whether individuals with certain diagnoses have life expectancies of six months or less." (Doc. No. 100 ¶ 71.) Those LCDs recognized that, while some diseases and conditions have a consistently short prognosis, other diseases and conditions, such as Alzheimer's disease, can be highly variable. For those diseases and conditions, the LCDs identified certain factors relevant to expected life expectancy. (*Id.* ¶¶ 73–74.)

The uncertainty of medical predictions presents a challenge for hospice admissions, but a manageable one; the Medicare and Medicaid systems are capable of paying for a few, or even many, extra months of hospice for beneficiaries whose diseases progress more slowly than had been reasonably expected. An additional problem arises, however, when the difficulties of prognosis are combined with the facts that (1) Medicare and Medicaid pay for hospice services on a per diem basis and (2) the hospice agencies that certify hospice eligibility are the same parties that receive those per diem payments. *See* 42 C.F.R. § 418.302. Paying hospice agencies per diem—as opposed to, for example, paying them a one-time flat fee for each patient—means that, the longer a patient is in hospice care, the more the hospice agency is paid.[2] An incentive therefore exists for unscrupulous providers to make a patient's time in hospice as long as possible. Because every hospice patient is dying, it is difficult to add days to the *end* of the hospice agency's period of care. It is far easier, rather, to add days to the *beginning* of it—which can be accomplished simply by certifying the patient as terminally ill as early as possible. The inherent indeterminacy of any given patient's prognosis, moreover, makes it hard to detect when a hospice is stretching

---

[2] The court stresses that the question of how best to pay for hospice care is a policy issue far beyond the scope of this litigation or the court's purview. It suffices to say that any payment structure is likely to lend itself to some good practices and leave room for some abuses, and this case is about alleged behaviors that were designed to exploit the current framework.

(or exceeding) the boundaries of reasonable medical evaluation in order to get patients into care—and into the hospice agency's paying population—sooner.

## B. Allegations Against the Defendants

The defendants are all companies involved in providing hospice services in Tennessee. TNMO Healthcare, LLC d/b/a Avalon Hospice ("Avalon"), which is the patient-level hospice operator this case is about, owns and controls at least 27 hospice agencies in the state. (Doc. No. 100 ¶ 11.) Curo Health Services Holdings, Inc. ("Curo Holdings") is a large operator of hospice chains founded by a private equity firm. It has grown, in part, by purchasing smaller providers, including, in 2011, Avalon's then-parent company, Regency Healthcare Group, LLC ("Regency"). (*Id.* ¶¶ 12–14.) Curo Holdings' revenue is generated overwhelmingly—the governments estimate about 95%—by Medicare. (*Id.* ¶ 14.) Curo Health Services, LLC ("Curo Health Services") is a subsidiary of Curo Holdings that, during the time period relevant to this case, shared officers and a physical address with Curo Holdings. (*Id.* ¶ 22.) The court will refer to Curo Holdings and Curo Health Services collectively as "Curo."

The plaintiffs allege that Avalon frequently certified patients as hospice-eligible when it should not have. For example, on June 29, 2010, a patient whom the Complaint in Intervention refers to as Patient No. 1 was admitted to Avalon's hospice agency in Jackson, Tennessee with a principal diagnosis of purportedly "end stage" heart failure, typically referred to as "congestive heart failure" or "CHF." (*Id.* ¶¶ 210–11.) Heart failure can be deadly, but not necessarily imminently so; whether Patient #1 was actually hospice-eligible therefore depended on an evaluation of his particular condition to determine whether it supported a six-month prognosis. At the time, Avalon Jackson was led by Director of Operations ("DOO") Barbara Gordon, who, according to the plaintiffs, regularly "took steps to circumvent clinicians' concerns about hospice

8

eligibility that led to the admission and retention of ineligible patients." (*Id.* ¶ 155.) With regard to Patient No. 1, this included "instruct[ing] a former Avalon Jackson nurse to document that Patient No. 1 had shortness of breath," despite the fact that the nurse had observed no such symptom. (*Id.* ¶ 213.) The plaintiffs also allege that Gordon "instructed nurses to . . .deduct five pounds from the patient's weight for 'dry weight'" and take other steps to "exaggerate the extent of the patient's illness." (*Id.* ¶ 213.)

Patient No. 1 lived another seven and one-half years, eventually dying on January 2, 2018. (*Id.* ¶ 224.) The patient spent the majority of that time receiving hospice care from Avalon. Several times during that period, Avalon and/or Curo personnel noticed that the patient's health did not appear to be declining. Indeed, Avalon began planning to discharge the patient as non-terminal in 2011. Instead, an Avalon medical director simply reclassified Patient No. 1 as suffering from a different terminal illness—end stage dementia—and discontinued the discharge process. (*Id.* ¶¶ 216–18.) But Patient No. 1 was not near death for that reason either. Patient No. 1 continued to survive, and red flags about the patient's prognosis continued to arise, until a June 2014 review by a Curo clinical compliance monitor found enough unequivocal flaws in the documentation related to Patient No. 1—including a claim that the patient suffered from "worsening MS" despite not having a "previous diagnosis or documentation of MS"—that Patient No. 1 was finally discharged, albeit only many months later, in late March of 2015. (*Id* ¶¶ 223–24.) Patient No. 1's time in Avalon's hospice care spanned numerous election periods, resulting in dozens of Medicare claims, most of them for thousands of dollars. (*Id.* ¶ 225.)

The plaintiffs provide other examples. Patient No. 2 was admitted to Avalon Jackson's hospice for coronary artery disease that, like Patient No. 1's heart failure, had been exaggerated at DOO Gordon's direction. Indeed, according to the plaintiffs, DOO Gordon had to overrule two

nurses before she found one willing to support the admission. (*Id.* ¶¶ 231–34.) A few months later, Patient No. 2 left hospice, sought treatment, and lived another three and one-half years. (*Id.* ¶¶ 235–39.) According to the plaintiffs, Avalon had not even submitted its Medicare claims for Patient No. 2 when it became clear that the patient was not terminal, but Avalon went on to submit the claims—amounting to thousands of dollars—anyway. (*Id.* ¶ 242.) Patient No. 3 is another patient who came to Avalon Jackson, received hospice services paid for by Medicare, was discharged, and lived for multiple years thereafter. (*Id.* ¶¶ 244–58.)

Not all of the plaintiffs' examples were from Avalon Jackson. Patient No. 4 was treated at Avalon Tullahoma and received hospice services—some of them paid for by TennCare and some by Medicare—for over five years. (*Id.* ¶ 301.) Patient No. 4 was admitted for ostensibly end stage cirrhosis of the liver, despite the fact that quantitative testing suggested that his disease was not yet at that point in its progression. (*Id.* ¶ 303.) As with Patient No. 1, Curo and/or Avalon personnel raised concerns about Patient No. 4 multiple times, but the hospice care—and the billing—continued until, many thousands of dollars later, Patient No. 4 was discharged. (*Id.* ¶ 322–24.)

The final exemplary patient identified, Patient No. 5, was a patient of Avalon Athens for nearly six years, and the plaintiffs have described a similar pattern of numerous internal concerns being dismissed until Patient No. 5 was finally discharged, having allowed Avalon to bill thousands of dollars to government healthcare programs—in this instance, Medicare—which Avalon did not return. (*Id.* ¶¶ 348–69.) Although the plaintiffs do not provide examples from every Avalon agency in Tennessee, they assert that those other facilities had similar problems. In support of that allegation, the plaintiffs state that former employees from other Avalon agencies, such as Avalon Chattanooga and Avalon Johnson City, voiced concerns about Avalon receiving payments for ineligible patients. (*Id.* ¶¶ 370–75.)

The pattern of admitting ineligible patients to Avalon facilities, the plaintiffs allege, was not merely the result of scattershot errors or a few bad actors. Rather, "Regency and Curo pressured Avalon staff to maximize census through aggressive targets, financial incentives, and restrictions on discharging patients," and Avalon's ground-level employees simply responded, predictably and reliably, to those top-down pressures. (*Id.* at 22.) The parent companies "set aggressive targets for the number of hospice patient admissions" and "pressured Avalon staff to meet these high admissions and census targets by tracking financial goals on a monthly, quarterly, and annual basis." (*Id.* ¶¶ 88–89.) Curo kept a monthly "scorecard" of each hospice agency's average daily census, referrals, admissions, referral conversion rate, revenues, and profits, and, if an agency failed to meet Curo's targets, the agency's DOO was required to submit a 30-day action plan. (*Id.* ¶ 90.) Certain targets, when missed, triggered a process through which Curo scrutinized each patient from the relevant period whom the hospice elected not to admit. As part of this review of so-called "Not Taken Under Care" or "NTUC" cases, the agency was required to justify every decision not to admit a patient to hospice. Some regional managers went so far as to require some DOOs to notify them of every patient not admitted. (*Id.* ¶ 93.)

The pressure from Regency and, later, Curo was backed up by financial incentives. For example, "hospice care coordinators"—effectively, marketers—were paid bonuses for admissions in excess of the relevant facility's target. (*Id.* ¶¶ 89, 95–99.) DOOs were given raises or paid bonuses based on the size of their patient populations. (*Id.* ¶ 100.) Those bonuses could be substantial; for example, the DOO of Avalon Nashville was offered a "monetization event bonus" equivalent to 20% of her base salary if her census exceeded a certain number by a particular date. (*Id.* ¶ 101.) The structure of the financial incentives and management cudgels changed over time and after Avalon was taken over by Curo. They continued, however, to reward admissions and/or

11

patient census numbers in such a way that particular agency personnel stood to benefit financially from admitting more patients, while effectively punishing the management of facilities that admitted fewer patients. (*Id.* ¶¶ 101–15.)

The plaintiffs have alleged other ways that corporate policies enabled—and concealed—overly aggressive admissions. For example, Curo trained personnel not to use words or phrases that could undermine a terminal prognosis, such as "stable," "no change," "feels good," or "looks good." (*Id.* ¶ 122.) A Curo-distributed "reference guide" for physicians instructed them not to document any belief that a patient had a life expectancy greater than six months, because such statements were "not helpful." Instead, physicians were, at most, supposed to state, vaguely, that such patients' eligibility was under continued evaluation. (*Id.* ¶ 123.)

Curo frequently audited patient records and identified those for whom hospice admission was not, based on those records, supported. The purpose of those audits, however, was, at least in large part, not to get patients out of hospice and back into curative or life-extending care because their admission had been in error or they had unexpectedly improved. Rather, the audits identified opportunities to supplement the records of patients so that, if Medicare or Medicaid scrutinized the record, the patient would be found to be hospice-eligible. (*Id.* ¶¶ 124–25.)

The result of these corporate policies was that Avalon agencies found ways big and small to admit patients even if the patients' eligibility was unsupported. For example, DOOs took steps like bypassing patients' primary care physicians who did not consider them terminal by recruiting replacement physicians to refer the patients regardless. In at least one instance, Avalon even allegedly "used [a] physician's log-in credentials to complete this documentation without his authorization." (*Id.* ¶ 139.)

12

According to the plaintiffs, Regency and Curo were aware of these practices, because they received internal complaints about them. Nevertheless, even when Regency or Curo corroborated a complaint, it took insufficient steps to actually identify improperly admitted patients. Moreover, as the plaintiffs' examples attest, even in the cases in which a patient's ineligibility was so apparent that the plaintiff was discharged, Regency and Curo generally did not take the steps necessary to identify and return overpayments. (*Id.* ¶ 140.) For example, in February of 2012, Curo's compliance hotline received a tip regarding falsification of documentation and admission of ineligible patients at Avalon Jackson. (*Id.* ¶ 195.) Curo's compliance personnel investigated, and DOO Gordon quickly resigned. (*Id.* ¶ 198.) However, after Curo Vice President of Clinical Operations for Tennessee Marti Miller learned of the compliance review's findings, she took over the investigation, overruled many of the review's findings, and released billing holds on at least some of the relevant patients—allowing Avalon to go back to billing for those patients' hospice services. (*Id.* ¶¶ 183, 199–200.)

## C. The False Claims Act and This Litigation

"Since its enactment . . . , the False Claims Act"—commonly referred to as the "FCA"— "has authorized both the Attorney General and private *qui tam* relators to recover from persons who make false or fraudulent claims for payment to the United States." *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 283 (2010). The *qui tam* provision creates an incentive for private individuals who become aware of fraud on the government to bring that fraud to light, in exchange for a share of the recovery—which, pursuant to 31 U.S.C. § 3729(a)(1), can include both treble damages and penalties. *See State Farm Fire & Cas. Co. v. U.S ex rel. Rigsby*, 137 S. Ct. 436, 440 (2016) (observing that "[t]his system is designed to benefit both the relator and the Government.").

13

A *qui tam* complaint under the FCA "shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders." 31 U.S.C. § 3730(b)(2). "The Government may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal . . . ." 31 U.S.C. § 3730(b)(3). Eventually, however, the Government faces a choice: it must either inform the court that it wishes to "proceed with the action, in which case" the Government will take over the litigation; or it must "notify the court that it declines to take over the action, in which case the person bringing the action shall have the right to conduct the action." 31 U.S.C. § 3730(b)(4)(A)–(B).

On July 9, 2013, four *qui tam* relators—all of them former employees of Avalon hospice agencies in Tennessee—jointly filed an FCA Complaint against Curo, Avalon, and Regency, raising many of the issues that the court has discussed, along with a handful of other allegations including claims for retaliatory discharge based on the former employees' resistance to the defendants' practices. (Doc. No. 1 ¶¶ 9–12.) The Complaint was served on the United States, and, on September 5, 2013, the United States filed an *ex parte* motion requesting a six-month extension of the seal and intervention period, which the court granted. (Doc. Nos. 19, 21.) The United States continued to request extensions, which the court continued to grant, for the next several years, during which time the United States assured the court that it was diligently investigating the allegations. Eventually, in 2017, the district judge to whom the case had been assigned resigned, and the case was reassigned to Judge Bernard A. Friedman,[3] who retained the case while the government's investigation continued. (*See, e.g.*, Doc. No. 52.)

---

[3] Judge Friedman, who sits in the Eastern District of Michigan, had volunteered to assist this district when, for various reasons, two district judges were carrying the load for the four district judge allotment in the district.

14

In the meantime, however, another, significantly overlapping *qui tam* case had been filed by two other former Avalon employees on October 12, 2016—this one in the Eastern District of Tennessee. (*See* Case No. 3:20-cv-168 (formerly E.D. Tenn. Case No. 4:16-cv-99), Doc. No. 1.) In addition to allegations regarding the admission of non-terminal patients, the Eastern District Complaint alleged, in a conclusory fashion, that the defendants "allowed [their] employees to commit acts of hospice fraud when [their] employees paid kickbacks in the form of in-kind services to nursing homes and other facilities." (*Id.* ¶ 60.) Unlike the original case filed in this district, the Eastern District case included, in addition to the FCA claims on behalf of the United States, claims under the Tennessee Medicaid False Claims Act ("TMFCA"), Tenn. Code Ann. §§ 71-5-181 to -185, in the name of the state of Tennessee. The TMFCA is a Medicaid-specific statute that largely follows the model of the FCA, including by permitting *qui tam* relators to file claims as whistleblowers and by granting the government—for these purposes, the State of Tennessee—the opportunity to investigate the allegations while the complaint remains under seal for a statutorily granted and then, if necessary, court-extended period of time. *See* Tenn. Code Ann. § 71-5-183(b). The state and federal governments in the Eastern District case—like the federal government in the Middle District case—sought and received extensions of the seal and intervention periods for a number of years. (*See, e.g.*, Case No. 3:20-cv-168, Doc. No. 40.)

On February 14, 2020, the United States, acting with the consent of the State of Tennessee and the Eastern District relators, filed an *ex parte* motion requesting the transfer of that case to this district, based, at least in part, on the fact that the earlier-filed Middle District case involved related subject matter. (Case No. 3:20-cv-168, Doc. No. 74.) That motion was granted on February 24, 2020, and the case was assigned to this judge. On September 3, 2020, the original Middle District

case was reassigned to this judge, so that the two cases could be considered together. (*See* Doc. No. 85.) The court consolidated the cases. (Doc. No. 89.)

Finally, on March 2, 2021, the governments filed separate but similar Notices, informing the court that they had made the election to intervene in part and to decline to intervene in part in the cases. (Doc. Nos. 91–92.) The United States "intervene[d] in that part of the action which alleges that the defendants violated the FCA, 31 U.S.C. [§] 3729(a)(1)(A),by submitting, or by causing the submission of claims, to Medicare and Medicaid for services provided to patients who were not eligible for the federal hospice benefit because they were not terminally ill," but it declined to intervene with regard to any other allegations, including the kickback-related allegations. (Doc. No. 91 at 2.) Tennessee's election was essentially the same, other than being limited to Medicaid: the state intervened as to the allegations regarding the admission of ineligible patients but otherwise declined. (Doc. No. 92 at 2.)

On June 1, 2021, the governments jointly filed their Consolidated Complaint in Intervention. (Doc. No. 100.) It states six causes of action, based on events from "at least January 1, 2010 through February 20, 2020." (Doc. No. 100 ¶ 5.) The first two causes of action are stated by the United States under the FCA: first, for presenting or causing the presentation of false claims, pursuant to 31 U.S.C. § 3729(a)(1)(A); and, second, for improperly retaining overpayments, pursuant to 31 U.S.C. § 3729(a)(1)(G). (*Id.* ¶¶ 376–381.) The next two causes of action are on behalf of the State of Tennessee and state the same theories of liability under the TMFCA. (*Id.* ¶¶ 382–87.) The final two causes of action are stated on behalf of both governments and rely, respectively, on theories of payment under mistake of fact and unjust enrichment.[4] (*Id.* ¶¶ 388–93.)

---

[4] Typically, a claim for unjust enrichment is based on state common law. However, courts have recognized that a federal 'common law' claim for unjust enrichment is available surrounding certain federal statutes or

16

When the government intervenes in an FCA case, "it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action." 31 U.S.C. § 3730(c)(1). However, "[i]f the Government elects not to proceed with the action, the person who initiated the action shall have the right to conduct the action." 31 U.S.C. § 3730(c)(3). The TMFCA functions the same way. *See* Tenn. Code Ann. § 71-5-183(c)(2)–(3). Because the governments only intervened in portions of the pending cases but declined to intervene in others, the relators—whom the court will refer to as the "Middle District relators" and the "Eastern District relators" (although all claims are now in the Middle District)—had a right to pursue the remaining claims. Each set of relators filed Amended Complaints stating their claims as they stood post-intervention. (Doc. Nos. 98, 102.) The Eastern District relators amended their complaint two more times with leave of the court. (Doc. Nos. 142, 160.)

The defendants filed a Motion to Dismiss addressed to the governments' claims.[5] (Doc. No. 136.) The motion does not ask the court to dismiss those claims in their entirety. Rather, the defendants ask the court to dismiss "portions of" the governments' claims in the following ways:

[1] Dismiss for failure to state a claim all claims involving the 24 Avalon locations for which no exemplars or other sufficient allegations are provided;

[2] Dismiss for failure to state a claim all claims outside the dates ranges pleaded for specific hospice locations, that is, all claims other than (a) Avalon Jackson (for admissions between June 2010 and March 2012); (b) Avalon Athens (for admissions between September 2015 and December 2016); and (c) Avalon Tullahoma (for admissions between 2011 and 2015), unless independently dismissed on other grounds;

---

payment obligations, with the federal unjust enrichment cause of action providing a backstop for liability related to those obligations akin to the backstop that unjust enrichment and quasi-contract provide for state common law claims that are similar to, but technically fall outside the bounds of, contract law. *See, e.g.*, *Farm Bureau Gen. Ins. Co. of Mich. v. Blue Cross Blue Shield of Mich.*, 655 F. App'x 483, 488 (6th Cir. 2016) (discussing common law unjust enrichment in the context of ERISA).

[5] On November 7, 2021, the court issued an order denying the pending motions to dismiss without prejudice to refiling, in light of amendments to some of the relators' allegations. (Doc. No. 146.) The defendants renewed their motion directed at the governments' claims. (Doc. No. 147.)

[3] Dismiss for failure to state a claim all claims against Regency, Curo Holdings, and Curo Health Services;

[4] Dismiss for failure to state a claim all claims that merely allege a disagreement in clinical judgment, that is, all claims alleged related to Avalon Tullahoma;

[5] Dismiss for failure to state a claim Count II alleging reverse false claims; and

[6] Dismiss all claims under the Tennessee Medicaid FCA (Counts II and IV) and for payment under mistake of fact and unjust enrichment (Counts V and VI) to the same extent that the federal FCA claims are dismissed.

(Doc. No. 136 at 1–2.) The defendants also filed motions seeking the outright dismissal of the relators' claims. (Doc. Nos. 148, 165.)

## II. LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the

18

plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

Rule 9(b) of the Federal Rules of Civil Procedure states that "a party must state with particularity the circumstances constituting fraud," if the cause of action at issue includes such an element. The Sixth Circuit has explained that, while Rule 9(b) imposes a heightened standard, the underlying purpose of the rule is to serve the same ends as the general pleading requirements of Rule 8:

> [Rule 9(b)] should not be read to defeat the general policy of "simplicity and flexibility" in pleadings contemplated by the Federal Rules. Rather, Rule 9(b) exists predominantly for the same purpose as Rule 8: to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading. Rule 9(b), however, also reflects the rulemakers' additional understanding that, in cases involving fraud and mistake, a more specific form of notice is necessary to permit a defendant to draft a responsive pleading

*United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (citations and quotation marks omitted). "So long as a [plaintiff] pleads sufficient detail—in terms of time, place, and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *Id.* "Where a complaint alleges 'a complex and far-reaching fraudulent scheme,' then that scheme must be pleaded with particularity and the complaint must also 'provide examples of specific' fraudulent conduct that are 'representative samples' of the scheme." *United States ex rel. Marlar v. BWXT Y–12, LLC*, 525 F.3d 439, 444–45 (6th Cir. 2008) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 510 (6th Cir. 2007)).

**A. Request to Narrow the Governments' Claims Based on Time Period and/or Location**

It is not surprising that the defendants' motion directed at the governments' claims is focused on narrowing those claims, rather than asking the court to dismiss them all outright. The plaintiffs have identified at least some actions that, if they actually occurred, are hard to characterize as anything but fraudulent. Hospice fraud preys on medicine's gray areas, but there is nothing tricky or ambiguous about, for example, the leader of a facility instructing a nurse to lie about a patient's symptoms in order to get a claim paid. Indeed, the defendants, in their briefing, concede that, if nothing else, the plaintiffs have adequately alleged that Avalon Jackson was, for a time, run by an "outlier" DOO, who "resigned in the face of a compliance audit or was terminated." (Doc. No. 137 at 8.) The governments therefore have had little trouble pleading at least *some* potentially actionable fraud claims. The questions raised by the defendants' motion are instead whether the government plaintiffs have pleaded their causes of action too broadly and whether the court should, in effect, trim those causes of action down, in terms of their time periods and the facilities involved, before this litigation goes any further.

The court will not do so. The plaintiffs' first two proposed grounds for limiting the scope of the governments' claims are based on a strikingly aggressive—and unsupported—reading of the requirement, under Rule 9(b), to file exemplary instances of fraud if a plaintiff has alleged a wide-ranging scheme involving numerous transactions. The purpose of an example is just that: to be an example. The defendants, however, ask the court instead to treat the governments' examples

---

[6] The defendants' arguments for dismissing the governments' unjust enrichment and payment by mistake of fact claims are functionally identical to their arguments regarding the FCA and TMFCA. (*See* Doc. No. 163 at 18 (stating that the claims are "indistinguishable" and "should fail for the same reasons").) The court, accordingly, will direct its analysis at those statutory claims.

20

as, in essence, fenceposts erecting an artificial boundary outside of which the plaintiffs' claims, no matter how otherwise well-pleaded, can extend. Pleading examples on a few dates, the plaintiffs argue, should mean not pursuing any fraud outside of the general range of those dates, and pleading examples at a few facilities should mean not pursuing any fraud—even otherwise wholly identical fraud by the same defendant—at other facilities in the same state. The defendants, however, have not identified any Sixth Circuit caselaw suggesting that that is actually how Rule 9(b) works.

"Rule 9(b) is not designed to force a plaintiff to prove their case in the complaint . . . ." *United States v. Assocs. in Eye Care, P.S.C.*, No. Civ. 13-27-GFVT, 2014 WL 414231, at *7 (E.D. Ky. Feb. 4, 2014) (citing *New England Health Care Emps. Pension Fund v. Fruit of the Loom, Inc.*, No. CIV.A. 1:98-CV-99-M, 1999 WL 33295037, at *6 (W.D. Ky. Aug. 16, 1999)). There is no requirement in the text of the Rule or the caselaw applying it that a plaintiff alleging the same pattern of fraud by the same defendants in multiple offices or facilities must plead an example for every single one. Nor is there any requirement that a plaintiff must provide an example from on or near the first day of the alleged scheme and another example from on or near the last day of the alleged scheme or risk forfeiting the full relevant period of the fraud. Rule 9(b) requires a plaintiff to plead specifically, not exhaustively.

Indeed, the Sixth Circuit has recognized that the very purpose of the "exemplary claims" requirement is to allow a plaintiff to fully assert a scheme involving "many allegedly false claims over a substantial period of time" without compromising the "logistical efficiency" of the pleading process by requiring unwieldy descriptions of claim after claim after claim. *Bledsoe*, 501 F.3d at 509. "[A]bsent authority from this Court, the Sixth Circuit, or the Supreme Court," there is no basis for "hold[ing] that the failure to allege examples over the entire span of an alleged fraudulent scheme requires dismissal of" claims supported by "otherwise representative examples that have

21

been plead with sufficient particularity." *U.S. ex rel. Lovett v. Holzer Clinic.*, No. 2:08-CV-312, 2014 WL 12767601, at *10 (S.D. Ohio Mar. 26, 2014).

It is, moreover, difficult to see where the defendants' logic in support of their motion would end. If the governments had pleaded examples from each hospice agency, the defendants could object that there was not an example for each employee or each diagnosis. If the governments had pleaded examples from every relevant year, the plaintiffs could object that there were not examples from each month or each week. An enterprising defendant can find lines like these to draw anywhere, no matter how well-pleaded a complaint is.

The infeasibility of such a standard becomes clear if one attempts to apply it to any number of ordinary types of FCA case. Imagine, for example, that the United States or a relator was pursuing a company-wide FCA case against a large national pharmacy chain. *See, e.g.*, *U.S. ex rel. Kester v. Novartis Pharms. Corp. et al.*, 43 F. Supp. 3d 332, 342 (S.D.N.Y. 2014). Would Rule 9(b) require the complaint to include an example from *every* pharmacy location for *every* segment of the underlying time period, even if that meant thousands of examples and a complaint the length of an encyclopedia volume? The defendants have found no court that has endorsed such a reading. Aside from the fact that so stringent a standard would serve very little purpose, it would also be impossible to reconcile with the "general policy of 'simplicity and flexibility' in pleadings" that, the Sixth Circuit has held, Rule 9(b) does not negate. *SNAPP, Inc.*, 532 F.3d at 504.

The reason that courts allow FCA plaintiffs to satisfy Rule 9(b) with examples, rather than a comprehensive list of individual claims, is that achieving that level of specificity and granularity for every false claim would, at least in a case like this one, "be extremely ungainly, if not impossible." *Bledsoe*, 501 F.3d at 509 (citing *U.S. ex rel. Franklin v. Parke–Davis, Div. of Warner–Lambert Co.*, 147 F.Supp.2d 39, 49 (D. Mass. 2001)). A policy of requiring separate

examples for every conceivable variation on the ancillary details of the underlying claims would pose the same problem. There is, of course, a limit to how much a plaintiff can rely on one example to support an array of attenuated theories of liability. What qualifies as a sufficient set of examples for any given case, however, depends on the nature of the allegations at issue, not on a rote checklist of dates and service locations. For example, in *United States ex rel. Hinkle v. Caris Healthcare, L.P.*, No. 3:14-CV-212-TAV-HBG, 2017 WL 3670652 (E.D. Tenn. May 30, 2017), the District Court for the Eastern District of Tennessee concluded that the government's description of "six 'audit sample patients' in detail" amounted to "sufficient illustrative examples of patients whom defendants allegedly knew did not qualify for hospice treatment" for the purposes of the twenty-six facilities at issue, because those examples, combined with the government's pleading of the general scheme itself, "g[ave] defendants fair notice of the FCA claims brought against them under Rules 8 and 9(b)." *Id.* at *3, *9–10. The pattern in this case is almost identical: the governments provided multiple examples to demonstrate a statewide problem of improper hospice certification. In this case, like in that one, the examples are adequate.

The governments in this case have alleged a coherent, specific pattern whereby (1) corporate pressure placed a thumb on the scales in favor of improper admissions and (2) the personnel in individual agencies predictably responded by admitting and/or retaining patients who did not qualify for hospice by any reasonable clinical standard. Although some Avalon agencies may have been worse than others, the top-down, corporate policies that drove all of the alleged false claims were not limited to any specific Avalon location, and the plaintiffs have provided examples from multiple Avalon locations, at multiple times, which illustrate the ways in which the scheme resulted in fraud against the Medicare and Medicaid systems. In the absence of some specific, binding authority suggesting that such pleading was nevertheless insufficient, the court

23

will not prematurely dismiss any aspect of the plaintiffs' claims based on supposed noncompliance with pleading requirements.[7]

## B. Claims Involving Disagreements of Clinical Judgment

The defendants argue next that the court should dismiss the governments' "claim[s] for FCA violations based solely on disagreements with certifying physician's clinical judgments." (Doc. No. 137 at 16.) The defendants are probably correct that, if the governments or relators had actually sought to assert any such claims—that is, claims alleging that it is fraudulent merely to make a good-faith clinical determination of terminal illness with which the government disagrees—those claims would be appropriate for dismissal. "[A] reasonable difference of opinion among physicians reviewing medical documentation *ex post* is not sufficient on its own to suggest that those judgments—or any claims based on them—are false under the FCA." *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1297 (11th Cir. 2019). The governments, however, do not allege a mere clinical disagreement; they allege fraud, in the simplest and most straightforward sense. Admittedly, that fraud involved prognosis determinations that required the exercise of judgment, but it is well-settled that "opinions are not, and have never been, completely insulated from scrutiny" for fraud. *United States v. Paulus*, 894 F.3d 267, 275 (6th Cir. 2018) "At the very least, opinions may trigger liability for fraud when they are not honestly held by their maker, or when the speaker knows of facts that are fundamentally incompatible with his opinion." *Id.* (citations omitted). That is what the governments allege happened at Avalon.

---

[7] From the briefing, it appears that the defendants' request to narrow the scope of the case is motivated, at least in part, by a desire to limit excessively burdensome or intrusive discovery. The court notes that this ruling does not prevent them from objecting to the breadth or burden of any specific discovery request. Nor does the court's Rule 12(b)(6) analysis prevent the defendants, when making any such objection, from noting that the necessity of any government discovery request should be assessed in light of the fact that the United States has already had nearly nine years to investigate these allegations unilaterally.

24

The defendants direct this argument at Patient No. 4 in particular, on the assumption that, if the billing for Patient No. 4 cannot actually support an FCA claim, then the court must dismiss all FCA claims arising out of Avalon Tullahoma. As the court has already held, the defendants' attempts to impose a rigid location-by-location pleading requirement on the governments' claims is unsupported and unpersuasive. In any event, though, it is not true that the governments' pleading with regard to Patient No. 4 alleges only a difference in clinical judgment. To the contrary, the governments specifically allege that Patient No. 4's "medical records do not support a diagnosis of end-stage liver failure or any other terminal diagnosis" at any point during the patient's time in Avalon's care. (Doc. No. 100 ¶ 303.) The governments further allege that, "upon admission and at multiple points during Patient No. 4's stay, the patient's lab results failed to meet clinical indicators for end-stage liver disease, such as those set forth in the relevant LCD." (*Id.*) They allege that Avalon's own staff eventually "decided to discharge the patient because he "appear[ed] more chronic than terminal." (*Id.* ¶ 321.) Moreover, while a patient's exceeding his predicted six-month prognosis is not inherently enough to render a hospice claim fraudulent, it can be corroborative, and the governments have alleged that Patient No. 4's liver disease did not, in fact, turn out to be in its end stage—if "end stage" means six months—because he ended up surviving for over five more years. (*Id.* ¶ 323.) Without the court's reiterating every detail, it suffices to say that the governments have pleaded that Patient No. 4 was not terminally ill, as defined under Medicare or TennCare, and that the defendants knowingly or recklessly certified him as such and billed those programs for his hospice services anyway. That is precisely what the governments needed to plead to survive a Rule 12(b)(6) motion.

It is entirely possible that, when the parties have the opportunity to present evidence, the defendants will be able to demonstrate that the certification of Patient No. 4's terminal illness was

reasonable, or at least sufficiently within the bounds of ordinary clinical judgment that the certification was not recklessly false. Not every good argument, however, is a good argument under Rule 12(b)(6). Because the defendants are asking the court to depart from its duty, at this stage, merely to test the pleadings, their request will be denied.

## C. Reverse False Claims

The defendants argue next that the court should dismiss the governments' claims based on the so-called "reverse false claims" provisions of the FCA and TMFCA. *See* 31 U.S.C. § 3729(a)(1)(G), Tenn. Code Ann. § 71-5-182(a)(1)(D). The FCA's reverse false claims provision, generally speaking, prohibits the knowing avoidance of an obligation to pay money to the United States. In a case involving a government healthcare program, that provision, codified at 31 U.S.C. § 3729(a)(1)(G), "requires [the plaintiff] to allege facts that show defendants," acting with the appropriate culpable mental state, "received overpayments from the government and failed to refund those payments." *U.S. ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 916 (6th Cir. 2017) (citing 31 U.S.C. § 3729(a)(1)(G); *U.S. ex rel. Prather v. Brookdale Senior Living Communities, Inc.*, 838 F.3d 750, 774 (6th Cir. 2016)); *see also* 31 U.S.C. § 3729(b)(3) (defining "obligation," to include any "established duty, whether or not fixed, arising from . . . . the retention of any overpayment"). In the alternative, liability under that section can be supported by "'proof that the defendant made a false record or statement at a time that the defendant owed to the government an obligation' . . . to pay money or property." *Id.* (quoting *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 473 (6th Cir. 2011)). The TMFCA includes a provision imposing liability on the same two alternative grounds. Tenn. Code Ann. § 71-5-182(a)(1)(D). The governments rely

26

primarily on the first option, retention of overpayments, although the two grounds can overlap significantly.[8]

The term "obligation," as it is used in the FCA's reverse false claims provision, expressly includes any "established duty, whether or not fixed, arising from . . . . the retention of any overpayment. 31 U.S.C.A. § 3729(b)(3). By statute, Medicare requires that "[a]n overpayment must be reported and returned" to the program no later than "the date which is 60 days after the date on which the overpayment was identified." 42 U.S.C. § 1320a-7k(d)(2). Similarly, TennCare Policy PI 11-001, which governs "Reporting and Returning Overpayments," states that an overpayment from TennCare must be reported and returned within 60 days from when it is identified. (Doc. No. 100 ¶ 32.[9])

CMS has provided the following guidance regarding what it means to have "identified" an overpayment:

> A person has identified an overpayment when the person has, or should have through the exercise of reasonable diligence, determined that the person has received an overpayment and quantified the amount of the overpayment. A person should have determined that the person received an overpayment and quantified the amount of the overpayment if the person fails to exercise reasonable diligence and the person in fact received an overpayment.

42 C.F.R. § 401.305(a)(2). The defendants suggest that CMS's definition is likely to be set aside as inconsistent with the statutory text, because the D.C. Circuit affirmed a district court's

---

[8] The issue of reverse false claims liability may be ultimately redundant in many instances—including many in this case—because the initial claims for payment will satisfy all the requirements of FCA or TMFCA liability. It is, however, possible to be liable for a reverse false claims violation without having committed a prior initial violation—most prominently, in a case in which an overpayment was not originally made due to fraud but was fraudulently retained after it was identified. It is therefore permissible, and often appropriate, to plead reverse false claims liability as an alternative theory to recovery. *See United States v. Omnicare, Inc.*, No. 1:15-CV- 4179 (CM), 2021 WL 1063784, at *12 (S.D.N.Y. Mar. 19, 2021) (noting that reverse false claims "can serve as an alternative and independent basis for liability").

[9] Policy available at https://www.tn.gov/content/dam/tn/tenncare/documents2/pi11001.pdf.

conclusion to that effect with regard to a similar CMS definition in another regulation, 42 C.F.R. § 422.326(c), in *UnitedHealthcare Ins. Co. v. Becerra*, 16 F.4th 867, 893 (D.C. Cir. 2021). The defendants argue that the court should instead construe the definition of "identified" to require actual knowledge or, at the very least, recklessness. (*See* Doc. No. 163 at 15–16.)

Relying on that narrower definition, the defendants argue that the court should dismiss all of the governments' reverse false claims counts because the Complaint in Intervention "points to no identified overpayments." (Doc. No. 137 at 21.) The plaintiffs, however, have explicitly pleaded, not only that numerous patients were improperly admitted into Avalon's hospice care, but that auditing and oversight imposed by the defendants at the corporate level actually uncovered many such instances but that the defendants chose not to return the overpayments. The details regarding retained overpayments to Avalon Jackson are particularly extensive and include the allegation that "[a] chart audit of approximately seventeen patients revealed that at least six patients were not hospice-appropriate," but the company's Vice President of Clinical Operations "overruled the findings of Curo's compliance staff." (Doc. No. 100 ¶¶ 196, 200.) The governments also detailed how Curo/Regency/Avalon personnel, at various times, noticed facts suggesting that Patients Nos. 1 through 5 were not terminal, but the money paid for those patients was not returned, even after some had been released from hospice altogether. Accordingly, even if the court were to ignore the still-in-effect CMS definition and adopt the defendants' proposed narrow reading of "identified"—indeed, even if the court were to adopt the strictest reading possible, requiring nothing short of actual knowledge—the governments' pleading would still be sufficient.[10]

---

[10] Because the viability of the CMS definition is not determinative, the court does not resolve this issue.

**D. Claims Against Regency and Curo**

The defendants argue next that, even if the plaintiffs have successfully pleaded causes of action against Avalon itself, the court should dismiss the claims against Regency and Curo, as its parent companies, because they were not actually the entities evaluating individual patients, filling out COTIs, or filing claims for payments. The governments respond that they have pleaded, in significant detail, how Regency's, and later Curo's, actions directly contributed to the submission of false claims and that the court, therefore, has no basis for dismissing those claims.

The provisions of the FCA at issue in this case "attach[] liability, not to the underlying fraudulent activity . . . , but to the claim for payment" or, in the case of reverse false claims, the retention of funds. *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877–78 (6th Cir. 2006) (quoting *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995)). The defendants are therefore correct that, even if unlawful activities took place and even if those activities benefited a particular defendant, the FCA will not provide the appropriate enforcement mechanism unless the defendant has been sufficiently tied to a claim for payment under, or retention of funds owed to, a government program. As the court has already discussed, however, the FCA provides multiple avenues through which the connection between the defendant and the claim can be made, including by showing that the defendant caused another party to submit a false claim. The FCA reaches not only the entity or person who submits a false claim, but one who "causes" a false or fraudulent claim "to be presented" or "causes to be made or used . . . a false record or statement material to an obligation to pay or transmit" an overpayment.  31 U.S.C. § 3729(a)(1)(A), (G). That is precisely what the governments have alleged—that Curo and Regency caused Avalon's false claims.

The defendants do not dispute that the FCA imposes causation-based liability on non-submitters. They argue, however, that the court should nevertheless dismiss these claims, because

the parent companies' corporate practices, such as financial incentives and company-wide documentation policies, were not inherently unlawful. But the governments' claims are not premised on any assumption that such policies are, in general, automatically unlawful. Rather, the governments argue that the parent companies' policies, in these particular instances, involving this particular type of claim and services, and in light of the information contemporaneously available to Regency and Curo, resulted in Regency's and Curo's knowingly or recklessly causing the submission of specific claims that were false. There is simply no requirement, under the FCA, that a defendant's culpable actions be independently illegal for some reason *other than* those set out in the FCA itself.

As with the issue of clinical judgment, the defendants will have every opportunity to establish that their corporate policies were above-board and that any false claims that were submitted by Avalon were purely Avalon's fault. The defendants' eagerness to make such an argument, moreover, is understandable, given how long they have been under investigation without the opportunity for formal rebuttal. From the perspective of the Federal Rules, however, this case is still at the pleading stage, and the court must treat it as it would any other fraud case challenged pursuant to Rule 12(b)(6). Because the governments have clearly and with particularity pleaded the elements necessary to establish liability on behalf of Avalon's corporate parents, the court cannot dismiss those claims.

### E. Claims of the Middle District Relators

**1. Claims in Which the United States Intervened.** The Middle District relators' Amended Complaint, in addition to pleading claims for retaliation and for some types of FCA liability that were not subject to government intervention, reiterates the core allegations regarding

non-terminal patients that were the subject of the United States' intervention. The defendants argue that those claims "should be dismissed or stayed" in light of the intervention. (Doc. No. 139 at 3.)

The defendants are correct that FCA claims do not belong to the relator. Rather, the FCA "effect[s] a partial assignment of the Government's damages claim" to the relator, who merely serves as the claim's steward unless and until the government intervenes. *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 773 (2000). At the same time, however, the FCA does not consider the relator to be *persona non grata* merely because the government has taken control of the claim. To the contrary, the relator has a "right to continue as a party to the action," including the rights to receive notice of certain events, to object to the government's decision to abandon or settle the case, and to participate in aspects of the litigation unless the court restricts that participation. 31 U.S.C. § 3730(c)(2).

When the relators pleaded their FCA claims, they did so on behalf of the government. Those claims, in other words, were *already* the government's claims—that is, the claims that are now proceeding forward, including those under the government's control. All that has happened is that the "primary responsibility for prosecuting the action" with regard to some claims has formally vested in the government. *Id.* No new claims were created, and no old claims were left behind. This aspect of the defendants' request, therefore, is unnecessary and will be denied.

**2. "False Records" Claims.** The FCA includes two provisions premising liability on the creation or use of a "false record or statement," distinct from traditional liability based on the presentment of a false claim for payment. The first provision, 31 U.S.C. § 3729(a)(1)(B), imposes liability on any person or entity who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." The second provision, which the court has already discussed, is a portion of the reverse false claims provision, 31 U.S.C. § 3729(a)(1)(G).

That prohibition reaches anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government." *Id.* Although the United States intervened with regard to the Middle District relators' reverse false claims allegation, the United States did not intervene with regard to 31 U.S.C. § 3729(a)(1)(B), despite that provision having been cited in the Middle District relators' initial Complaint. (Doc. No. 1 ¶ 70.) Those relators therefore could pursue a claim pursuant to 31 U.S.C. § 3729(a)(1)(B)—and they, in fact, initially indicated that they intended to do so.

However, after the defendants moved for dismissal of any such claims, the relators "elected not to pursue a separate, free-standing false records claim under 31 U.S.C. § 3729(a)(1)(B)." (Doc. No. 154 at 2.) With the consent of the United States, they voluntarily dismissed those claims on November 23, 2021. (Doc. No. 167.) This portion of the defendants' motion is therefore moot, as the claims against which it is directed are no longer pending.

**3. FCA Retaliation Claims.** The FCA contains an anti-retaliation provision, which provides a cause of action for damages and other relief to any employee who is discharged or otherwise discriminated against "because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop [one] or more violations of" the Act. 31 U.S.C. § 3730(h)(1). Retaliatory discharge claims under the FCA proceed under the same rules applicable to other employment-related retaliation claims, which means that a plaintiff "must show: (1) he engaged in a protected activity; (2) his employer knew that he engaged in the protected activity; and (3) his employer discharged or otherwise discriminated against the employee as a result of the protected activity." *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003) (citing *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 513–14 (6th Cir. 2000)).

Because the FCA's anti-retaliation provision is specific to that statute, the underlying protected activity must be "in furtherance" of either an FCA action itself or "other efforts" directed at stopping an FCA violation—that is, stopping one of the various alternative types of fraud against the government outlawed by the Act. 31 U.S.C. § 3730(h)(1). That latter route to liability—establishing that the defendant took action against the employee based on his or her anti-fraud efforts other than merely participating in an FCA case—was added to the statute in 2009. *See* Fraud Enforcement and Recovery Act of 2009 (FERA), PL 111–21, May 20, 2009, 123 Stat 1617. "As a result of this amendment, the FCA 'now protects two categories of conduct.'" *Mikhaeil v. Walgreens Inc.*, No. 13-14107, 2015 WL 778179, at *7 (E.D. Mich. Feb. 24, 2015) (quoting *Tibor v. Mich. Orthopaedic Inst.*, 72 F. Supp. 3d 750, 761 (E.D. Mich. 2014)).

The defendants concede that "the pleading standards for an FCA retaliation claim are not subject to Rule 9(b)," but they argue that the Middle District relators failed to adequately plead that their dismissals were caused by their participation in protected activity, even pursuant to the more forgiving pleading standards of Rule 8 alone. (Doc. No. 139 at 12.) As the plaintiffs point out, however, aspects of the defendants' argument rely on holdings that have, on their face, been superseded by the 2009 amendment. (*See id.* at 10 (citing *McKenzie*, 219 F.3d at 516, for proposition that "protected activity" must be "activity which reasonably could lead to a viable FCA action"). Nevertheless, even under the amended, more expansive version of the provision, the plaintiffs were required to state facts sufficient to support their claims. The court, accordingly, will consider the allegations regarding each Middle District relator individually.

Teague alleges that she "was terminated by Defendants for refusing to perform the illegal tasks Defendants required her to do and for reporting Defendants' illegal activities." (Doc. No. 98 ¶ 41.) Specifically, "[s]oon after Teague made numerous complaints to her superiors making clear

33

references to activities occurring in the Jackson office that she was ethically and legally prohibited from doing, Defendants terminated her employment" for a reason that, she says, was pretextual. (*Id.*) The Complaint lists multiple specific illegal activities in which Teague refused to participate and about which she alerted her superiors, including several that could form the basis of an FCA claim. (*Id.* ¶ 42.) These allegations plainly satisfy the requirements of alleging retaliatory discharge.

Pence similarly specifically alleges that she "was terminated . . . for refusing to perform the illegal tasks Defendants required her to do and for reporting Defendants' illegal activity." (*Id.* ¶ 47.) The Complaint specifically lists the fraudulent activities involved, as well as the process by which, according to Pence, the defendants built a pretextual case for her termination. (*Id.* ¶ 49.) She also cites comments from "corporate officials" during that process that appear to have been veiled criticisms of her whistleblowing, packaged as complaints about her negativity, insubordination, or dishonesty. (*Id.* ¶ 49.) These allegations, like Teague's, plainly satisfy the requirements of alleging protected activity and causation.

Adkins' allegations are even more plainly sufficient. She states that she "was placed on administrative leave after she reported illegal activities to her superiors, refused to participate in the illegal activity, and then reported to the Tennessee Bureau of Investigation about Defendants' illegal activity." (*Id.* ¶ 53.) She states that she was eventually denied a promotion for which she was qualified and eventually terminated based on her actions. (*Id.* ¶¶ 56–58.) She even quotes a supervisor saying to her, "we don't want any whistleblowers." (*Id.* ¶ 56.) Such allegations are more than sufficient to survive a Rule 12(b)(6) motion.

Finally, Carnell alleges that she was constructively terminated after having "made numerous complaints to her superiors making clear references to activities occurring in the Jackson

34

office that were fraudulent and illegal and in which she was ethically and legally prohibited from participating." (*Id.* ¶ 60.) Like the other Middle District relators, she lists the unlawful practices involved, at least some of which could form the predicate for FCA claims. (*Id.* ¶ 61.) She explains that her constructive termination occurred by her having to choose between complying with her ethical obligations as a licensed nurse and following directions from Avalon. (*Id.* ¶ 62.) Her FCA retaliation claim was therefore sufficiently pleaded and will not be dismissed.

**4. State Law Retaliation Claims.** The Middle District relators have "elected not to pursue [their] redundant state law claims," which the defendants have argued are untimely (Doc. No. 154 at 6), and they voluntarily dismissed those claims along with their "false records" claims. (Doc. No. 167.) This portion of the defendants' motion is therefore similarly moot.

**5. Claims Against Regency and Curo.** Finally, the defendants argue that, even if the Middle District relators' claims against Avalon should be permitted to proceed, the court should dismiss the claims against Regency and Curo. The relators, however, have alleged that all of the corporate defendants were alter egos for the purposes of FCA retaliation and pleaded specific facts in support of that contention. (Doc. No. 98 ¶¶ 15–16.) Whether they will prevail on such an argument is an open question. At this stage, however, there is no basis for prematurely dismissing the claims against the other corporate entities for their alleged involvement in the retaliation, particularly given that such claims are not subject to Rule 9(b) and therefore may be pleaded more generally.

**F. Claims of the Eastern District Relators**

**1. Kickback-Based FCA Claims.** The federal Anti-Kickback Statute ("AKS") makes it unlawful to

> knowingly and willfully offer[] or pay[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any

35

person to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or . . . to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program . . . .

42 U.S.C. § 1320a-7b(b)(2)."In short, a kickback violation entails 1) remuneration to a person or entity in a position to refer Federal health care program patients 2) that could reasonably induce the person or entity to refer such patients." *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 401 (6th Cir. 2015) (citing OIG Supplemental Compliance Program Guidance for Hospitals, 70 Fed. Reg. at 4864). "Federal health care program" includes Medicare and Medicaid. 42 U.S.C. § 1320a-7b(f).

Although the AKS "is a criminal statute," AKS violations frequently form the basis for civil claims under the FCA. *U.S. ex rel. Arnstein v. Teva Pharm. USA, Inc.*, No. 13 CIV. 3702 (CM), 2019 WL 1245656, at *5 (S.D.N.Y. Feb. 27, 2019) (citing *Donovan v. Rothman*, 106 F. Supp. 2d 513, 516 (S.D.N.Y. 2000)). The linkage between the two statutes was first pursued by governments and relators themselves in the context of litigation, but it was formalized by statutory amendment in 2010. *Id.* Pursuant to that amendment, a claim to Medicare or Medicaid "that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim" as a matter of law. 42 U.S.C. § 1320a-7b(g).

The Eastern District relators allege that the defendants' marketers "promised the owners of [two assisted living] facilities the use of CNAs (certified nursing assistants) and offered [various] types of supplies if the owner would agree for the residents to receive hospice services," and that "Avalon would provide CNAs to assist with daily care, and supplies including, but not limited to, bed pads, diapers, skin barrier cream, shampoos, toothpaste, and medication and other items," in violation of the AKS. (Doc. No. 160 ¶ 58.) The Eastern District relators argue that such practices

36

violated the AKS and gave rise to FCA claims. The governments declined to intervene in any such claims, meaning that the Eastern District relators are solely responsible for pleading them sufficiently.

An AKS-based FCA claim is still an FCA claim, meaning that it sounds in fraud and must be pleaded in accordance with Rule 9(b), including by pleading at least one exemplary claim. The Eastern District Relators do identify a number of patients who, they claim, were improperly admitted to Avalon hospice. (Doc. No. 160 ¶¶ 36–56.) None of those examples, however, includes an express allegation that the patients were referred pursuant to a kickback relationship. A few of the patients—namely, Patients 28, 31, and 35—are expressly identified as having been patients of Extended Family Care, one of the two facilities with which Avalon allegedly had an improper kickback relationship. (*Id.* ¶¶ 52–53, 55.) That comes closer to satisfying Rule 9(b), but the defendants do not allege that any of those patients was actually referred *by* Extended Family Care or that the underlying claims would not have occurred but for kickbacks. (*Id.*) The FCA only reaches claims "that include[] items or services *resulting from*" an underlying AKS violation. 42 U.S.C. § 1320a-7b(g) (emphasis added). It is not enough merely to have alleged that Patients 28, 31, and 35 happened to have received care from two entities with an improper relationship. The claims to government healthcare programs for those patients must themselves have been tainted by that relationship. The Eastern District relators have not alleged that they were.

This analysis may seem like it is splitting hairs or asking too much of the relators. But these relators are already on their *Third* Amended Complaint. When the court granted them leave to file that most recent version of their allegations, the court expressly stated that it did so "reluctantly" and would "not permit these relators another opportunity to amend, absent extraordinary circumstances warranting such a step." (Doc. No. 159.) It is not expecting too much to ask a party

to specifically state the basic elements of a claim on the party's fourth try. To the contrary, it is what Rule 9(b) requires. The court, accordingly, will dismiss the FCA claims based on the AKS.

**2. Retaliation Claims.** The Eastern District relators, like the Middle District relators, have pleaded claims under the FCA's retaliation provision. The same standards that the court has already discussed govern those claims. The court will apply those standards to the allegations of Anderson and Mathis individually, as it did with the other relators.

Anderson alleges that she "expressed opposition in the IDG meeting to the Defendant's medical director, Dr. Ephraim Gammada, Nurse Practitioner Deanna Britton and Director of Operations Nena Hart that an Alzheimer's diagnosis was not appropriate for hospice care for a patient who had a good memory, remained alert, oriented and was ambulatory," but that "[t]he medical director took no action to change the certificate of illness and allowed the patient to remain on hospice services." (Doc. No. 160 ¶ 80.) She describes raising specific concerns, on more than one occasion, about Alzheimer's patients' having been inappropriately diagnosed as having reached a terminal stage. In one such instance, the patient's diagnosis was simply changed to suffering from a terminal stage of a different progressive illness, COPD. (*Id.* ¶¶ 77–88.)

On the same day as that last instance, Anderson was terminated for allegations of misconduct that, she says, were false. (*Id.* ¶¶ 89–90.) Anderson expressly alleges that the "reasons given to terminate [her] were a mere pretext to discharge her because of her opposition and/or refusal to participate in, or for refusing to remain silent about illegal activities involving fraudulent practices and submission of false claims." (*Id.* ¶ 94.) While Anderson perhaps could have done more to be as explicit as possible to link her termination to seeking to prevent false claims—as opposed to seeking to prevent general wrongdoing—she is entitled to all reasonable inferences in her favor, and the allegations involve issues of terminal illness certification that, both under the

38

law and in the context of the pleading, provide a plain nexus with the FCA. Anderson's, therefore, allegations state a claim for retaliation under the FCA.

Mathis alleges that, "[i]n an effort [to] stop violations of the False Claims Act, [he] expressed his concern and opposition about promises of kickbacks and false certifications with Avalon/Curo's Director(s) of Operations and Area Director of Operations" and "met with two nursing home administrators concerning complaints about Avalon/Curo's marketers making referrals for patients who clearly were not qualified for hospice care." (*Id.* ¶ 60.) Shortly thereafter, Mathis was fired, allegedly for various types of misconduct and substandard performance. (*Id.* ¶¶ 70–73.) He alleges that these reasons were pretextual, reflected a combination of falsehoods and an inconsistent application of the agency's employee standards, and concealed the fact that he was terminated for speaking up about the agency's fraud. (*Id.* ¶ 71–74.) These allegations state a claim for unlawful retaliatory discharge under the FCA.

The defendants point out that, according to Anderson's and Mathis's allegations, there were ostensible reasons for firing them other than their fraud-related actions. That, though, is true in virtually every wrongful termination case. While the defendants will have every opportunity to argue that their reasons were not pretextual, that inquiry is beyond the scope of a Rule 12(b)(6) motion. The court, accordingly, will not dismiss these relators' claims for retaliation under the FCA.

**IV. CONCLUSION**

For the foregoing reasons, the defendants' Renewed Motion to Dismiss the Consolidated Complaint in Intervention of the United States and Tennessee (Doc. No. 147) will be denied, their Renewed Motion to Dismiss the First Amended Complaint of Plaintiff-Relators Teague, Pence, Adkins, and Carnell (Doc. No. 148) will be denied in part on the merits and in part as moot, and

their Motion to Dismiss the Third Amended Complaint of Plaintiff-Relators Rachel Carol Anderson and Steven Troy Mathis (Doc. No. 165) will be granted in part and denied in part. The FCA claims based on violations of the AKS will be dismissed.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge